MILBANK, TWEED, HADLEY &
MᶜCLOY LLP
Andrew M. Leblanc
David S. Cohen
Erin M. Culbertson (admitted *pro hac vice*)
1850 K Street, NW, Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500

*Counsel to Defendants Z Capital Partners,*
*LLC and Z Capital Florida Resort, LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| FL 6801 SPIRITS LLC, *et al.*, | ) Case No. 16-01259 (SCC) |
| | )  14-11691 (SCC) |
| Debtors. | ) |
| | ) Jointly Administered |
| NORTH CARILLON BEACH CONDOMINIUM ASSOCIATION, INC., | ) Ref. ECF No. 2 |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| Z CAPITAL PARTNERS, LLC; Z CAPITAL FLORIDA RESORT, LLC; NORTH BEACH DEVELOPMENT, LLC; CARILLON HOTEL AND SPA MASTER ASSOCIATION, INC.; SOUTH CARILLON BEACH CONDOMINUM ASSOCIATION, INC.; and CENTRAL CARILLON BEACH CONDOMINIUM ASSOCIATION, INC., | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| Defendants. | ) |

**Z CAPITAL PARTNERS, LLC AND Z CAPITAL FLORIDA RESORT, LLC'S MOTION TO DISMISS NORTH CARILLON BEACH CONDOMINIUM ASSOCIATION, INC.'S ADVERSARY COMPLAINT**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................... 1

FACTUAL BACKGROUND .................................................................................... 4

    The Property.......................................................................................................... 4

    The Commencement of the Debtors' Bankruptcy Proceedings........................... 5

    The Auction of the Property ................................................................................ 6

    Post-Auction Negotiations ................................................................................... 9

    The Sale Order ................................................................................................... 13

    Current Adversary Proceeding........................................................................... 17

ARGUMENT ........................................................................................................ 17

I.     Standard of Review.................................................................................... 17

II.    The Adversary Complaint's Sale-Related Claims Must Be Dismissed, Because the North Tower Association Has Failed to State Claims For Which Relief Can Be Granted................................................................................................... 21

    a.     More Than Two Years after the Sale Order Was Entered, This Court Is Now Legally Precluded from Revisiting Its Findings that Z Capital Was a Good Faith Purchaser.................................................................................... 21

    b.     The Adversary Complaint's Sale-Related Claims Must Be Dismissed Because They Improperly Attack this Court's Sale Order ................................... 26

    c.     The Adversary Complaint's Sale-Related Claims Must Be Dismissed Because They Fail to Satisfy the Relevant Pleading Standards........................... 29

III.   The Declaration Claims Must Be Dismissed, Because They Are Subject to the Doctrine of *Res Judicata*................................................................................ 30

CONCLUSION..................................................................................................... 37

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

Adelphia Recovery Trust v. HSBC Bank USA (In re Adelphia Recovery Trust),
    634 F.3d 678 (2d Cir. 2011).............................................................................23, 37

Ashcroft v. Iqbal,
    556 U.S. 662 (2009)...............................................................................................19

Baeshen v. Arcapita Bank, B.S.C. (c) (In re Arcapita Bank B.S.C. (c)),
    520 B.R. 15 (Bankr. S.D.N.Y. 2014).......................................................................22

Bank of Lafayette v. Baudoin (In re Badouin),
    981 F.2d 736 (5th Cir. 1993) ..................................................................................23

BDC Fin., LLC v. Metaldyne Corp. (In re Metaldyne Corp.),
    421 B.R. 620 (S.D.N.Y. 2009).................................................................................29

Bell Atl. Corp. v. Twombly,
    550 U.S. 544 (2007)...............................................................................................19

Bennett v. Behring Corp.,
    466 F.Supp. 689 (S.D. Fla. 1979), aff'd, 737 F.2d 982 (11th Cir. 1984) ...............35

Bronson v. CHC Indus. (In re CHC Indust.),
    389 B.R. 767 (Bankr. M.D. Fla. 2007) ...................................................................29

Carrega v. Grubb & Ellis Co. (In re Grubb & Ellis Co.),
    523 B.R. 423 (S.D.N.Y. 2014).................................................................................27

Cent. Carillon Beach Condo. Ass'n, Inc. v. Z Capital Fla. Resort, LLC,
    No. 2016-011172 CA-01 (Fla. Miami-Dade County Ct. July 29, 2016) .................18

Comerica Bank v. McDonald,
    No. C-06-03735 (RMW), 2006 WL 3365599 (N.D. Cal. Nov. 17, 2006)...............20

Conopco, Inc. v. Roll Int'l,
    231 F.3d 82 (2d Cir.2000).......................................................................................22

Contrarian Funds LLC v. Aretex LLC (In re WestPoint Stevens, Inc.), 600 F.3d
    231 (2d Cir. 2010)...................................................................................................25

Corbett v. MacDonald Moving Servs., Inc.,
    124 F.3d 82 (2d Cir. 1997)......................................................................................22

Culp v. Stanzialie (In re Culp),
    550 B.R. 683 (D. Del. 2015) ..................................................................................23

Elliott v. Gen. Motors LLC (In re Motors Liquidation Co.),
    15-2844-bk(L), 2016 WL 3766237 (2d Cir. July 13, 2016) ....................................22

Enron Wind Energy Systems, LLC, et al. v. Marathon Electric Manufacturing
    Corp. (In re Enron Corp.),
    367 B.R. 384 (Bankr. S.D.N.Y. 2007) ..............................................................19, 31

FirstBank Puerto Rico v. Barclays Capital, Inc. (In re Lehman Bros. Holding
    Inc.),
    492 B.R. 191 (Bankr. S.D.N.Y. 2013) ...................................................................26

Fleming v. New York Univ.,
    865 F.2d 478 (2d Cir. 1989) ...................................................................................26

Freedom, N.Y., Inc. v. United States,
    438 F. Supp. 2d 457 (S.D.N.Y. 2006) ....................................................................26

GAF Holdings, LLC v. Rinaldi (In re Farmland Indus., Inc.),
    376 B.R. 718 (Bankr. W.D. Mo. 2007), aff'd, 639 F.3d 402 (8th Cir. 2011).........31

Gottlieb v. SEC,
    No. 05-cv-2401, 2007 WL 646382 (S.D.N.Y. Feb. 27, 2007) ...............................26

In re Grubb & Ellis Co.,
    523 B.R. 423 (S.D.N.Y. 2014) ...............................................................................30

In re GSC, Inc.,
    453 B.R. 132 (Bankr. S.D.N.Y. 2011) ...................................................................25

Herendeen v. Champion Int'l Corp.,
    525 F.2d 130 (2d Cir. 1975) ...................................................................................38

Kana v. Wintermute (In re Wintermute),
    No. 09-17314 (AJG), 2010 WL 3386946 (Bankr. S.D.N.Y. Aug. 25, 2010) ...20, 31

Kaye Dentistry, PLLC v. Turchin,
    No. 13-CV-5306 (JMF), 2014 WL 2649976 (S.D.N.Y. June 13, 2014) ................20

King v. First Am. Investigations, Inc.,
    287 F.3d 91 (2d Cir. 2002) .....................................................................................26

Lerner v. Fleet Bank, N.A.,
    459 F.3d 273 (2d Cir. 2006) ...................................................................................19

Licensing by Paolo v. Sinatra (In re Gucci),
    105 F.3d 837 (2d Cir. 1997)..................................................................................25

Licensing by Paolo v. Sinatra (In re Gucci),
    126 F.3d 380 (2d Cir. 1997)..................................................................................24

In re Met-L-Wood Corp.,
    861 F.2d 1012 (7th Cir. 1988) .......................................................................26, 29

Mills v. Polar Molecular Corp.,
    12 F.3d 1170 (2d Cir. 1993)..................................................................................19

Prime Healthcare Servs. v. Hudson (In re Christ Hosp.),
    No. 14-472 (ES), 2014 WL 4613316 (D.N.J. Sept. 12, 2014)..............................28

Seepes v. Schwartz (In re Schwartz),
    45 B.R. 354 (S.D.N.Y. 1985)................................................................................20

St. Pierre v. Dyer,
    208 F.3d 394 (2d Cir. 2000)..................................................................................37

In re Stadium Mgmt. Corp.,
    895 F.2d 845 (1st Cir. 1990)...........................................................................25, 29

State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada,
    374 F.3d 158 (2d Cir. 2004)..................................................................................26

Sure-Snap Corp. v. State Street Bank & Trust Co.,
    948 F.2d 869 (2d Cir. 1991)............................................................................22, 37

In re Teltronics Servs.,
    762 F.2d 185 (2d Cir. 1985)..................................................................................22

Tongue v. Sanofi,
    816 F.3d 199 (2d Cir. 2016)..................................................................................19

Twentieth Century Fox Film Corp. v. Marvel Enterprises, Inc.,
    220 F. Supp. 2d 289 (S.D.N.Y. 2002)....................................................................5

Warren v. Garvin,
    219 F.3d 111 (2d Cir. 2000)..................................................................................26

Winget v. JP Morgan Chase Bank, N.A.,
    537 F.3d 565 (6th Cir. 2008) ................................................................................23

**Statutes and Rules**

11 U.S.C. § 363...................................................................................... passim

Fed. R. Civ. P. 12(b)(6).................................................................................................................1

Fed. R. Civ. P. 60..........................................................................................................................26

TO THE HONORABLE SHELLEY C. CHAPMAN,
UNITED STATES BANKRUPTCY JUDGE:

Z Capital Partners, LLC and Z Capital Florida Resort, LLC (collectively, "Z Capital") respectfully submit this Motion to Dismiss the *North Carillon Beach Condominium Association, Inc.'s Adversary Complaint*, [Adv. Pro. ECF No. 1] (the "Adversary Complaint") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and Rule 7012(b)(6) of the Federal Rules of Bankruptcy Procedure.

## PRELIMINARY STATEMENT

1.       Nearly two years after Z Capital purchased through a Court-supervised and approved bankruptcy auction (the "Sale") a significant part of the Carillon Hotel & Spa (the "Carillon"), a luxury oceanfront condominium development located in Miami Beach, Florida, Plaintiff North Carillon Beach Condominium Association, Inc. (the "North Tower Association") asks this Court effectively to unwind the Sale.[1] This Court should dismiss all claims for alleged pre-closing conduct in the Adversary Complaint and affirm that re-litigation of issues that this Court already decided (or had the opportunity to decide) is procedurally defective, untimely, and barred by *res judicata*.

2.       ***First***, recognizing that it cannot legally ask for rescission of a long-since closed bankruptcy sale that is the subject of a final, non-appealable order (the "Sale Order"), the North Tower Association instead alleges—contrary to reality and this Court's express findings of good faith—that Z Capital engaged in fraudulent, negligent, and/or deceptive conduct in connection with the Sale (the "Sale-Related Claims").[2] Yet this articulation of the North Tower

---

[1]       Undefined terms shall have the definitions ascribed to them in the Adversary Complaint or in the body of this Motion to Dismiss.

[2]       Claim 1 (Fraudulent Inducement), Claim 2 (Negligent Misrepresentation), and Claim 3 (Florida Deceptive and Unfair Trade Practices Act).

Association's claims is no less a frontal and impermissible attack on the Sale Order than would be the plainly-barred rescission claim. The crux of the Sale-Related Claims is the contention that Z Capital's purported misconduct induced the North Tower Association and the other Associations (as defined below) to withdraw their objections to the Sale (the "Sale Objections"). In order to prevail on its claims of fraudulent inducement or actionable misrepresentation and its request for damages—even assuming the allegations of "fraudulent, unconscionable, unfair, and deceptive conduct" to be true (which they are not)—the North Tower Association would have to establish that but for Z Capital's actions, the outcome of the Sale would have been different. That is, the North Tower Association would have to establish that if it had not withdrawn its Sale Objection, this Court would have ruled differently on the Sale Motion and not approved the Sale to Z Capital. Such a claim, even if well-pleaded (which here it is not), would be precluded by principles of *res judicata*, Section 363(m) of the Bankruptcy Code, and the time limits imposed by Fed. R. Civ. P. 60(b).

3.      In the Sale Order, this Court concluded that Z Capital was a "good faith purchaser" under Section 363(m). That good faith finding is binding on the North Tower Association, and the time to appeal from or seek reconsideration of the Sale Order has long since passed. The North Tower Association cannot state a claim upon which relief could be granted where the Court would be required to make a finding that cannot be made as a matter of law.

4.      ***Second***, the North Tower Association also challenges certain provisions of the Property's governing documents, alleging that Z Capital's rights to manage and operate the Property as Hotel Lot Owner somehow violate Florida law (the "Declaration Claims"),[3]

---

[3]      Claim 10 (Declaratory Judgment as to Common Areas Belonging to the North Tower), Claim 11 (Declaratory Judgment as to Common Areas Belonging to the Master Association), Claim 12 (Declaratory Judgment Regarding Recreational Lease), Claim 13 (Unfairness and Unreasonableness under Chapter 718), Claim 14 (Unfairness and Unreasonableness under Chapter 720), Claim 15 (Declaratory Judgment as to Majority Members of

notwithstanding the fact that these foundational documents (which were in place for years prior to the bankruptcy proceeding) were the subject of express findings by the Court. Like all bidders participating in the auction, Z Capital's willingness to purchase the Property was based on an understanding of its rights under these documents that the Court confirmed when it approved the Sale Order. The findings in the Sale Order regarding the Declarations cannot be challenged now, and principles of *res judicata* bar re-litigation of issues that were or could have been raised during the bankruptcy proceeding. The Declaration Claims also should be dismissed, and the *res judicata* effect of the Sale Order should be enforced.

5.     *Third*, the North Tower Association has made numerous allegations concerning Z Capital's post-closing operation and management of the Carillon (the "Post-Closing Claims")[4]— claims that have nothing to do with the propriety of the Sale or enforcement of this Court's orders.[5] Although this Court retained exclusive jurisdiction to address such claims, Z Capital does not object to the Court abstaining from adjudicating the Post-Closing Claims.[6]

6.     Thus, Z Capital respectfully requests that this Court (1) dismiss the Sale-Related Claims and Declaration Claims, (2) affirm the *res judicata* effect of its Sale Order in precluding

---

the Board of Directors and Member Voting Rights on the Master Association), and Claim 16 (Injunctive relief and Declaratory Judgment as to Planned Renovations and Improvements).

[4]     Claim 3 (Breach of North Tower Term Sheet), Claim 4 (Breach of Implied Covenant of Good Faith and Fair Dealing – North Tower Term Sheet), Claim 5 (Unjust Enrichment), Claim 7 (Breach of Covenants – Master Declaration), Claim 8 (Breach of Implied Covenant of Good Faith and Fair Dealing – Master Declaration).

[5]     The North Tower Association attempts to classify the various Declaration Claims as post-closing conduct. See, e.g., Adv. Compl. ¶ 6. Yet the Declaration Claims hinge on provisions in the Declarations that were in existence prior to the Sale, were not challenged by the Associations, and were relied on by Z Capital when purchasing the Property. See infra ¶¶ 53-55.

[6]     Because Z Capital is not disputing that the Court should abstain with respect to the Post-Closing Claims, this Motion to Dismiss does not address the sufficiency of such claims (which sufficiency should be tested by the court that will ultimately adjudicate those claims). Z Capital is prepared to defend its actions against the North Tower Association's allegations, in either the pending Central Tower Association action in Florida state court or whatever proper forum the North Tower Association selects. If the Court retains jurisdiction over all claims in the Adversary Complaint, Z Capital reserves the right to challenge the sufficiency of the Post-Closing Claims under Rule 12(b)(6) at a later time.

the Sale-Related Claims and Declaration Claims, and (3) abstain from exercising its jurisdiction to hear the Post-Closing Claims.

## FACTUAL BACKGROUND

***The Property***

7.      The Carillon was developed as a mixed-use project comprised of 580 condominium units,[7] spanning across three towers, with hotel and spa amenities and facilities, consisting of:  (a) a combination hotel (the "<u>Hotel Lot</u>"), retail component (the "<u>Retail Lot</u>"), residential condominium building and spa in the central portion of the property (the "<u>Central Tower</u>"); (b) a residential condominium building on the south portion of the property (the "<u>South Tower</u>"); and (c) the North Tower (together with the Central Tower and South Tower, the "<u>Condo Towers</u>").  <u>See</u> Barsanti Decl. ¶ 26.  The Hotel Lot and Retail Lot were previously owned by Debtor FL 6801 Collins Central LLC ("<u>6801 Central</u>").   Debtors FL 6801 Collins North LLC ("<u>6801 North</u>") and FL 6801 Collins South LLC ("<u>6801 South</u>," and collectively with 6801 North and 6801 Central, the "<u>Collins Subsidiaries</u>")[8] owned thirteen residential units in the North, South, and Central Towers (together with the Hotel and Retail Lots, the "<u>Property</u>").  <u>See</u> <u>id.</u> ¶ 34.

8.      The Carillon is governed by the Declaration of Covenants, Restrictions and Easements for Carillon Hotel and Spa (the "<u>Master Declaration</u>"), as well as the Declarations for each of the North Tower, the South Tower, and the Central Tower (collectively, the "<u>Tower</u>

---

[7]      Of the 580 total condominium units on the property, 150 units are "hotel units" and 430 units are standard "residential units."  <u>See</u> *Decl. of Anthony Barsanti Pursuant to Local Bankruptcy Rule 1007-2 and in Support of Chapter 11 Petitions and First Day Mots.* ¶ 26, June 1, 2014 [ECF No. 2] (hereinafter "<u>Barsanti Decl.</u>").  On a motion to dismiss, the Court can take judicial notice of the pleadings and hearings in the case before it.  <u>See</u>, <u>e.g.</u>, <u>Twentieth Century Fox Film Corp. v. Marvel Enterprises, Inc.</u>, 220 F. Supp. 2d 289, 293, n.4 (S.D.N.Y. 2002).

[8]      The Debtors are various indirect, wholly-owned subsidiaries of Lehman Brothers Holdings Inc. ("<u>Lehman</u>"):  Lehman Ali Inc. was the sole member of PAMI ALI LLC ("<u>PAMI</u>"), the manager and sole member of Debtor FL 6801 Spirits LLC ("<u>Spirits</u>"), the manager and sole member of the Collins Subsidiaries.

Declarations," and together with the Master Declaration, the "Declarations").[9]  See id. ¶ 27.  The

Master Declaration, which has been in effect since December 3, 2007 (as amended from time to

time and subject to this Court's findings in the Sale Order), governs the relationships between the

Hotel Lot Owner, the Retail Lot Owner, the North Tower Association, and the related Central

Carillon Beach Condominium Association, Inc. (the "Central Tower Association") and the South

Carillon Beach Condominium Association, Inc. (the "South Tower Association," and together,

with the North Tower Association and the Central Tower Association, the "Associations"), and

the condominium owners (the "Unit Owners").  The Master Declaration, among other things: (a)

vests Z Capital, as the Hotel Lot Owner, with broad control over all of the facilities necessary to

operate, maintain and manage the hotel, common areas and operations, including services in the

spa, the private health and wellness facilities, the salon, parking facilities and retail space; and

(b) provides for the division of certain costs for shared Property components among the

condominium unit owners through a cost sharing mechanism that is based upon applicable use

and benefits.  See id. ¶¶ 28-29.

***The Commencement of the Debtors' Bankruptcy Proceedings***

9.      From their acquisition of the Property in 2009, the Collins Subsidiaries

consistently faced operating losses.  In light of those losses, in 2013 they began pursuing a sale

of the Property.  See id. ¶ 7-8.  Shortly thereafter, in February 2014, the Associations each

brought actions in Florida state court (the "Florida Lawsuits"), seeking declaratory judgments

against the Collins Subsidiaries in an effort to encumber, define, and limit the rights afforded to

the Hotel Lot Owner under the Declarations, including the right to control access to and assess

charges for the spa and shared facilities.  See id. ¶¶ 10-11, 17.  Because the Florida Lawsuits

---

[9]      Each Tower Declaration incorporates and is subordinated to the Master Declaration.

sought to limit the owner's rights in the Property, the Debtors believed that the Florida Lawsuits chilled a potential sale of the Property.  <u>See</u> <u>id.</u> ¶ 54.

10.     In 2014, faced with the anticipation of continued, if not escalating, operating losses as the Property entered its slow summer season, the Collins Subsidiaries began contemplating filing a bankruptcy petition, including a potential sale of the Property under section 363 of the Bankruptcy Code.  <u>See</u> <u>id.</u> ¶¶ 14, 57.  In May 2014, before the Collins Subsidiaries actually filed their chapter 11 petitions, they received an offer of $12 million for the Property from 360 Miami Hotel and Spa LLC, free and clear of liens and encumbrances pursuant to section 363 of the Bankruptcy Code—including a favorable resolution of the Florida Lawsuits through express findings by this Court confirming the Debtors' rights under the Declarations— subject to higher or better offers and Bankruptcy Court approval (the "<u>Stalking Horse Bid</u>").  <u>See</u> <u>id.</u> ¶ 15, 57.

11.     On June 1, 2014, the Debtors also filed their Chapter 11 petitions.  *Voluntary Petition for FL 6801 Spirits LLC (Chapter 11)*, June 1, 2014 [ECF No. 1].  The Debtors made clear in their first-day filings that they intended to pursue and consummate a sale of the Property through an expedited and streamlined process to minimize the incurrence of further losses and to maximize recoveries for the Debtors' estates.  <u>See</u> Barsanti Decl. ¶ 21.

***The Auction of the Property***

12.     On June 1, 2014, the same day they filed their chapter 11 petitions, the Debtors filed a Motion for an Order approving, among other things, bidding procedures regarding the Debtors' Sale of the Property, and the Sale free and clear of liens, claims, encumbrances, and other interests (the "<u>Sale Motion and Proposed Bidding Procedures</u>").  *Debtors' (I) Ex Parte Application for an Order Scheduling a Hearing to Consider, Among Other Things, Bidding*

*Procedures and (II) Motion for (A) an Order Approving, Among Other Things, (i) Bidding*
*Procedures Regarding the Debtors' Sale of Property, Subject to Higher or Better Offers and*
*Bankruptcy Court Approval, (ii) the Time, Date, Place and Form of Notice for the Auction and*
*Sale Hearing, and (iii) a Break-up Fee, (B) an Order (i) Approving the Sale Free and Clear of*
*Liens, Claims, Encumbrances and Other Interests, and (ii) Authorizing the Assumption and*
*Assignment of Certain Executory Contrast, and (C) Related Relief*, June 1, 2014 [ECF No. 4]. In
addition to approving procedures to govern the auction and sale process, the Debtors specifically
requested that the Court include findings in the sale order confirming the Debtors' broad rights
under the Declarations. See, e.g., id. ¶ 89 ("[T]he Debtors submit that it is necessary for this
Court to make findings in the Sale Order confirming the Debtors' rights under the
Declarations—thereby nullifying the Associations' attempts to limit a Hotel Lot Owner's rights
with respect to the Property—in order to maximize the value of the Property and to successfully
facilitate the Proposed Sale."). This express finding was needed to resolve the disputes presented
in the Florida Lawsuits and to define precisely what the Debtors were selling.

13.     On June 19, 2014, the Associations objected to the Sale Motion and Proposed
Bidding Procedures, arguing, among other things, that (1) the relief requested in the Sale Motion
was procedurally improper, (2) the Court should abstain from determining property rights under
the Declarations affecting the Property as such determinations were non-core matters, and (3) the
proposed Bidding Procedures were unreasonable and provided anti-competitive advantages to
the Stalking Horse Bid. See *Associations' Obj. to Debtors' Sale Mot. and Proposed Bidding*
*Procedures*, June 19, 2014 [ECF No. 52]. Notably, the Associations did not claim that any
provisions of the Declarations were invalid under or in violation of Florida law. See id., Exhibit
A.

14.     On July 1, 2014, after considering and hearing the Associations' Objections, <u>see</u> <u>id.</u>, and the Debtors' response thereto, <u>see</u> *Debtors' Resp. to Associations' Obj. to Debtors' Sale Mot. and Proposed Bidding Procedures*, June 26, 2014 [ECF No. 71], the Court approved the Debtors' proposed Bidding Procedures. <u>See</u> *Order (A) Approving (i) Bidding Procedures, (ii) Form and Manner of Notices, and (iii) Form of Asset Purchase Agreement, Including Bid Protections; (B) Scheduling the Time, Date and Place for the Auction and Hearing to Consider Final Approval of Sale, Including Treatment of Executory Contracts and Unexpired Leases; and (C) Granting Related Relief*, July 1, 2014 [ECF No. 77] (the "<u>Bidding Procedures Order</u>"); <u>see also</u> *Tr. of Hr'g re: Debtors' Sale Mot. and Proposed Bidding Procedures*, June 30, 2014 [ECF No. 139]. The Court agreed to schedule a subsequent hearing (the "<u>Final Sale Hearing</u>") to consider whether to grant an order approving the Sale of the Assets free and clear of liens, encumbrances, and other interests. <u>See</u> Bidding Procedures Order ¶ F.

15.     Pursuant to the Bidding Procedures Order, which was designed to ensure a substantively and procedurally fair Sale process, the Property was auctioned on August 19, 2014. <u>See</u> *Notice of Successful Bidder*, Aug. 21, 2014 [ECF No. 113]; <u>see also</u> Sale Order ¶ E. In addition to participating in the discussion of the Bidding Procedures' approval, the Associations (represented by counsel) participated in the auction process as observers and parties-in-interest and consulted with the Debtors throughout. <u>See</u> *Auction Proceedings Tr.*, Aug. 19, 2014 at 29, 37:22-25, 42:3-10, 66:14-17 [ECF No. 134-12]. The auction, which was conducted according to the letter and spirit of the Bidding Procedures, was a success. Significantly, Debtors' counsel explained at the Sale Hearing,

> The auction process was as the Court would want it to be. Forty-five hundred parties were contacted; 193 signed confidentiality agreements. Thirty-one different groups went in to look at the

property; fifty people attended the auction.  Seven people bid, and it was, as Your Honor noted, an ordinary process.

See *Tr. of Mot. to Sell Property Free and Clear of Liens Under Section 363(f)*, Nov. 24, 2014 at 9:21-10:1 [ECF No. 227] (hereinafter, "Sale Hr'g Tr.").

16.     On August 21, 2014, Z Capital was selected as the Successful Bidder and entered into a Purchase and Sale Agreement with the Debtors to purchase the Property for $21.6 million—nearly twice the Stalking Horse Bid.  See *Notice of Successful Bidder and Second Highest Bidder*, Aug. 21, 2014 [ECF No. 113]; *Notice of Filing of Purchase and Sale Agreement*, Aug. 26, 2014 [ECF No. 118].  In addition to providing the highest and best offer, the Debtors determined that Z Capital was well-suited and able to consummate the Sale and fulfill the Debtors' plans to continue operation of the Property as a luxury hotel and spa.  See *Debtors' Reply to the Associations' and 6801 Collins Hotel's Objections to the Sale*, Nov. 10, 2014 ¶ 58 [ECF No. 134].

***Post-Auction Negotiations***

17.     In the days and weeks following the auction, the Associations (and a related bidder)[10] filed objections challenging certain aspects of the auction, the selection of Z Capital as the Successful Bidder, and the terms of the proposed sale (collectively, the "Sale Objections").[11] Specifically, the Associations challenged Z Capital's ability and commitment to maintaining the distinctive and exclusive lifestyle of the Carillon.  The Associations also took issue with the fact

---

[10]     Z Capital understands that the current president of the North Tower Association was one of the financial backers of that bid.

[11]     See *Associations' Suppl. Obj. To: (I) Conduct of Auction; (II) Selection of Successful Bidder And Second Highest Bidder; And (III) Terms of Proposed Sale*, Aug. 26, 2014 [ECF No. 120]; *Obj. of 6801 Collins Hotel LLC to the Debtors' Sale Mot. and Auction*, Aug. 26, 2014 [ECF No. 121]; *Notice of Associations' Mot. For Entry Of An Order: (I) Finding That The Proposed Sale Cannot Be Consummated Free And Clear of the Florida Lawsuits Pursuant To 11 U.S.C. §§ 105 and 363, Or In The Alternative, (II) Abstaining From Adjudicating Declaratory Relief Requested In Florida Lawsuits Pursuant To 28 U.S.C. § 1334 And To Lift The Automatic Stay To Pursue The Declaratory Relief Sought In The Florida Lawsuits Pursuant To 11 U.S.C. § 362*, Sept. 9, 2014 [ECF No. 132].

that the Sale was conditioned on a favorable resolution of the Florida Lawsuits, which hinged, in

the Associations' view, on interpretation of the Declarations and Florida law that would be best

decided by a Florida court.  In other words, despite the fact that the bankruptcy cases were

proceeding in this Court, and the auction and ultimate sale were unquestionably before this

Court, the Associations wanted some other court to consider their arguments.[12]  The Associations

did not, however, raise any arguments that certain provisions of the Declarations or the

Declarations as a whole were invalid under or in violation of Florida law.

18.     In light of these objections and notwithstanding the fact that Z Capital was the

Successful Bidder, the Debtors, in exercising their fiduciary duty to act in the best interests of

their estates and creditors, continued negotiations with the Associations and the Associations'

preferred bidder, which proposed to acquire the Debtors' Property through a plan of

reorganization (as an alternative to a 363 sale).  See, e.g., *Z Capital's Motion to Compel Debtors

to Comply with Bidding Procedures Order*, Oct. 14, 2014 [ECF No. 158].  Because the

Associations had differing interests and priorities, however, the "sand just [kept] shifting under

[the Debtors'] feet."  See *Tr. of Status Teleconference*, Oct. 23, 2014 [ECF No. 195] (hereinafter

"Oct. 23 Status Conference Tr.") at 6:22.[13]

19.     Z Capital attempted to mollify the Associations' concerns by making concessions

and providing additional information regarding how they intended to manage and operate the

---

[12]     This is precisely what is happening yet again, as demonstrated by the North Tower Association's Motion to Abstain.  See infra ¶ 44.

[13]     See also Oct 23 Status Conference Tr. at 6:7-22 (MR. TOGUT (Debtors' counsel):  "We have given [the Associations] some more time to try to get this done but frankly, from our perspective, we're running out of time because this whole process is extremely costly to the debtor's estate. . . . So far as we can tell, [the Associations are] not in a position to sign documents because there are disagreements within factions of the association. . . . And the sand just keeps shifting under our feet."); see also id. at 9:3-10:2 (MS. MARCUS (Lehman's counsel):  "The associations which have repeatedly stated to the Court that they want to control their own destiny have been unable to get to a deal here. . . . So there's no real business reason why we don't have a deal with the associations.  The associations—not for lack of trying I might add, simply haven't been able to make it happen.").

Property.  See, e.g., Oct. 23 Status Conference Tr. at 10:9-14 (MS. MARCUS (Lehman's counsel): "[W]e have no complaints about Z Capital.  They have been extraordinarily patient, have made themselves available for meetings with everyone and have demonstrated a willingness to make concessions to reach a consensual deal."); see also *Tr. of Status Teleconference*, Oct. 28, 2014 [ECF No. 179] (hereinafter "Oct. 28, 2014 Hr'g Tr.") at 5:15-21 (MS. MARCUS:  "Z Capital has continued to be constructive and we have learned that Z Capital has reached out to unit owners to provide them with more details regarding Z Capital's plan for the properties."); see also Sale Hr'g Tr. at 28:18-23 (THE COURT:  "And, by the way, [Z Capital] sat by for weeks, for weeks, while the debtor in the exercise of its fiduciary [duty] conducted those plan discussions with 6801 . . . [a]nd the homeowners.  They were good sports").

20.     Both Z Capital and the Debtors expended "extraordinary efforts" to try to unify all three Associations, resulting in a three-month delay of the final Sale Hearing.  See Sale Hr'g Tr. at 10:15-18; see also *Decl. of Andrei Scrivens In Support of the Debtors' Mot. for an Order (I) Approving the Sale Free and Clear of Liens, Claims, Encumbrances and Other Interests, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts, and (III) Granting Related Relief* ¶ 12, Nov. 17, 2014 [ECF No. 199] ("Since being announced the Successful Bidder on August 21, 2014, Z Capital has engaged in good faith negotiations with the Debtors and Associations in an effort to resolve actual and potential objections to the Sale Motion").  During this delay, the Court considered the Objections, as well as responses filed by the Debtors and Z Capital, at multiple hearings.[14]  As the Court recognized, it was "frankly offensive" that another bidder would complain about the sale process.  See Sale Hr'g Tr. at 3:21-22, 3:23-4:6.

---

[14]     See, e.g., *Hr'g Tr. re: Status Conference re: Sale Hr'g*, Aug. 27, 2014 [ECF No. 141]; *Debtors' Reply to the Associations' and 6801 Collins Hotel's Objs. to the Sale*, Sept. 10, 2014 [ECF No. 134]; *Tr. of Hr'g re: Status*

21.     Finally, on October 28, 2014, after "extensive deliberation at an hours-long meeting," the South and Central Tower Associations made the "business judgment" to enter into a term sheet with Z Capital (the "South/Central Tower Term Sheet").  See *Letter to Judge Chapman on Behalf of South and Central Associations*, Nov. 4, 2014 [ECF No. 179].  The South/Central Tower Term Sheet memorialized Z Capital's commitment to provide spa services, health and wellness programs, and fitness classes consistent with the existing offerings; to negotiate in good faith with Canyon Ranch to remain as spa operator; to cap future assessments; to limit the number of spa memberships; and to agree to a temporary parking arrangement.  See *South/Central Term Sheet (Exhibit B to Sale Order)*, Nov. 26, 2014 [ECF No. 218-2].  In exchange for these commitments, and in particular the commitment to attempt to negotiate for Canyon Ranch to remain affiliated with the Property for a period of time, the Central and South Associations agreed to dismiss with prejudice the Florida Lawsuits.  See id.  On November 6, 2014, the Central and South Tower Associations withdrew their Sale Objections.  See *Withdrawal of Support for Pending Motions*, Nov. 6, 2014 [ECF Nos. 184, 186, 187, 188, 189].

22.     Z Capital also continued negotiations with the North Tower Association.  Despite the ongoing negotiations, the North Tower Association filed a Supplemental Objection to the Sale Motion three days before the final Sale Hearing.  See *Supp. Obj. to the Sale Mot.*, Nov. 21, 2014 [ECF No. 210].  The Sale Hearing was held on November 24, 2014, nearly three months to the day after Z Capital was named the Successful Bidder at the auction.

23.     During a recess at the Sale Hearing, Z Capital and the North Tower Association reached an agreement (the "North Tower Term Sheet") pursuant to which the North Tower Association joined the Central/South Term Sheet (together with the North Tower Term Sheet,

---

*Conference*, Sept. 12, 2014 [ECF No. 147]; *Z Capital's Prelim. Resp.  in Support of the Proposed Sale to Successful Bidder in Accordance with Bidding Procedures*, Sept. 16, 2014 [ECF No. 142]; *Tr. of Status Conference*, Oct. 16, 2014 [ECF No. 194]; *Tr. of Status Conference*, Oct. 23, 2016 [ECF No. 195]; and Oct. 28 Hr'g Tr. [ECF No. 340].

the "Term Sheets"), adding a small number of additional provisions (described below) and one exception (the North Tower Association did not agree to be bound by any provisions requiring dismissal of any lawsuits or claims by the North Tower Association against the Debtors). *See Letter Agreement*, Nov. 24, 2014 ¶ 7 [ECF No. 218-3]. For example, pursuant to the North Tower Term Sheet, Z Capital agreed to use its reasonable best efforts to provide a "destination restaurant," provide services (at it sole discretion) that would result in a "5-star product," implement various security measures, limit spa memberships, review valet parking usage and cost allocation, and permit the re-naming of the North Tower. See id. ¶¶ 1-6. With the Term Sheets memorializing the parties' agreements incorporated into the final Sale Order (discussed below), the Sale Hearing continued.

### *The Sale Order*

24.     Upon consideration of the full record before it, on November 26, 2014, the Court determined that "[a]pproval of the Purchase Agreement and consummation of the Sale Transaction [were] in the best interests of the Debtors' estates, their creditors, and other parties-in-interest." See *Order (I) Approving Sale of Debtors' Property; (II) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* [ECF No. 218] (the "Sale Order") ¶ I. This Court also found that the Debtors had demonstrated "good, sufficient, and sound business purpose and justification and compelling circumstances for the Sale pursuant to section 363(b) of the Bankruptcy Code." See id. ¶ J. Specifically, this Court found that the Debtors validly and soundly exercised good business judgment in determining that:

- the Purchase Agreement constituted the "highest or otherwise best offer for the Assets;"

- the Purchase Agreement and the closing of the Sale presented the "best opportunity to realize the value of the Assets on a going concern basis and avoid decline and devaluation of the Assets;" and

- any other transaction "would not have yielded as favorable an economic result."

See id. ¶¶ J, N, Z.

25.     In approving the Sale, this Court, as requested by the Debtors, confirmed the Debtors' rights under the Declarations, and therefore, the rights that were granted to Z Capital as the incoming Hotel Lot Owner.  See Sale Order ¶¶ V, Y.  These judicial findings, which were necessary to define the asset the Debtors were conveying to the Property's purchaser, were included in every iteration of the Sale Order, see Proposed Sale Order ¶ V, June 1, 2014 [ECF No. 4-4], including the final Sale Order to which the Associations consented.  These rights, which the North Tower Association now challenges, are:

- "the exclusive right to determine from time to time, in its sole discretion and without notice or approval of any change, how and by whom the Spa and spa facilities shall be used;"

- "the right to permit other persons to use [the Shared Facilities] as the Hotel Lot Owner may designate in its sole discretion;"

- The right to "grant and use general and specific easements over, under, and through the Shared Facilities at its sole discretion to whomever it so chooses;"

- The right to "levy assessments for, without limitation, the maintenance, repair, management, replacement and operation of the Shared Facilities;"

- "broad rights under the Master Declaration to regulate the use of the Shared Facilities;"

- the right to "institute reasonable rules and regulations to operate and manage the Shared Facilities;"

- the right to "include the expense of Valet Parking Services in the Condominium Tower's Shared Facilities Assessments;"

- the right to "assess utility costs based upon square footage rather than actual usage;" and

- certain rights, benefits, and privileges under the Declarations, as well as recognition under Florida law that Z Capital was a "Bulk Buyer."

See Sale Order ¶ V; see also Purchase Agreement § 10(b)(i)(C), Ex. D [ECF No. 218-1].

26. As part of its Sale Order, the Court also determined that:

- The sale and auction process afforded a "full, fair, and reasonable opportunity for all creditors, parties-in-interest and other entities to make a higher or otherwise better offer to purchase the Assets;"

- A "reasonable opportunity to object or be heard with respect to the Sale Motion and the relief requested therein [was] afforded to all interested persons and entities;" and

- Z Capital was a good faith purchaser.

See Sale Order ¶¶ F, G, L, 33.

27. Following entry of the Term Sheets, the Associations withdrew their various Sale Objections and consented to the Sale of the Property, free and clear of all Liens, Claims, and/or Interests (as defined in the Sale Order). See Sale Order at 1, and ¶¶ U, 4, 15.

28. In entering the Sale Order, the Court retained exclusive jurisdiction to enforce and implement the terms and provisions of the Purchase Agreement and of each of the agreements executed in connection therewith, including jurisdiction to: (a) compel delivery of the Assets to the Purchaser in accordance with the terms of the Purchase Agreement; (b) resolve any dispute, controversy or claim arising under or related to the Purchase Agreement, or the breach thereof; and (c) interpret, implement, and enforce the provisions of the Sale Order and resolve any dispute related thereto. See id. ¶ 31.

29. Pursuant to its commitments in the Term Sheets, Z Capital continued to negotiate in good faith with Canyon Ranch to remain affiliated with the Property. Z Capital twice delayed closing the Sale in an effort to reach consensus among Canyon Ranch and the Central and South Tower Associations. Z Capital and Canyon Ranch in fact reached an agreement in principal and

were close to finalizing a written agreement that would have kept Canyon Ranch involved in the Property for at least two years.  The Central and South Tower Associations, however, refused to grant Canyon Ranch releases for pre-closing conduct and, in fact, announced their intention (after weeks of negotiating the form of such releases) to sue Canyon Ranch for its purported mismanagement of the Property.  Thus, on January 6, 2015, the Debtors notified the Court that although Z Capital and Canyon Ranch had not been able to achieve a consensual agreement to manage the Property, Canyon Ranch would assist in the transition to new management.  *Motion of Debtors for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a) and 363(b) Authorizing and Approving Debtors' Termination of Canyon Ranch Management and Related Agreements on Shortened Notice*, Jan. 6, 2015 [ECF No. 240].  The Court granted the termination of the Canyon Ranch agreements and confirmed Canyon Ranch's obligations to assist in the transition of the Property's management.  *Order Pursuant to 11 U.S.C. §§ 105(a) and 363(b) Authorizing and Approving Debtors' Termination of Canyon Ranch Management and Related Agreements*, Jan. 15, 2015 [ECF No. 247].  On January 14, 2015, the Debtors and Z Capital closed on the Sale of the Property.  *See Notice of Sale Closing*, Jan. 15, 2015 [ECF No. 246].

30.     Following the Sale, the Debtors filed a Liquidating Plan, which was confirmed on May 20, 2015.  *Liquidating Plan of FL 6801 Spirits LLC and Its Affiliated Debtors under Chapter 11 of the Bankruptcy Code* [ECF No. 330].  The Debtors' chapter 11 cases were closed as of September 30, 2015, after final administrative actions were completed, such as the payment of professional fees.  [ECF No. 361].  No motions were made by November 26, 2015 (within the time allotted by the Federal Rules of Civil Procedure or Bankruptcy Procedure) to appeal or seek relief from the Sale Order.

*Current Adversary Proceeding*

31.     On August 11, 2016, the North Tower Association filed its Motion to Reopen,

seeking leave to commence this Adversary Proceeding alleging claims and causes of action

"similar to" those detailed in a separate lawsuit commenced by the Central Tower Association in

Florida.[15]  [ECF No. 364.]  Z Capital filed its Response to the Motion to Reopen on September

15, 2016, in which it emphasized that the North Tower Association's claims constituted an attack

on the Sale Order.  [ECF No. 386.]  Thus, Z Capital was not opposed to reopening the

bankruptcy case for the purpose of enforcing this Court's Sale Order.  See Sept. 22, 2016 Hr'g

Tr. at 46:5-12.  On October 5, 2016, the Court entered an Order Reopening the Chapter 11 Cases.

[ECF No. 398.]  On November 7, 2016, the North Tower Association commenced this Adversary

Proceeding by filing its Adversary Complaint and then immediately filing its Motion to Abstain.

[Adv. Pro. ECF Nos. 1, 2.]

## ARGUMENT

## I.     Standard of Review

32.     In considering a motion to dismiss under Rule 12(b)(6), a court must consider the

legal feasibility and plausibility of the claims set forth in the complaint.  The plausibility

standard of Ashcroft v. Iqbal demands that the North Tower Association demonstrate "more than

---

[15]     On May 6, 2016, the Central Tower Association commenced an action against Z Capital in the Circuit Court of the Eleventh Judicial Circuit in and for Miami Dade County (the "Florida Court").  See Cent. Carillon Beach Condo. Ass'n, Inc. v. Z Capital Fla. Resort, LLC, No. 2016-011172 CA-01 (Fla. Miami-Dade County Ct. May 6, 2016) (the "New Florida Lawsuit").  In the New Florida Lawsuit, the Associations attempt to resuscitate claims previously raised before this Court that were adjudicated, waived, and/or released in connection with Z Capital's purchase of the Property.  For example, the New Florida Lawsuit seeks declaratory judgments that (i) certain provisions of the Master Declaration and the Central Tower Declaration violate Florida law; (ii) contrary to the Purchase Agreement (as approved by the Sale Order), Z Capital is a "Developer," not a "Bulk Buyer," and (iii) contrary to the Central/South Tower Term Sheet, the Central Tower Association, not Z Capital, has the power to determine assessments.  See, e.g., id. at Counts I, II, III, VI, VII, VIII.  Z Capital filed a motion to dismiss the New Florida Lawsuit on the basis that, inter alia, the Sale Order provides that this Court retained exclusive jurisdiction over claims arising thereunder.  See Defendant Z Capital Florida Resort, LLC's Motion to Dismiss Complaint and Supporting Memorandum of Law, Cent. Carillon Beach Condo. Ass'n, Inc. v. Z Capital Fla. Resort, LLC, No. 2016-011172 CA-01 (Fla. Miami-Dade County Ct. July 29, 2016). Moreover, many, if not most, of the claims in the New Florida Lawsuit are barred by principles of res judicata from this Court's prior orders.  Id. at 16-20.

the mere possibility" that Z Capital engaged in wrongful conduct. 556 U.S. 662, 679 (2009). To avoid subjecting Z Capital to the "enormous expense" of discovery, Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559 (2007), the Adversary Complaint must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable" as alleged. Iqbal, 556 U.S. at 678; accord Tongue v. Sanofi, 816 F.3d 199, 209 (2d Cir. 2016). Assessing the sufficiency of a complaint is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679. Facts "merely consistent with" liability are not enough. Id. at 678 (quoting Twombly, 550 U.S. at 557).

33. Moreover, because certain of the claims sound in fraud, the North Tower Association must satisfy the heightened pleading requirements of Rule 9(b), or in other words "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290 (2d Cir. 2006) (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)). To prove the Sale-Related Claims, the North Tower Association must "specifically allege how they were misled and what statements made to them during the negotiations at issue were misleading." Enron Wind Energy Systems, LLC, et al. v. Marathon Electric Manufacturing Corp. (In re Enron Corp.), 367 B.R. 384, 401 (Bankr. S.D.N.Y. 2007). To hold plaintiffs to a lesser standard "would essentially mean 'every breach of contract would support a claim of fraud so long as the plaintiff adds to his complaint a general allegation that the defendant never intended to keep her promise.'" Id. (quoting Comerica Bank v. McDonald, No. C-06-03735 (RMW), 2006 WL 3365599, at *5 (N.D. Cal. Nov. 17, 2006)). That is not the rule—a broken promise must have been "made without the intention to perform" in order to be actionable as fraudulent. Id. at 399; see also Kana v.

Wintermute (In re Wintermute), No. 09-17314 (AJG), 2010 WL 3386946, at *5 (Bankr. S.D.N.Y. Aug. 25, 2010) ("'Fraud cannot be based on statements or promises to perform in the future, absent proof of scienter'") (quoting Seepes v. Schwartz (In re Schwartz), 45 B.R. 354, 357 (S.D.N.Y. 1985)); accord Kaye Dentistry, PLLC v. Turchin, No. 13-CV-5306 (JMF), 2014 WL 2649976, at *5 (S.D.N.Y. June 13, 2014) (Rule 9(b) demands factual allegations "that give rise to a strong inference of fraudulent intent") (quoting Lerner, 459 F.3d at 290).

34.     The North Tower Association's claims in the Adversary Complaint can be grouped into three categories:  (1) Sale-Related Claims arising from Z Capital's alleged bad faith in negotiating and entering into the Purchase Agreement and Sale Order; (2) Declaration Claims relating to the scope and validity of Z Capital's rights under the Declarations; and (3) Post-Closing Claims relating to management and operations of the Property.  The claims and their related categories are depicted in the chart below:

| Category | Claims Asserted in Adversary Complaint |
|---|---|
| 1) **Sale-Related Claims:**  Precluded by the Sale Order and section 363(m) of the Bankruptcy Code and time-barred by Rule 60(b) of the Federal Rules of Civil Procedure; thus should be dismissed. | Claim 1 (Fraudulent Inducement) |
| | Claim 2 (Negligent Misrepresentation) |
| | Claim 3 (Florida Deceptive and Unfair Trade Practices Act) |
| 2) **Declaration Claims:**  Precluded by the Sale Order and section 363(m) of the Bankruptcy Code and time-barred by Rule 60(b) of the Federal Rules of Civil Procedure; thus, should be dismissed. | Claim 3 (Florida Deceptive and Unfair Trade Practices Act) (certain components of Claim 3) |
| | Claim 10 (Declaratory Judgment as to Common Areas Belonging to the North Tower) |
| | Claim 11 (Declaratory Judgment as to Common Areas Belonging to the Master Association) |
| | Claim 12 (Declaratory Judgment Regarding Recreational Lease) |
| | Claim 13 (Unfairness and Unreasonableness under Chapter 718) |

| Category | Claims Asserted in Adversary Complaint |
|---|---|
| | Claim 14 (Unfairness and Unreasonableness under Chapter 720) |
| | Claim 15 (Declaratory Judgment as to Majority Members of the Board of Directors and Member Voting Rights on the Master Association) |
| | Claim 16 (Injunctive Relief and Declaratory Judgment as to Planned Renovations and Improvements) |
| **3) _Post-Closing Claims_:** Z Capital does not object to the Court abstaining from exercising its jurisdiction over these claims.[16] | Claim 4 (Breach of North Tower Term Sheet) |
| | Claim 5 (Breach of Implied Covenant of Good Faith and Fair Dealing - North Tower Term Sheet) |
| | Claim 6 (Unjust Enrichment) |
| | Claim 7 (Negligence for Failure To Make Timely and Prompt Stucco Repairs) |
| | Claim 8 (Breach of Covenants - Master Declaration) |
| | Claim 9 (Breach of Implied Covenant of Good Faith and Fair Dealing-Master Declaration) |

35.     This Court plainly has jurisdiction to interpret and enforce its own prior orders, see, e.g., Elliott v. Gen. Motors LLC (In re Motors Liquidation Co.), No. 15-2844-bk(L), 2016 WL 3766237, at *10 (2d Cir. July 13, 2016), including jurisdiction to decide that re-litigating this Court's findings and conclusions in the Sale Order are barred by _res judicata_.  _Res judicata_ applies when four factors are present:  (1) a final judgment on the merits (2) by a court of competent jurisdiction; (3) a subsequent action between the same parties; and (4) identity of

---

[16]     Z Capital reserves its right to move to dismiss the Post-Closing claims under Rule 12(b)(6) at a later time if this Court chooses to adjudicate the Post-Closing Claims.  For example, Count VIII of the Adversary Complaint (Breach of Covenants-Master Declaration) merely states, without further detail, that "Z Capital has failed to comply with various portions of the Master Declaration."  Adv. Compl. ¶ 146.  Such allegations fail to satisfy the Iqbal/Twombly pleading standards.

causes of action. <u>Corbett v. MacDonald Moving Servs.</u>, 124 F.3d 82, 87-88 (2d Cir. 1997) (citing <u>In re Teltronics Servs.</u>, 762 F.2d 185, 190 (2d Cir. 1985)).[17]  A court also must consider whether "an independent judgment in a separate proceeding would 'impair, destroy, challenge, or invalidate the enforceability or effectiveness' of the reorganization plan."  <u>Id.</u> at 88 (quoting <u>Sure-Snap Corp. v. State Street Bank and Trust Co.</u>, 948 F.2d 869, 875-76 (2d Cir. 1991)).  The defense of *res judicata* may be brought, under appropriate circumstances, through a motion to dismiss.  <u>See</u>, <u>e.g.</u>, <u>Baeshen v. Arcapita Bank, B.S.C. (c) (In re Arcapita Bank B.S.C. (c))</u>, 520 B.R. 15, 22 (Bankr. S.D.N.Y. 2014) (internal quotation marks omitted) ("[W]hen all relevant facts are shown by the court's own records, of which the court takes notice, the defense [of *res judicata*] may be upheld on a Rule 12(b)(6) motion without requiring an answer.").[18]  Here, as described in more detail below, each of the *res judicata* factors is present, and the Sale-Related Claims and Declaration Claims should be dismissed.

## II.    The Adversary Complaint's Sale-Related Claims Must Be Dismissed, Because the North Tower Association Has Failed to State Claims For Which Relief Can Be Granted

### a.  More Than Two Years after the Sale Order Was Entered, This Court Is Now Legally Precluded from Revisiting Its Findings that Z Capital Was a Good Faith Purchaser

36.    The Court's Sale Order, and the findings and conclusions included therein, is a binding order with *res judicata* effect.  <u>See</u> <u>Adelphia Recovery Trust v. HSBC Bank USA (In re Adelphia Recovery Trust)</u>, 634 F.3d 678, 695 (2d Cir. 2011) ("A bankruptcy court order

---

[17]     For ease of reference in this Motion to Dismiss, the first two factors are combined into one:  a final judgment on the merits by a court of competent jurisdiction.

[18]     <u>See</u> <u>also</u> <u>id.</u> ("'Dismissal under Fed.R.Civ.P. 12(b)(6) is appropriate when a defendant raises claim preclusion ... and it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the claims are barred as a matter of law.'") (quoting <u>Conopco, Inc. v. Roll Int'l</u>, 231 F.3d 82, 86 (2d Cir.2000)).

confirming an asset sale is a final judgment capable of having res judicata effect.").[19] When it entered the Sale Order, this Court made clear that *res judicata* would apply: "I'm going to enter an order that turns that into a binding order of this Court that's going to have collateral estoppel effect." See Sale Hr'g Tr. at 82:10-18.[20]

37.     This Court found that the Debtors conducted the Sale process in compliance with the Bidding Procedures Order, which afforded a "full, fair, and reasonable opportunity" for all creditors, parties-in-interest and other entities. See Sale Order ¶ F. This Court determined that the Bidding Procedures were "non-collusive and proposed and executed in good faith as a result of arm's-length negotiations," and were "substantively and procedurally fair to all entities." See id. ¶ E. And this Court acknowledged that all persons and entities interested in the Sale were provided a "reasonable opportunity to object or be heard," see id. ¶ G,[21] and as this Court recognized, it was—and still is—"frankly offensive" that someone would complain about the Sale process—particularly someone who participated in that process. See Sale Hr'g Tr. at 3:21-22.

38.     This Court has already determined that the terms and conditions of, as well as the consideration for, the Purchase Agreement were "fair and reasonable," and the $21.4 million Z Capital provided for the Assets provided a greater recovery for the Debtors' creditors than "any

---

[19]     See also Culp v. Stanzialie (In re Culp), 550 B.R. 683, 691 (D. Del. 2015) ("The majority of courts to consider the issue have concluded that an order authorizing the sale of assets of an estate is a final, appealable order.") (citing In re Adelphia Recovery Trust, 634 F.3d at 694-95 and collecting cases from other circuits); Winget v. JP Morgan Chase Bank, N.A., 537 F.3d 565 (6th Cir. 2008) (holding that a bankruptcy court's sale order is a final order for *res judicata* purposes); Bank of Lafayette v. Baudoin (In re Baudoin), 981 F.2d 736, 742 (5th Cir. 1993) ("[B]ankruptcy court orders authorizing the sale of part of the estate or confirming such sale are final judgments on the merits for *res judicata* purposes").

[20]     As the Court acknowledged at the Final Sale Hearing, "a decision on the meaning of the [D]eclarations . . . will have whatever effect it has and at least in my view although I'm not that court [the Florida court], my order will have collateral estoppel res judicata effect." See Sale Hr'g Tr. at 82: 12-18. The North Tower Association, which participated fully in the Sale process, has filed an Adversary Complaint in this Court that challenges the Sale Order, an order which this Court has jurisdiction to interpret, enforce, and affirm its *res judicata* effect.

[21]     The Associations' counsel observed the Auction, filed numerous Sale Objections, participated at multiple court hearings, and negotiated with the Debtors and Z Capital for months. See supra ¶¶ 14-23.

other practical available alternative." See Sale Order ¶ N. Notably, and expressly at odds with the North Tower Association's present allegations that Z Capital fraudulently induced its consent to the Sale, ***this Court found that Z Capital was not fraudulently entering in the transaction contemplated by the Purchase Agreement***. See Sale Order ¶ S (emphasis added).

39.     Here, this Court expressly made a 363(m) finding that Z Capital was a "good faith purchaser" that (i) complied in all respects with the Bidding Procedures Order; (ii) agreed to certain provisions in the Purchase Agreement that would enable the Debtors to accept a higher or better offer in respect of the Sale; (iii) made the highest or best bid in respect of the Sale; and (iv) engaged in good faith negotiations and execution of the Purchase Agreement. See Sale Order ¶ L; see also id. ¶ 33. The Bankruptcy Code does not define "good faith purchaser," but the Second Circuit has adopted the traditional equitable definition: "one who purchases the assets for value, in good faith, and without notice of adverse claims." Licensing by Paolo v. Sinatra (In re Gucci) ("**Gucci II**"), 126 F.3d 380, 390 (2d Cir. 1997) (internal quotation marks omitted). In this context, good faith is shown by the "integrity of [the purchaser's] conduct during the course of the sale proceedings." Id.

40.     Pursuant to Section 363(m) of the Bankruptcy Code,[22] which protects finality in judicial bankruptcy sales,[23] this Court has no jurisdiction to review and modify the Sale Order.

---

[22]     11 U.S.C. § 363(m) provides: "The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal."

[23]     The interests of finality, which *res judicata* also serves, "are particularly important in the bankruptcy context." Corbett, 124 F.3d at 91. As the Sixth Circuit explained in Winget:

> A sale order signals an end to litigation in a bankruptcy proceeding; with the execution of the sale order the debtor's assets are judicially sold and ***no further litigation can be brought regarding those assets without forcing the court to undo the sale***, an action of the very kind res judicata seeks to prohibit. If sale orders were not final, parties could continue to litigate issues regarding the assets long after their sale, which is certainly an outcome worth prohibiting. As such, we hold that a sale order is a final order for res judicata purposes.

See Licensing by Paolo v. Sinatra (In re Gucci) ("**Gucci I**"), 105 F.3d 837, 838 (2d Cir. 1997);

see also Contrarian Funds LLC v. Aretex LLC (In re WestPoint Stevens, Inc.), 600 F.3d 231, 248

(2d Cir. 2010) (holding that section 363(m)'s limitation on a court's jurisdiction to review a final

sale is consistent with the "uniquely important interest in assuring the finality of a sale").[24]

41.    The Sale has long since been consummated, and Z Capital's $21.4 million

contribution to the Debtors' estates was distributed through the Debtors' Liquidating Plan.  The

North Tower Association never requested a stay of the Sale or sought to appeal the Sale—the

time for which has long since passed.[25]  The time to seek relief from a judgment or an order

based on newly-discovered evidence or fraud, misrepresentation, or misconduct expires within

*one year* of the entry of the judgment or order.  See Fed. R. Civ. P. 60(c);[26] Fed. R. Bank. P.

9024 (applying Fed. R. 60).[27]  Thus, any challenges to or appeal of the Sale Order and this

Court's findings and conclusions therein are time-barred.  See FirstBank Puerto Rico v. Barclays

Capital, Inc. (In re Lehman Bros. Holding Inc.), 492 B.R. 191, 201 (Bankr. S.D.N.Y. 2013) ("A

_____

Winget, 537 F.3d at 579 (emphasis added).

[24]    "Section 363(m) maximizes the purchase price of assets because without this assurance of finality, purchasers could demand a large discount for investing in a property that is laden with the risk of endless litigation as to who has rights to estate property."  See Gucci II, 126 F.3d at 387 (internal citations omitted); see also In re GSC, Inc., 453 B.R. 132, 180 (Bankr. S.D.N.Y. 2011) (same).  Moreover, section 363(m) stresses a court's general inability to decide cases in which it cannot provide a remedy.  See, e.g., In re Stadium Mgmt. Corp., 895 F.2d 845, 848 (1st Cir. 1990) (internal citations omitted).

[25]    See Fed. R. Bankr. P. 8002 (notice of appeal must be filed with the bankruptcy clerk within 14 days of the entry of judgment or order being appealed).

[26]    The plain language of Rule 60 creates no exception for evidence or fraud discovered more than one year after judgment.  See, e.g., Freedom, N.Y., Inc. v. United States, 438 F. Supp. 2d 457, 465 (S.D.N.Y. 2006); cf. Gottlieb v. SEC, No. 05-cv-2401, 2007 WL 646382, at *2 (S.D.N.Y. Feb. 27, 2007) (plaintiff's allegations of "fraudulent misrepresentations" one year and three months after a final judgment were time-barred).  Adherence to this deadline is not a sign of a "Prussian soul;" rather, it underscores the importance of finality in bankruptcy sales. See In re Met-L-Wood Corp., 861 F.2d 1012, 1019 (7th Cir. 1988); accord Warren v. Garvin, 219 F.3d 111, 114 (2d Cir. 2000) (describing the limitations period for motions brought pursuant to Rule 60(b) as "absolute").

[27]    Moreover, the moving party must demonstrate by clear and convincing evidence that the adverse party engaged in fraud, misrepresentation, or other misconduct that prevented the movant from fully and fairly presenting its case.  See, e.g., Fleming v. New York Univ., 865 F.2d 478, 484 (2d Cir. 1989); see also State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada, 374 F.3d 158, 176 (2d Cir. 2004).

bankruptcy sale order may be collaterally attacked only 'within the tight [time] limits' of Federal Rule of Civil Procedure 60(b)") aff'd, 526 B.R. 481 (S.D.N.Y. 2014), as corrected (Dec. 29, 2014), aff'd, 645 F. App'x 6 (2d Cir. 2016).

42.     Even if the time to appeal were somehow extended by newly-discovered fraud,[28] the North Tower Association cannot credibly allege that Z Capital's purported fraudulent conduct was "newly-discovered."  For example, the North Tower Association acknowledges that it was informed in January 2015 (within weeks of entry of the Sale Order, two weeks before the Sale closed, and months before the Debtors' Liquidating Plan was confirmed and the chapter 11 cases closed) that Canyon Ranch's agreements were being terminated.  Yet, it is only now that the North Tower Association alleges (without pleading any facts supporting a strong inference of fraud) that Z Capital failed to negotiate in good faith with Canyon Ranch.  See, e.g., Adv. Compl. ¶ 65.  The Sale-Related Claims and Declaration Claims are barred, because the Sale Order now poses an insuperable barrier to the North Tower Association's claims.

43.     Thus, courts "cannot take any action that affects the judicially-authorized sale if the purchaser acted in good faith and no stay was granted."  Gucci II, 126 F.3d at 389; Carrega v. Grubb & Ellis Co. (In re Grubb & Ellis Co.), 523 B.R. 423, 438 (S.D.N.Y. 2014) (seeking a form of relief that is less than full reversal of a sale order does not relieve the appealing party of their burden to obtain a stay before relief can be granted).  As the North Tower Association's counsel acknowledged at the Hearing on the Motion to Reopen:

> We are painfully aware of the standards for fraud on the Court.
> We are painfully aware of the standards for unwinding a 363 sale,

---

[28]     The North Tower Association has not alleged any facts supporting the "fraud on the court" exception to Rule 60's one year time limitation.  Indeed, the facts do not exist to support such an allegation.  Fraud on the court, which must be proved by the moving party by clear and convincing evidence, is "only that species of fraud which does or attempts to defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases."  King v. First Am. Investigations, Inc., 287 F.3d 91, 95 (2d Cir. 2002) (internal quotation marks omitted).

> especially beyond the one-year period contained in Rule 60(b).
> We are left to our devices, which we view as damages against Z
> Capital for fraud and breach of contract.

See Sept. 22, 2016 Hr'g Tr. at 7:8-13.

44.     The North Tower Association attempts to provide this Court false comfort with its *ipse dixit* that the Adversary Complaint does not "challenge[] [or] conflict[] with any of the findings made by this Court in the Sale Order." See Mot. to Abstain ¶ 8.  But the North Tower Association's stance that none of its claims "ha[s] anything to do with the Bankruptcy Sale per se or enforcement of this Court's orders," id. ¶¶ 5-6, cannot be reconciled with the allegations asserted.  The Sale-Related Claims and the Declaration Claims are frontal attacks on the Sale and the Sale Order, no matter how much the North Tower Association wants to claim otherwise.

### b. The Adversary Complaint's Sale-Related Claims Must Be Dismissed Because They Improperly Attack this Court's Sale Order

45.     The Sale-Related Claims are expressly precluded by this Court's findings in the Sale Order.  In the Sale-Related Claims, the North Tower Association generally contends that it, notwithstanding its representation by two sets of sophisticated bankruptcy counsel (including the same lawyer at the Brown Rudnick law firm representing Plaintiff now), somehow was tricked into entering into the North Tower Term Sheet by Z Capital's allegedly false and misleading statements, negligent misrepresentations, and/or deceptive conduct.

46.     Even if the North Tower Association had pleaded effectively that Z Capital made fraudulent, negligent, and/or deceptive representations, the only inducement the North Tower Association can allege is that it was "induced" to withdraw its Sale Objections.  See Adv. Compl. ¶¶ 6, 9, 99, 107.[29]  Thus, in order to succeed on these Sale-Related Claims, the North

---

[29]     The North Tower Association also claims that it was induced to enter into the North Tower Term Sheet, but the North Tower Term Sheet, which was negotiated in the midst of the Final Sale Hearing, was not a condition precedent to the Sale.  The Court could have and would have approved the Sale without the Term Sheets.

Tower Association must prove that but for its withdrawal of its Sale Objections, this Court would

not have entered the Sale Order, and that a more favorable outcome would have somehow

resulted.[30]  Absent that alternative reality, the North Tower Association has suffered no harm as a

result of its decision to withdraw its Sale Objections.

47.     For this reason, the North Tower Association's claims depend on asking this

Court to re-visit Z Capital's purchase of the Property and to determine whether if "it knew then

what it knows now," it would not have approved the Sale.  As this Court accurately summarized

at the hearing on the North Tower Association's Motion to Reopen:

> [T]he allegation among many, is, in essence, that the unit owners
> were fraudulently induced to sign onto the sale, and, by extension,
> the Court therefore was fraudulently induced to enter the order.
> Stated differently, had I known then what I know – what you're
> going to try to tell me is the case now, I wouldn't have approved
> the sale to Z Capital, because they, in essence, misrepresented their
> intentions.

See Sept. 22, 2016 Hr'g Tr. at 6:24-7:6 (THE COURT).  The Court's analysis was spot-on—and

demonstrates why the relief the North Tower Association requests cannot be granted.

48.     Section 363(m) of the Bankruptcy Code, Rule 60(b) of the Federal Rules of Civil

Procedure, and principles of *res judicata* preclude this Court from revisiting its final Sale Order

and its findings therein to determine if it would have come to a different conclusion.  See, e.g.,

Gucci II, 126 F.3d at 389 (courts "cannot take any action that affects the judicially-authorized

sale if the purchaser acted in good faith and no stay was granted"); In re Met-L-Wood Corp., 861

F.2d at 1019 (affirming finality of sale order and finding that allegations of fraud were barred by

*res judicata*); In re Christ Hosp., 502 B.R. at 178-179 (prior finding that purchaser acted in good

faith was sufficient to rebut collateral attack alleging purchaser acted maliciously); Bronson v.

---

[30]     Generally, such "consent-based bankruptcy sale orders . . . are not subject to collateral attack."  See, e.g., In re Christ Hosp., 502 B.R. 158, 175 (Bankr. D.N.J. 2013), aff'd sub nom. Prime Healthcare Servs. v. Hudson (In re Christ Hosp), No. 14-472 (ES), 2014 WL 4613316 (D.N.J. Sept. 12, 2014).

CHC Indus. (In re CHC Indus.), 389 B.R. 767 (Bankr. M.D. Fla. 2007) (finding that claims based on fraud and negligent misrepresentation were barred by the doctrine of *res judicata* and were impermissible collateral attacks on sale order); GAF Holdings, LLC v. Rinaldi (In re Farmland Indus., Inc.), 376 B.R. 718, 728 (Bankr. W.D. Mo. 2007), aff'd, 639 F.3d 402 (8th Cir. 2011) (dismissing impermissible attack on validity of sale order and court's findings that defendant was a good faith purchaser, notwithstanding plaintiff's claims of newly-discovered evidence that defendant allegedly misrepresented value of the assets).

49.     Courts have routinely rejected efforts to circumvent the restrictions of section 363(m) and Rule 60(b) through arguments that a challenge is to the conditions of a sale, but not to the sale itself.  See In re Stadium Mgmt. Corp., 895 F.2d at 848-49 ("It is axiomatic that one cannot challenge a central element of a purchase . . . without challenging the validity of the sale itself.") (internal quotation marks omitted); see also BDC Fin., LLC v. Metaldyne Corp. (In re Metaldyne Corp.), 421 B.R. 620, 626 (S.D.N.Y. 2009) ("[Appellant] seeks to escape the limitations imposed by § 363(m) by arguing that it does not challenge the sale itself, but the allocation of the assets of the sale . . . This is a specious distinction.").

50.     Moreover, courts have rejected claims as impermissible under Section 363(m) for damages arising from sales, including punitive damages, as undermining the economic integrity of the sale.  See, e.g., In re Farmland Indus., Inc., 376 B.R. at 726 (dismissing complaint as an impermissible collateral attack on sale order, because plaintiff was "seeking to undo the economics of the sale by seeking damages").  For example, in In re Grubb & Ellis Co., the appellants disclaimed any desire to "unwind" the bankruptcy sale through appeal.  523 B.R. 423 (S.D.N.Y. 2014).  The District Court for the Southern District of New York observed that seeking "modification" of a sale order rather than a full reversal of the order (a "specious

distinction" at best) did not relieve the appellants of their burden to obtain a stay before relief can be granted. Id. at 442. The Court held that the appeal of the sale order was equitably moot under section 363(m) because the monetary sum sought by appellants was "so large [that] any relief ordered by [the] Court would carry a significant risk of knock[ing] the props out from under the sale." Id. at 438. (alterations in original) (internal quotation marks omitted).

51.     Here, as noted above, the North Tower Association failed to stay or appeal the Sale Order within the appropriate time period. Thus, it has disclaimed its desire to "unwind" the Sale, and instead seeks damages, including punitive damages. But revisiting its Sale Order now is the only way in which this Court, or any other court, can determine that the North Tower Association was "harmed" by Z Capital's alleged misconduct and is entitled to damages (which carry the "significant risk" of "knocking the props out" from under the Sale). Revisiting the Sale Order is legally precluded and time-barred, and thus the Sale-Related Claims fail as a matter of law.

### c.  The Adversary Complaint's Sale-Related Claims Must Be Dismissed Because They Fail to Satisfy the Relevant Pleading Standards

52.     The Sale-Related Claims are rife with specious allegations and frivolous claims that are unsupported by the record (to say nothing of any well-pleaded facts), and thus, they do not satisfy relevant pleading standards. Cf. In re Farmland Indus., Inc., 376 B.R. at 729 (applying plausibility standard for evaluating a complaint on a motion to dismiss and holding that it was not persuaded that the fraud allegedly perpetrated by defendants plausibly called into doubt the court's findings that the sale was negotiated at arm's length, without collusion, and in good faith). In re Enron Corp., 367 B.R. 384, 401 (Bankr. S.D.N.Y. 2007), for example, the plaintiff alleged that the defendant had made statements that it would comply with certain warranty provisions, but "knew that the foregoing representations and promises were false, and

knew at the time that the representations and promises were made that it did not intend to perform them." Id. at 400. In finding the pleading to be deficient under Rule 9(b), the court noted that such a "bare allegation [did] not allege any facts from which the Court [could] infer that the allegedly fraudulent statements were actually false when made." Id.; see also In re Wintermute, No. 09-17314 (AJG), 2010 WL 3386946, at *6-7 ("When a debtor makes a representation that is a promise, his intent to fulfill the promise at the time the representation is made determines whether such representation is truthful. . . . It is insufficient to show that a debtor left unfulfilled a prior representation or promise"). Similarly here, the Adversary Complaint merely offers a "[t]hreadbare recital[]," Iqbal, 556 U.S. at 678, that Z Capital knowingly "implemented a fraudulent scheme" and "never intended to deliver on its representations and promises." Adv. Compl. ¶¶ 62, 97. But the Adversary Complaint puts forth no evidence, let alone credible evidence, of "conscious misbehavior or recklessness," nor a theory of "motive and opportunity" that bears any plausible relationship to the alleged misrepresentations. Turchin, 2014 WL 2649976, at *5. The Adversary Complaint is void of any plausible allegations regarding fraud, collusion or impropriety attributable to Z Capital that would call into doubt this Court's findings that Z Capital was a good faith purchaser. The Sale-Related Claims should be dismissed.

III.   **The Declaration Claims Must Be Dismissed, Because They Are Subject to the Doctrine of _Res Judicata_**

53.   The Declaration Claims are challenges, purportedly under Florida law, to the rights afforded to Z Capital under the Declarations that either this Court has already addressed and determined or that the North Tower Association had the opportunity to raise during the bankruptcy proceedings and failed to do so. This Court should not hesitate to reaffirm the _res judicata_ effect of its findings and decisions in the Sale Order.

54.     Prior to and during the bankruptcy proceedings, the Associations disputed and sought to define narrowly the rights granted by the Declarations to the owner of the Property. See Sale Order ¶ V. Specifically, the Associations sought entry of an order finding that the proposed sale to Z Capital could not be consummated free and clear of the claims for declaratory relief asserted by the Associations in the Florida Lawsuits. See, e.g., *Associations' Obj. to the Debtors' Sale Mot. and Bidding Procedures* ¶ 4; see also *Notice of Associations' Mot. for Entry of an Order* ¶ 10-11.

55.     In response, the Debtors, at the outset of the Sale process, asked this Court to include in the Sale Order certain findings with respect to the Declarations so that the Debtors could define for potential purchasers what they were selling. See *Sale Motion and Bidding Procedures Order.* As the Debtors emphasized, resolution of the parties' disputes with respect to the Declarations was critical for the Sale, because the Declarations are unambiguously "'covenants that run with the land.'" See *Notice of Associations' Mot. for Entry of an Order* ¶¶ 19-20 (citing Master Declaration, Arts. 19.1, 19.7; Tower Declarations, Art. 19). The Declarations were binding on the Debtors, and would continue to bind the Debtors' successor to the Property, such as Z Capital. See id. (citing Master Declaration, Art. 1.1(r)). Consequently, it was core to the Sale that the Debtors had the ability to define exactly what it was selling and what the buyer was getting. See Sept. 12, 2014 Hr'g Tr. at 22:19-23:10 (THE COURT: "Well, the determination of—the determination of what it is that the estate is selling is definitely core— is the centerpiece of the sale. . . . that doesn't change the core nature of the determination that's incumbent upon me [to] make in connection with the disposition of the property either pursuant to 363 or under a plan. . . That's core—in the truest sense of core."); see also id. at 154:14-16

(THE COURT: "I mean, the centerpiece of this dispute is what it says in those declarations, how they—and how they're going to be interpreted going forward.").[31]

56.     In the Sale Order, the Court confirmed that, with respect to elements of the Declarations that were the subject of prior dispute, the Debtors' interpretation of the Declarations was correct. Specifically, the Court found that the Declarations provided that the Hotel Lot Owner (now Z Capital) had broad discretion and rights under the Declarations to, *inter alia*, regulate the use of Shared Facilities, institute reasonable rules and regulations, and levy assessments for the maintenance, repair, management, replacement and operation of the Shared Facilities. See Sale Order ¶ V.

57.     In making these express findings, the Court conclusively determined the proper interpretation of the disputed elements of the Declaration. Importantly, the Court did not modify the Declarations, instead holding that "[n]othing herein, including the Court's approval of the North Tower Term Sheet and the South/Central Tower Sheet, shall constitute an amendment or modification of the Declarations. See Sale Order ¶ V; see also *Letter Agreement* ¶ 12 ("Other than as set forth herein, the terms of the Master Declaration shall remain in full force and effect.").[32] And the Court was well within its authority and jurisdiction to interpret and enforce the Declarations in accordance with the law. See, e.g., Sept. 12, 2014 Hr'g Tr at 125:19-21

---

[31]     See, e.g., Sale Hr'g Tr. at 8:11-17 (THE COURT: "The debtor has never for one moment suggested that it's going to sell the property free and clear of the declarations but the debtor has every right to sell the property and to seek an order of this Court describing exactly what the property is and that's governed by the [D]eclarations. There's nothing lawless about that, and there's [*sic*] inconsistent with what bankruptcy courts do all the time."); see also id. at 84:24-85:3 (THE COURT: "I think that when the debtor made its motion to sell the property it going out [*sic*] needed clarity on the meaning of the declarations in order to have a bidder know what it was buying. So it's not a Z Capital thing. It's a debtor trying to sell an asset thing."); see also *Debtors' Reply to the Associations' and 6801 Collins Hotel's Objections to the Sale*, Nov. 9, 2014 ¶ 79 [ECF No. 134] ("Because the Association Litigations attempt to limit the Debtors' (and any successor owner's) rights under the Declarations that govern the Property and because the Property is the lifeblood of the Debtors' business, the Bankruptcy Court must confirm these rights under the Declarations in order to facilitate the sale of the Property.").

[32]     Thus, the Court fully considered and decided (or had the opportunity to consider and decide) the scope of Z Capital's rights under the Declarations with respect to the issues that are the subject of the Declaration Claims.

(THE COURT: "At the end of the day, my view is that I decide, as a matter of law, what the declarations mean. Period.").[33]

58.     The Court's Sale Order, and the findings therein, is a binding order with *res judicata* effect, and the North Tower's Declaration Claims should be dismissed. As but one example, the North Tower Association complains that Z Capital is "utilizing the Master Declaration, in an unfair and unreasonable manner . . . by entirely excluding [the North Tower Association] . . . from having the sort of post-turnover input, oversight, and control over [common] areas." Adv. Compl. ¶ 187. This Court already confirmed, however, that Z Capital, as the Hotel Lot Owner, has the following broad rights (in addition to other rights delineated in the Master Declaration) to:

- "determine from time to time, in its sole discretion and without notice or approval of any change, how and by whom the Spa and spa facilities shall be used";

- "permit other persons to use [the Shared Facilities] as the Hotel Lot Owner may designate in its sole discretion";

- "grant and use general and specific easements over, under, and through the Shared Facilities at its sole discretion to whomever it so chooses";

- "levy assessments for, without limitation, the maintenance, repair, management, replacement and operation of the Share Facilities";

- "regulate the use of the Shared Facilities"; and

- "institute reasonable rules and regulations to operate and manage the Shared Facilities."

Sale Order ¶ V.

59.     Remarkably, and despite all of the litigation that has come before, the Associations now contend that the Declarations, which have been in place since 2007, somehow

---

[33]     See also id. at 45:15-18 (THE COURT: "There are—there's declarations that govern the operation and the conduct of the property. They have to be complied with. I'm going to enforce them in accordance with the law and we're going to be done"). The Court also reminded the parties that it could "read Florida law the same way" it "can read any other law." See Sept. 12, 2014 Hr'g Tr. at 57:7-8.

violate Florida law.  See, e.g., Adv. Compl. ¶¶ 92 ("The provisions in the Master Declaration governing Unit Owners' access to the Spa and the Fixed Fees and assessments that Unit Owners must pay for that access are the functional equivalent of a recreational lease embedded in the Master Declaration."); 165 ("The North Tower Condominium Declaration and the Master Declaration contain various provisions which violate the above listed rights of the Unit Owners…"), 179 ("The declarant, and Z Capital as its successor, should not be allowed to eviscerate the protections afforded Unit Owners under Fla. Stat. 718.401(f)(1) by the simple expedient of embedding a recreational lease in the Master Declaration . . ."); 182 ("Certain provisions of the Master Declaration as written, or as construed and implemented by Z Capital, do not meet the fair and reasonable, arbitrary and capricious, and/or unconscionability standards mandated under Section 718.302 of the Florida Condominium Act.").  But the North Tower Association cannot seek to unwind the Sale now based on provisions in the Declarations, which were adopted and publicly recorded well before the Sale.  Cf. Bennett v. Behring Corp., 466 F.Supp. 689, 697 (S.D. Fla. 1979), aff'd, 737 F.2d 982 (11th Cir. 1984) (holding that property owners could not claim that they were unaware of restrictions on their property or that the deeds were unconscionable because the restrictions "were recorded and were a matter of public record well prior to the closing of any of the individual real estate transactions" and thus "all plaintiffs had either actual or constructive notice of the restrictions . . . complained of").

60.     Notably, the North Tower Association amended its Draft Adversary Complaint (filed as Exhibit A to its Motion to Reopen) to delete many of its express challenges to numerous provisions of the Master Declaration and the North Tower Declaration.  The North Tower Association now suggests obliquely that the problem is with Z Capital's "interpretation" of the

Declarations.[34]  The Court should see through the North Tower Association's machinations that were designed to omit details about the arguments underlying the Declaration Claims.

61.     For example, the North Tower Association alleges that Z Capital's "failure to relinquish control" over the Master Association violates Florida law.  Adv. Compl. ¶¶ 80-82, 190-194.  Specifically, according to the North Tower Association, after 90% of the residential units in the Towers are sold to Unit Owners, a developer should turn over voting rights to the Master Association.  Id. ¶ 80.  What the North Tower Association omitted from its Adversary Complaint, however, is its previous acknowledgement that by or about February 2013—nearly two years *before* the Sale Order was entered and Z Capital purchased the Property—the "Turnover Conditions Precedent" had already been met.  Compare id. ¶¶ 80-82 with Mot. to Reopen, Ex. A (Draft Adv. Compl.) ¶ 253.  The North Tower Association never raised these concerns during the bankruptcy proceeding nor sought to appeal or seek other relief from the Sale Order.[35]

62.     The Associations had the opportunity to challenge—and did challenge—the Declarations during the bankruptcy proceedings.  See supra ¶¶ 14-23.[36]  Yet now, the North Tower Association alleges that Z Capital has imposed assessments "without any meaningful vote

---

[34]     Attached hereto as Exhibit B is a chart listing the Declaration Claims and the corresponding findings in the Sale Order precluding such claims.

[35]     Moreover, the North Tower Associations' allegations are factually inaccurate and misstate the Articles of Incorporation (the "AOI") of the Master Association.  Specifically, Section 2 of the AOI sets forth two classes of voting membership, Class A and Class B.  The Declarant (*i.e.*, now Z Capital) shall be a Class B member until three months after 90% of all Condominium Units have been sold and conveyed to owners other than the Declarant.  Once Class B Membership no longer exists, the Declarant can—and here does—qualify as a Class A Member.  Z Capital is a Class A Member as the Retail Lot Owner and the Hotel Lot Owner, and thus, per the AOI, Z Capital has 6 votes out of 9 votes for the Master Association.  Therefore, contrary to the North Tower Association's allegations, Z Capital has the right to elect a majority of the Board of Directors of the Master Association.

[36]     See also Sale Hr'g Tr. at 39:16-20 (THE COURT:  "Now, the fact that you did a very lawyerly job of identifying some of the denseness of the language doesn't change the fact that the opportunity to deal with the declaration issues on the merits has been extant for months and months and months."); see also id. at 62:19-24 (THE COURT:  "I believe without question that there's been more [than] adequate due process afforded to everybody that at the sale hearing there was going to be a merits consideration of the issues surrounding the declaration . . . .").

or input from the Unit Owners" and has "improperly charged" the Unit Owners for assessments by "not offsetting revenues collected from third parties for access to Shared Facilities and the Spa." Adv. Compl. ¶¶ 75, 87, 89, 129. But this Court confirmed Z Capital's ability to levy assessments, see Sale Order ¶ V, and Section 4.4 of the Master Declaration expressly states "[a]ll fees collected by the Hotel Lot Owner for use of the Spa, if any, shall be retained by the Hotel Lot Owner and shall not constitute income or revenue of the Association or any other Lot Owner." Master Decl. § 4.4. If the North Tower Associations' claims that such provisions of the Master Declaration violate Florida law ever had any merit, they should have been brought during the bankruptcy proceeding. They were not, and thus they also are barred by *res judicata*. See, e.g., In re Adelphia Recovery Trust, 634 F.3d at 694 ("'[a] final judgment on the merits . . . precludes the parties or their privies from relitigating issues that were ***or could have been*** raised in that action.'") (alteration in original) (emphasis added) (quoting St. Pierre v. Dyer, 208 F.3d 394, 399 (2d Cir. 2000)); Sure-Snap Corp. v. State Street Bank & Trust Co., 948 F.2d 869, 873 (2d Cir. 1991) ("[Res judicata] bars re-litigation not just of those claims which were brought in a prior proceeding, but of 'any other admissible matter' which could have been brought, but wasn't").

63. Simply, the North Tower Association does not get a "do over" to challenge the governing documents of the Property long after Z Capital paid $21.4 million and assumed the rights granted therein as Hotel Lot Owner. Cf. Id. at 870 ("Restraining litigious plaintiffs from taking more than 'one bite of the apple' has been our avowed purpose since the common law doctrine of *res judicata* first evolved."). The Declaration Claims are, like the Sale-Related Claims, a frontal attack on the Sale Order. As the North Tower Association acknowledges, the Court's specific findings regarding certain provisions of the Declarations are no longer

susceptible to challenge. <u>See</u>, <u>e.g.</u>, Mot. to Abstain ¶ 6. Therefore, the North Tower Association now argues that other provisions of the Declarations are invalid under or in violation of Florida law—arguments that were never raised during the bankruptcy proceedings, but could have been and should have been raised—in an attempt to undermine the Assets (and the rights that run with them) that Z Capital purchased in the Sale.

64. The declaratory relief sought by the North Tower Association would not only materially change the long-standing Declarations, but it also would impair the value of the Assets and Z Capital's rights under the Sale Order. <u>See</u>, <u>e.g.</u>, <u>Sure-Snap</u>, 948 F.2d at 874 ("Also dispositive to a finding of preclusive effect, is whether an independent judgment [entered] in a separate proceeding would 'impair or destroy rights or interests established by the judgment entered in the first action.'") (quoting <u>Herendeen v. Champion Int'l Corp.</u>, 525 F.2d 130, 133 (2d Cir. 1975)). Significantly, the Court recognized that if its findings regarding the rights granted by the Declarations were not entered, Z Capital would not consummate the Sale, thereby adversely affecting the Debtors, their estates and their creditors. <u>See</u> Sale Order ¶ W. This Court also enjoined the Associations from asserting claims and/or interests against the Property or Z Capital. <u>See</u> <u>id.</u> ¶ 14. The North Tower Association's attempt to rewrite the Declarations, which govern Z Capital's rights to the Property and which were directly at issue during the bankruptcy proceeding, should not be permitted. The Court should enforce the *res judicata* effect of its Sale Order, protect the economic integrity of the Sale, and dismiss the Declaration Claims.

## <u>CONCLUSION</u>

Defendant Z Capital respectfully requests that the Court enter an order granting the relief requested in the Proposed Order:

(1)     With respect to the Sale-Related Claims and Declaration Claims, enforcing the *res

         judicata* effect of the Sale Order and conclusively determining that the North Tower

         Association is collaterally estopped and time-barred from pursuing these claims;

(2)     With respect to the Post-Closing Claims, determining the scope of its jurisdiction and

         deciding whether to (i) adjudicate the Post-Closing Claims, or (ii) abstain from

         adjudicating the Post-Closing Claims, because appropriate and alternate fora exist; and

(3)     Such other and further relief as the Court may deem appropriate.


Dated: December 5, 2016                    MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP
Washington, DC                             */s/ Andrew M. Leblanc*
                                           Andrew M. Leblanc
                                           David S. Cohen
                                           Erin M. Culbertson (*pro hac vice*)
                                           1850 K Street NW, Suite 1100
                                           Washington, DC 20006
                                           Telephone:  (202) 835-7500
                                           Facsimile:  (202) 263-7586
                                           *Counsel to Defendants Z Capital Partners, LLC and*
                                           *Z Capital Florida Resort, LLC*

**Exhibit A**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| FL 6801 SPIRITS LLC, *et al.*, | ) Case No. 16-01259 (SCC) |
| | )　　　　 14-11691 (SCC) |
| Debtors. | ) |
| | ) Jointly Administered |
| NORTH CARILLON BEACH CONDOMINIUM | ) Ref. ECF No. 2 |
| ASSOCIATION, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| Z CAPITAL PARTNERS, LLC; Z CAPITAL | ) |
| FLORIDA RESORT, LLC; NORTH BEACH | ) |
| DEVELOPMENT, LLC; CARILLON HOTEL | ) |
| AND SPA MASTER ASSOCIATION, INC.; | ) |
| SOUTH CARILLON BEACH CONDOMINUM | ) |
| ASSOCIATION, INC.; and CENTRAL | ) |
| CARILLON BEACH CONDOMINIUM | ) |
| ASSOCIATION, INC., | ) |
| | ) |
| Defendants. | ) |

**ORDER ON MOTION OF Z CAPITAL PARTNERS, LLC AND Z CAPITAL FLORIDA
RESORT, LLC TO DISMISS THE NORTH CARILLON BEACH CONDOMINIUM
ASSOCIATION, INC.'S ADVERSARY COMPLAINT**

Upon the *North Carillon Beach Condominium Association, Inc.'s Adversary*

*Complaint* [ECF No. 1] (the "Adversary Complaint") and Defendant Z Capital Partners, LLC

and Z Capital Florida Resort, LLC (together, "Z Capital") Motion to Dismiss the Adversary

Complaint (the "Motion to Dismiss");[37] and the Court having found that the Court has

jurisdiction to consider the Motion to Dismiss and the relief requested therein pursuant to 28

U.S.C. § 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C.

---

[37]　　Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the
Adversary Complaint or the Motion to Dismiss.

§ 157(b)(2); and the Court having found that venue of this proceeding and the Motion to Dismiss in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having retained exclusive jurisdiction to resolve any dispute, controversy or claim arising under or related to the Purchase Agreement, or the breach thereof; and the Court having retained exclusive jurisdiction to interpret, implement, and enforce the provisions of the Sale Order and resolve any dispute related thereto; and due and proper notice of the Motion to Dismiss having been provided under the circumstances, and it appearing that no other or further notice need be provided; and any objections to the Motion to Dismiss having been withdrawn, resolved, or overruled on the merits; and after due deliberation and sufficient cause appearing therefor, it is hereby **ORDERED** that:

1.      The Motion to Dismiss is granted.

2.      Claims 1, 2, 3, 10, 11, 12, 13, 14, 15, and 16 are precluded by the Sale Order, which has *res judicata* effect, and estopped under Section 363(m) of the Bankruptcy Code.

3.      The Court will abstain from exercising its jurisdiction over Claims 4, 5, 6, 7, 8, and 9 in light of (a) the length of time that has passed since the entry of the Sale Order, (b) the lack of benefit to the Debtors' estates, (c) the futility of the claims asserted in the Adversary Complaint, and (d) the availability of an appropriate, alternate forum in state court.

4.      The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

5.      This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Date: _____, 2016
New York, New York

_____
HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE

# Exhibit B

## Declaration Claims

# DECLARATION CLAIMS

The Master Declaration was recorded on December 3, 2007 in the public records for Miami-Dade County, FL., including all recorded amendments. Sale Order ¶ V. The Master Declaration was amended in 2008, 2011, and 2016.

The North Tower Declaration was recorded on August 27, 2008 in the public records for Miami-Dade County, FL, including all recorded amendments. Sale Order ¶ V. The North Tower Declaration was amended in 2009 and 2012.

Key Findings in Sale Order

- The Court recognized that the Associations "dispute and have sought to impinge upon and define those rights [granted to the owner of the Assets under the Declarations]." Sale Order ¶ V.

- "Nothing herein, including the Court's approval of the North Tower Term Sheet and the South/Central Tower Term Sheet, shall constitute an amendment or modification of the Declarations." Sale Order ¶ V.

- "If the above findings regarding the rights granted by the Master Declaration and Declarations were not entered, the Purchaser would not consummate the Sale, thus adversely affecting the Debtors, their estates and their creditors." Sale Order ¶ W.

- "If the Sale were not free and clear of all Liens, Claims and/or Interests, or if the Purchaser would, or in the future could, be liable for any of the Liens, Claims and/or Interests, the Purchaser would not have entered into the Purchase Agreement and would not consummate the Sale, thus adversely affecting the Debtors, their estates and their creditors." Sale Order ¶ X.

| North Tower Allegations in the Draft Adversary Complaint | North Tower Allegations in the Filed Adversary Complaint | Sale Order and/or Declarations |
|---|---|---|
| **Claim 6 (Florida Deceptive and Unfair Trade Practices Act)**<br><br>"Z Capital is double-charging Unit Owners for access to and use of the Spa in violation of the plain language of the Master Declaration in a practice that is unconscionable, unfair, and deceptive." Mot., Ex. A ¶ 177(a).<br><br>"Z Capital collects revenue from non-Unit Owners who use these facilities . . . this revenue is retained exclusively by Z Capital, and, on information and belief, in no way reduces the assessments Unit Owners are charged for maintaining these facilities." Mot., Ex. A ¶ 177(b).<br><br>"Z Capital made numerous deceptive promises and representations to Plaintiff (and other condominium associations) to induce Plaintiff to execute the North Tower Contract and to withdraw opposition to Z Capital's bid." Mot., Ex. A ¶ 177(d). | **Claim 3 (Florida Deceptive and Unfair Trade Practices Act)**<br><br>"Unfairly maintaining total control over the monthly rates and occasional special assessments levied against Unit Owners and the fees that they are being charged . . ." Adv. Compl. ¶ 114(c)<br><br>"Charging Unit Owners the same assessments and fees (or higher ones) despite drastic cutbacks in expenses, including offering services that do not meet those earlier provided to Plaintiff and the Unit Owners, and failing to account to the Unit Owners for all or a substantial portion of the cost savings." Adv. Compl. ¶ 114(d).<br><br>"Imposing assessments which have been improperly calculated, allocated or otherwise determined, and including expenses for which it does not have the right to assess the Unit Owners within the meaning of applicable provisions of the Master Declaration." Adv. Compl. ¶ 114(f). | The Court confirmed Z Capital's authority to levy assessments: "The Hotel Lot Owner (or any successor Hotel Lot Owner) may levy assessments for, without limitation, the maintenance, repair, management, replacement and operations of the Shared Facilities. Included in the Shared Facilities are the Unit Owner's Limited Spa Rights, only as expressly set forth in Articles 1.1(dd)(iv)(d), 1.1(oo), and 4.4 of the Master Declaration. Such assessments for the Shared Facilities are separate from and in addition to the monthly Fixed Charge that Unit Owners are obligated to pay the Hotel Lot Owner (or any successor Hotel Lot Owner) in accordance with Article 16.3 of the Master Declaration." Sale Order ¶ V.<br><br>Per Section 4.4 of the Master Declaration, "[a]ll fees collected by the Hotel Lot Owner for use of the Spa, if any, shall be retained by the Hotel Lot Owner and shall not constitute income or revenue of the Association or any other Lot Owner." |

| North Tower Allegations in the Draft Adversary Complaint | North Tower Allegations in the Filed Adversary Complaint | Sale Order and/or Declarations |
|---|---|---|
| **Claim 7 (Breach of Covenants – Master Declaration)**<br><br>"Z Capital has included assessments in the Shared Facilities budgets for items that are not part of the Shared Facilities but rather are exclusive expenses of the Hotel or Spa . . . ." Mot., Ex. A ¶ 185(b).<br><br>"Z Capital has included charges for operation, maintenance, repair, and renovation of the Spa in assessments for the expenses of the Shared Facilities." Mot., Ex. A ¶ 185(c).<br><br>"Z Capital has included assessments for fitness-instructor expenses in the assessments for Non-Retail Shared Facilities, even though neither the fitness center nor the instructors are defined as part of the Non-Retail Shared Facilities in the Master Declaration." Mot., Ex. A ¶ 185(d).<br><br>"Z Capital has assessed Plaintiff and Unit Owners for the costs of maintaining and operating facilities as to which they have merely "Limited Spa Rights," while also collecting the full "Fixed Charge" for the Limited Spa Rights . . . ." Mot., Ex. A ¶ | **Claim 8 (Breach of Covenants – Master Declaration)**<br><br>"Z Capital has failed to comply with various provisions of the Master Declaration." Adv. Compl. ¶ 146. | The Court confirmed Z Capital's authority to levy assessments: "The Hotel Lot Owner (or any successor Hotel Lot Owner) may levy assessments for, without limitation, the maintenance, repair, management, replacement and operations of the Shared Facilities. Included in the Shared Facilities are the Unit Owner's Limited Spa Rights, only as expressly set forth in Articles 1.1(dd)(iv)(d), 1.1(oo), and 4.4 of the Master Declaration. Such assessments for the Shared Facilities are separate from and in addition to the monthly Fixed Charge that Unit Owners are obligated to pay the Hotel Lot Owner (or any successor Hotel Lot Owner) in accordance with Article 16.3 of the Master Declaration." Sale Order ¶ V. |

| North Tower Allegations in the Draft Adversary Complaint | North Tower Allegations in the Filed Adversary Complaint | Sale Order and/or Declarations |
|---|---|---|
| 185(e).<br><br>"Z Capital has inappropriately categorized expenses for the North Tower garage as part of the North Tower Shared Facilities Budget . . . in violation of the Master Declaration's requirement that the "Garage Costs" "shall be deemed part of the expenses attributable to the Non-Retail Shared Facilities." Mot., Ex. A ¶ 185(f). | | |
| **Claim 9 (Declaratory Judgment as to Common Elements Belonging to the North Tower)**<br><br>"Currently, those common elements of the North Tower are listed as part of the Shared Facilities of the Hotel Lot, and Z Capital is exercising unrestricted and unregulated authority over them, including the right to set the assessment levied against the North Tower Unit Owners for the maintenance of these common elements." Mot., Ex. A ¶ 212. Plaintiff seeks a declaration that the following sections of the North Tower Declaration and the Master Declaration violate Chapter 718 of the Florida Statutes, in that the property that primarily or exclusively serves the North Tower | **Claim 10 (Declaratory Judgment as to Common Elements Belonging to the North Tower)**<br><br>"The North Tower Condominium Declaration and the Master Declaration contain various provisions which violate the above listed rights of the Unit Owners to control through their elected board their common elements . . ." Adv. Compl. ¶ 165.<br><br>"Currently, Z Capital in its role as Hotel Lot Owner, is improperly, and in violation of Florida law, exercising unrestricted and unregulated authority over those common elements of the North Tower, including the right to set the assessments levied against the Unit Owners for the maintenance of | The North Tower Declaration has been in place since 2008 (and last amended in 2012). The time for the North Tower Association to bring these claims was during the bankruptcy proceeding, prior to the Sale.<br><br>The Master Declaration has been in place since 2007 (and amended from time to time).<br><br>- Relevant to this claim, the 2016 Amendment to the Master Declaration altered Sections 1.1(dd) (by adding and/or reorganizing components of the Shared Facilities) and 16.3 (by adding assessments). |

| North Tower Allegations in the Draft Adversary Complaint | North Tower Allegations in the Filed Adversary Complaint | Sale Order and/or Declarations |
|---|---|---|
| condominium should be common elements of the North Tower and not Shared Facilities of the Hotel Lot:<br><br>- Section 2.14 of North Tower Declaration (Definition of Common Elements) [1]<br><br>- Section 3.4(g) of North Tower Declaration (Easements)[2]<br><br>- Section 7.4 of the North Tower Declaration (Maintenance Obligations)[3]<br><br>- Section 8.2 of the North Tower Declaration (Improvements by Hotel Lot Owner)[4]<br><br>- Section 1.1(dd) of the Master | those common elements." Adv. Compl. ¶ 166. | Section 1.1(dd) of the Master Declaration provides that "The Hotel Lot Owner shall have the right . . . to supplement the [Shared Facilities] by adding additional facilities to or to designate additional portions of the Project as Shared Facilities hereunder (or redesignate any portion of same). . . . [T]he Hotel Lot Owner shall have the right, from time, to time, to expand, alter, relocate and/or eliminate the Shared Facilities, or any portion thereof, without requiring the consent or approval of the Association. . ."<br><br>Moreover, the Court found that "[t]he Hotel Lot Owner (or any successor Hotel Lot Owner) may grant and use general and specific easements over, under, and through the Shared Facilities at its sole discretion to whomever it so chooses." |

---

[1] Section 2.14 of the North Tower Declaration defines "Common Elements" of the North Tower, and provides that "No portion of the Shared Facilities shall be deemed Common Elements hereunder." See North Tower Declaration [ECF No. 364-2].

[2] Section 3.4(g) of the North Tower Declaration creates easements for the Master Association and the Hotel Lot Owner. See North Tower Declaration [ECF No. 364-2].

[3] Section 7.4 of the North Tower Declaration provides that all maintenance obligations must be undertaken in a manner consistent with the high standards of the hotel. See North Tower Declaration [ECF No. 364-2].

[4] Section 8.2 of the North Tower Declaration provides that the Developer has the right, without the consent or approval of the Board of Directors or the Unit Owners to make alterations, additions or improvements to and upon any Unit, and to expand, alter or add to all or any part of the recreational facilities. See North Tower Declaration [ECF No. 364-2].

| North Tower Allegations in the Draft Adversary Complaint | North Tower Allegations in the Filed Adversary Complaint | Sale Order and/or Declarations |
|---|---|---|
| Declaration (Definition of various Shared Facilities)[5]<br><br>- Section 2.3 of the Master Declaration (Right to amend Declaration unilaterally at any time) [6]<br><br>- Section 4.3 of the Master Declaration (Use of Shared Facilities) [7]<br><br>- Section 5.1 of the Master Declaration (Exteriors of Structures)[8]<br><br>- Section 5.2 of the Master | | Sale Order ¶ V.<br><br>With respect to the Shared Facilities, the Court confirmed that "[t]he Hotel Lot Owner (or any successor Hotel Lot Owner) has broad rights under the Master Declaration to regulate the use of the Shared Facilities, including, without limitation, (i) the right to limit the availability of Unit Owners' use privileges, (ii) to change, eliminate or cease of any or all of the spa features and/or services, and (iii) to impose reasonable non-discriminatory rules and regulations, policies, restrictions and/or prohibitions to govern the orderly use of such facilities." Sale Order ¶ V. |

---

[5]    Section 1.1(dd) of the Master Declaration contains descriptions of Shared Facilities, including each Tower's Shared Facilities, Non-Retail Shared Facilities, and General Shared Facilities.  See Master Declaration [ECF No. 364-3].

[6]    Section 2.3 of the Master Declaration gives the Declarant the right to amend the Declaration unilaterally at any time, without prior notice and without the consent of any person or entity for the purpose of removing certain portions of The Properties from the provisions of the Declaration.  See Master Declaration [ECF No. 364-3].

[7]    Section 4.3 of the Master Declaration grants each Member limited rights to use the various Shared Facilities, subject to the Hotel Lot Owner's right to levy assessments, adopt and enforce rules and regulations governing use of the Shared Facilities, grant and use easements through the various Shared Facilities, and the right to withdraw portions of the Shared Facilities.  See Master Declaration [ECF No. 364-3].  Section 4.3 was amended in 2016 to grant Unit Owners in the North Tower limited rights to use, benefit from and enjoy the North Tower Shared Facilities (a new category of Shared Facilities).

[8]    Section 5.1 of the Master Declaration requires the Hotel Lot Owner to maintain all exterior surfaces and roofs and other improvements (such as driveways and sidewalk surfaces).  To the extent such portions of the structures are deemed various Shared Facilities, a proportionate share of the costs shall be assessed against the Associations in accordance with paragraph 16.3 of the Master Declaration.  See Master Declaration [ECF No. 364-3].  Section 5.1 was amended in 2016 to include the exterior portions of the north tower structure that were deemed part of the North Tower Shared Facilities.

| North Tower Allegations in the Draft Adversary Complaint | North Tower Allegations in the Filed Adversary Complaint | Sale Order and/or Declarations |
|---|---|---|
| Declaration (Maintenance of Lots)[9]<br><br>- Section 16.2 of the Master Declaration (Maintenance)[10]<br>- Section 16.3 of the Master Declaration (Assessments)[11]<br><br>Mot., Ex. A ¶ 215. | | Additionally, the Court confirmed Z Capital's authority to levy assessments: "The Hotel Lot Owner (or any successor Hotel Lot Owner) may levy assessments for, without limitation, the maintenance, repair, management, replacement and operations of the Shared Facilities. Included in the Shared Facilities are the Unit Owner's Limited Spa Rights, only as expressly set forth in Articles 1.1(dd)(iv)(d), 1.1(oo), and 4.4 of the Master Declaration. Such assessments for the Shared Facilities are separate from and in addition to the monthly Fixed Charge that Unit Owners are obligated to pay the Hotel Lot Owner (or any successor Hotel Lot Owner) in accordance with Article 16.3 of the Master Declaration." Sale Order ¶ V. |

---

[9] Section 5.2 of the Master Declaration requires the Hotel Lot Owner to maintain the landscaping of the Property. To the extent any portion of the landscaping is deemed part of the Shared Facilities, a proportionate share of the costs will be assessed. See Master Declaration [ECF No. 364-3].

[10] Section 16.2 of the Master Declaration requires the Hotel Lot Owner to maintain the various Shared Facilities. All work shall be paid for through assessments on the Unit Owners. See Master Declaration [ECF No. 364-3].

[11] Section 16.3 of the Master Declaration provides that Unit Owners agree to pay to the Hotel Lot Owner assessments for the maintenance, management, operation and insurance of the Shared Facilities. See Master Declaration [ECF No. 364-3].

| North Tower Allegations in the Draft Adversary Complaint | North Tower Allegations in the Filed Adversary Complaint | Sale Order and/or Declarations |
|---|---|---|
| **Claim 10 (Unfairness and Unreasonableness Under Chapter 718)**<br><br>"Plaintiffs seek a declaration that the following aspects of the North Tower and Master Declarations violate Chapter 718's requirement that "[a]ny grant or reservation made by a declaration, lease, or other document, and any contract made by an association prior to assumption of control of the association by unit owners other than the developer, *shall be fair and reasonable*":<br><br>- Section 2.14 of the North Tower Declaration[12]<br>- Section 3.4(g) of the North Tower Declaration[13]<br>- Section 7.3 of the North Tower Declaration[14]<br>- Section 7.4 of the North Tower Declaration[15]<br>- Section 8.2 of the North Tower | **Claim 13 (Unfairness and Unreasonableness Under Chapter 718)**<br><br>"Certain provisions of the Master Declaration as written, or as construed and implemented by Z Capital, do not meet the fair and reasonable, arbitrary and capricious, and/or unconscionability standards mandated under Section 718.302 of the Florida Condominium Act." Adv. Compl. ¶ 182.<br><br>"Plaintiff is required to pay an unfair and unreasonable portion of the expenses for maintenance, improvement, operation, repair, replacement and renovation for certain facilities that primarily benefit the hotel, spa, and retail facilities while, on information and belief, Z Capital pays little or *none of these expenses*." Adv. Compl. ¶ 184. | The North Tower Declaration has been in place since 2008 (and last amended in 2012). The time for the North Tower Association to bring these claims was during the bankruptcy proceeding, prior to the Sale.<br><br>The Master Declaration has been in place since 2007 (and amended from time to time).<br><br>- Relevant to this claim, the 2016 Amendment to the Master Declaration altered Sections 1.1(dd) (by adding and/or reorganizing components of the Shared Facilities) and 16.3 (by adding assessments).<br><br>Section 1.1(dd) of the Master Declaration provides that "The Hotel Lot Owner shall the right . . . to supplement the [Shared Facilities] by adding additional facilities to |

---

[12]    *See supra* note 1.

[13]    *See supra* note 2.

[14]    Section 7.3 of the North Tower Declaration makes the Hotel Lot Owner responsible for the repair, replacement, improvement, maintenance, management, operation, and insurance of the Shared Facilities. Each Unit Owner is obligated to pay for expenses in connection with such maintenance. *See* Master Declaration [ECF No. 364-3].

[15]    *See supra* note 3.

| North Tower Allegations in the Draft Adversary Complaint | North Tower Allegations in the Filed Adversary Complaint | Sale Order and/or Declarations |
|---|---|---|
| Declaration[16]<br>- Section 1.1(dd)(i)-(v) of the Master Declaration[17]<br>- Section 2.3 of the Master Declaration[18]<br>- Section 4.3 of the Master Declaration[19]<br>- Section 5.1 of the Master Declaration[20]<br>- Section 5.2 of the Master Declaration[21]<br>- Section 16.1 of the Master Declaration[22]<br>- Section 16.2 of the Master Declaration[23]<br>- Section 16.3 of the Master Declaration[24] | | or to designate additional portions of the Project of the Shared Facilities hereunder (or redesignate any portion of same). . . . [T]he Hotel Lot Owner shall have the right, from time, to time, to expand, alter, relocate and/or eliminate the Shared Facilities, or any portion thereof, without requiring the consent or approval of the Association. . ."<br><br>Moreover, the Court found that "[t]he Hotel Lot Owner (or any successor Hotel Lot Owner) may grant and use general and specific easements over, under, and through the Shared Facilities at its sole discretion to whomever it so chooses." |

[16] *See supra* note 4.

[17] *See supra* note 5.

[18] *See supra* note 6.

[19] *See supra* note 7.

[20] *See supra* note 8.

[21] *See supra* note 9.

[22] Section 16.1 of the Master Declaration sets forth the reservation of easements for support structures; construction, installation, and maintenance of General Shared Facilities; and use of the Shared Facilities. See Master Declaration [ECF No. 364-3].

[23] *See supra* note 10.

[24] *See supra* note 11.

| North Tower Allegations in the Draft Adversary Complaint | North Tower Allegations in the Filed Adversary Complaint | Sale Order and/or Declarations |
|---|---|---|
| Mot., Ex. A ¶ 223(a)-e). | | Sale Order ¶ V.<br><br>With respect to the Shared Facilities, the Court confirmed that "[t]he Hotel Lot Owner (or any successor Hotel Lot Owner) has broad rights under the Master Declaration to regulate the use of the Shared Facilities, including, without limitation, (i) the right to limit the availability of Unit Owners' use privileges, (ii) to change, eliminate or cease of any or all of the spa features and/or services, and (iii) to impose reasonable non-discriminatory rules and regulations, policies, restrictions and/or prohibitions to govern the orderly use of such facilities." Sale Order ¶ V.<br><br>Additionally, the Court confirmed Z Capital's authority to levy assessments: "The Hotel Lot Owner (or any successor Hotel Lot Owner) may levy assessments for, without limitation, the maintenance, repair, management, replacement and operations of the Shared Facilities. Included in the Shared Facilities are the Unit Owner's Limited Spa Rights, only as expressly set forth in Articles 1.1(dd)(iv)(d), 1.1(oo), and 4.4 of the Master Declaration. Such assessments for |

| North Tower Allegations in the Draft Adversary Complaint | North Tower Allegations in the Filed Adversary Complaint | Sale Order and/or Declarations |
|---|---|---|
| | | the Shared Facilities are separate from and in addition to the monthly Fixed Charge that Unit Owners are obligated to pay the Hotel Lot Owner (or any successor Hotel Lot Owner) in accordance with Article 16.3 of the Master Declaration." Sale Order ¶ V. |
| **Claim 11 (Declaratory Judgment as to Common Areas Belonging to the Master Association)**<br><br>Plaintiff seeks a declaration that the Master Declaration, or the following portions thereof, "violate Chapter 720 of the Florida Statues, in that the Shared Facilities serving the several lots at the Carillon should be common areas of the Master Association and not Shared Facilities of the Hotel Lot Owner under Fla. Stat. 720.301(2) and 720.303(1), and that the common areas should be under the control of the Master Association, not Z Capital . . .":<br><br>- Section 1.1(dd)[25]<br>- Section 1.1(i)[26]<br>- Section 2.3[27] | **Claim 11 (Declaratory Judgment as to Common Areas Belonging to the Master Association)**<br><br>"The Master Association has been stripped of all of its functions, power, authority, and responsibilities, including as a result of the failure of Z Florida to designate any common areas whatsoever, and to re-characterize what should be "common areas" under Chapter 720 of the Florida Statutes as "Shared Facilities" or as portions of the "Spa," which are purportedly subject to Z Capital's unregulated and unrestricted discretion." Adv. Compl. ¶ 172.<br><br>"Those common areas of the Master Association are listed inappropriately as | The North Tower Declaration has been in place since 2008 (and last amended in 2012). The time for the North Tower Association to bring these claims was during the bankruptcy proceeding, prior to the Sale.<br><br>The Master Declaration has been in place since 2007 (and amended from time to time).<br><br>- Relevant to this claim, the 2016 Amendment to the Master Declaration altered Sections 1.1(dd) (by adding and/or reorganizing components of the Shared Facilities) and 16.3 (by adding assessments). |

---

[25] *See supra* note 5.

[26] Section 1.1(i) of the Master Declaration defines "Common Properties." See Master Declaration [ECF No. 364-3].

| North Tower Allegations in the Draft Adversary Complaint | North Tower Allegations in the Filed Adversary Complaint | Sale Order and/or Declarations |
|---|---|---|
| - Section 4.3[28]<br>- Section 5.1[29]<br>- Section 5.2[30]<br>- Section 16.1[31]<br>- Section 16.2[32]<br>- Section 16.3[33]<br><br>Mot., Ex. A ¶ 234. | part of the Shared Facilities, or the "Spa" facilities, of the Hotel Lot . . . ." Adv. Compl. ¶ 173. | Section 1.1(dd) of the Master Declaration provides that "The Hotel Lot Owner shall have the right . . . to supplement the [Shared Facilities] by adding additional facilities to or to designate additional portions of the Project as Shared Facilities hereunder (or redesignate any portion of same). . . . [T]he Hotel Lot Owner shall have the right, from time, to time, to expand, alter, relocate and/or eliminate the Shared Facilities, or any portion thereof, without requiring the consent or approval of the Association . . . ."<br><br>Moreover, the Court found that "[t]he Hotel Lot Owner (or any successor Hotel Lot Owner) may grant and use general and specific easements over, under, and through the Shared Facilities at its sole discretion to whomever it so chooses." |

---

[27] *See supra* note 6.

[28] *See supra* note 7.

[29] *See supra* note 8.

[30] *See supra* note 9.

[31] *See supra* note 22.

[32] *See supra* note 10.

[33] *See supra* note 11.

| North Tower Allegations in the Draft Adversary Complaint | North Tower Allegations in the Filed Adversary Complaint | Sale Order and/or Declarations |
|---|---|---|
| | | Sale Order ¶ V.<br><br>With respect to the Shared Facilities, the Court confirmed that "[t]he Hotel Lot Owner (or any successor Hotel Lot Owner) has broad rights under the Master Declaration to regulate the use of the Shared Facilities, including, without limitation, (i) the right to limit the availability of Unit Owners' use privileges, (ii) to change, eliminate or cease of any or all of the spa features and/or services, and (iii) to impose reasonable non-discriminatory rules and regulations, policies, restrictions and/or prohibitions to govern the orderly use of such facilities." Sale Order ¶ V. |
| **Claim 12 (Unfairness and Unreasonableness under Chapter 720)**<br><br>"[T]he Master Declaration purports to grant Z Capital exclusive possession and control over what should be the common areas of the Master Association, and gives Z Capital plenary power over the operation, maintenance, and management of these common areas—which are instead called "Shared Facilities" in the Master Declaration." Mot., Ex. A ¶ 237. | **Claim 14 (Unreasonableness and Unfairness under Chapter 720)**<br><br>"Z Capital is operating the Property, and utilizing the Master Declaration, in an unfair and unreasonable manner, in violation of Section 720.309(1), Fla. Stat., including (without limitation) by entirely excluding Plaintiff and Unit Owners, and the other non-developer members of the Master Association, from having the sort of post-turnover input, oversight, and | The North Tower Declaration has been in place since 2008 (and last amended in 2012). The time for the North Tower Association to bring these claims was during the bankruptcy proceeding, prior to the Sale.<br><br>The Master Declaration has been in place since 2007 (and amended from time to time). |

| North Tower Allegations in the Draft Adversary Complaint | North Tower Allegations in the Filed Adversary Complaint | Sale Order and/or Declarations |
|---|---|---|
| "[T]he Master Declaration requires Unit Owners to pay an escalating "Fixed Charge" to Z Capital for limited access rights to the Spa . . . . "Unit Owners have no input in how the Spa is operated, what services are provided, or who is allowed to use the Spa." Mot., Ex. A ¶ 240.<br><br>Plaintiff seeks a declaration that the following aspects of the Master Declaration violate Chapter 720's [fair and reasonable] requirement:<br><br>  -  Section 1.1(dd)(i)-(v) of the Master Declaration[34]<br>  -  Section 1.2 of the Master Declaration[35]<br>  -  Section 2.3 of the Master Declaration[36]<br>  -  Section 4.3 of the Master Declaration[37]<br>  -  Section 5.1 of the Master Declaration[38] | control over areas that are contemplated under Chapter 720 of the Florida Statutes to be common areas." Adv. Compl. ¶ 186.<br><br>"Z Capital is arbitrarily and capriciously, and unfairly and unreasonably, running the facilities at the Property in a manner calculated to be the most profitable for itself, regardless of the interests of Plaintiff and the Unit Owners and purports to exercise unrestricted authority to renovate some aspects of the Property, neglects others, and charges unfair, unreasonable and otherwise improper assessments . . . ." Adv. Compl. ¶ 187. |   -  Relevant to this claim, the 2016 Amendment to the Master Declaration altered Sections 1.1(dd) (by adding and/or reorganizing components of the Shared Facilities) and 16.3 (by adding assessments).<br><br>Section 1.1(dd) of the Master Declaration provides that "The Hotel Lot Owner shall have the right . . . to supplement the [Shared Facilities] by adding additional facilities to or to designate additional portions of the Project as Shared Facilities hereunder (or redesignate any portion of same). . . . [T]he Hotel Lot Owner shall have the right, from time, to time, to expand, alter, relocate and/or eliminate the Shared Facilities, or any portion thereof, without requiring the consent or approval of the Association . . . ." |

[34]     *See supra* note 4.

[35]     Section 1.2 of the Master Declaration enables the Hotel Lot Owner to interpret the provisions of the Master Declaration. <u>See</u> Master Declaration [ECF No. 364-3].

[36]     *See supra* note 6.

[37]     *See supra* note 7.

[38]     *See supra* note 8.

| North Tower Allegations in the Draft Adversary Complaint | North Tower Allegations in the Filed Adversary Complaint | Sale Order and/or Declarations |
|---|---|---|
| - Section 5.2 of the Master Declaration[39]<br>- Section 16.1 of the Master Declaration[40]<br>- Section 16.2 of the Master Declaration[41]<br>- Section 16.3 of the Master Declaration[42]<br><br>Mot., Ex. A ¶ 241(a)-(g). | | Moreover, the Court found that "[t]he Hotel Lot Owner (or any successor Hotel Lot Owner) may grant and use general and specific easements over, under, and through the Shared Facilities at its sole discretion to whomever it so chooses." Sale Order ¶ V.<br><br>With respect to the Shared Facilities, the Court confirmed that "[t]he Hotel Lot Owner (or any successor Hotel Lot Owner) has broad rights under the Master Declaration to regulate the use of the Shared Facilities, including, without limitation, (i) the right to limit the availability of Unit Owners' use privileges, (ii) to change, eliminate or cease of any or all of the spa features and/or services, and (iii) to impose reasonable non-discriminatory rules and regulations, policies, restrictions and/or prohibitions to govern the orderly use of such facilities." Sale Order ¶ V. |

[39] *See supra* note 9.

[40] *See supra* note 22.

[41] *See supra* note 10.

[42] *See supra* note 11.

| North Tower Allegations in the Draft Adversary Complaint | North Tower Allegations in the Filed Adversary Complaint | Sale Order and/or Declarations |
|---|---|---|
| | | Additionally, the Court confirmed Z Capital's authority to levy assessments: "The Hotel Lot Owner (or any successor Hotel Lot Owner) may levy assessments for, without limitation, the maintenance, repair, management, replacement and operations of the Shared Facilities. Included in the Shared Facilities are the Unit Owner's Limited Spa Rights, only as expressly set forth in Articles 1.1(dd)(iv)(d), 1.1(oo), and 4.4 of the Master Declaration. Such assessments for the Shared Facilities are separate from and in addition to the monthly Fixed Charge that Unit Owners are obligated to pay the Hotel Lot Owner (or any successor Hotel Lot Owner) in accordance with Article 16.3 of the Master Declaration." Sale Order ¶ V. |
| **Claim 14 (Injunctive Relief and Declaratory Judgment as to Planned Renovations and Improvements)**<br><br>"Z Capital has announced . . . its plans to make material and unilateral alterations to the nature of the Property which are unreasonable, arbitrary and capricious, in bad faith and which destroy the general plan of development in violation of Section | **Claim 16 (Injunctive Relief and Declaratory Judgment as to Planned Renovations and Improvements)**<br><br>"These planned, unilateral alterations of the Property are unreasonable, arbitrary and capricious, in bad faith and destroy the general plan of development in violation of Section 720.3075, Fla. Stat." Adv. Compl. ¶ 198. | The Sale Order confirms that the "owner (or any successor owner) of the Future Development Property as defined by Article 1.1(x) of the Master Declaration has the right to "annex" or add Future Development Property to the jurisdiction of the Master Declaration, provided that a Supplemental Declaration is duly executed and recorded in the Public Records of Miami-Dade County, as provided in |

| North Tower Allegations in the Draft Adversary Complaint | North Tower Allegations in the Filed Adversary Complaint | Sale Order and/or Declarations |
|---|---|---|
| 720.3075." Mot., Ex. A ¶ 258.<br><br>"Z Capital is undertaking significant and expensive renovations that primarily benefit Z Capital, including taking space from the Shared Facilities and converting it into exclusive property of Z Capital." Mot., Ex. A ¶ 259.<br>"By converting space that was part of the Shared Facilities and converting it into exclusive property of Z Capital, Z Capital's planned renovation will, on information and belief, violate the contractually binding promise in Section 10 of the North Tower Contract . . ." Mot., Ex. A ¶ 260.<br><br>"Although the planned renovations will benefit Plaintiff very little, if at all, Z Capital has indicated . . . that Plaintiff will be assessed to pay a significant portion of the cost of these renovations to facilities that are part of the Spa, and not part of the Shared Facilities (other than for limited access purposes)." Mot., Ex. A ¶ 263.<br><br>"Plaintiff seeks a declaration that the planned renovations and assessments are unlawful under the Florida Condominium Act," and "a preliminary injunction | | Article 2.2 of the Master Declaration." Sale Order ¶ V. |

**DECLARATION CLAIMS**

| North Tower Allegations in the Draft Adversary Complaint | North Tower Allegations in the Filed Adversary Complaint | Sale Order and/or Declarations |
|---|---|---|
| prohibiting the defendant, Z Capital, from altering the Shared Facilities until and unless there is a final determination of the merits of the claims in this case." Mot., Ex. A ¶ 272. | | |