BROWN RUDNICK LLP
Edward S. Weisfelner
Bennett S. Silverberg
Seven Times Square
New York, NY 10036
Telephone: (212) 209-4900

BOIES, SCHILLER & FLEXNER LLP
Sigrid S. McCawley
Carl Goldfarb
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Telephone: (954) 356-0011

*Co-Counsel for North Carillon Beach Condominium Association, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------X

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| | : | Case No. 14-11691 (SCC) |
| FL 6801 SPIRITS LLC, *et al.*, | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |

-----------------------------------------------------------------X

| | | |
|---|---|---|
| | : | |
| NORTH CARILLON BEACH CONDOMINIUM | : | |
| ASSOCIATION, INC., | : | |
| | : | |
| Plaintiff, | : | Adv. Pro. No. 16-01259 (SCC) |
| | : | |
| vs. | : | |
| | : | |
| Z CAPITAL PARTNERS, LLC; Z CAPITAL | : | |
| FLORIDA RESORT, LLC; NORTH BEACH | : | |
| DEVELOPMENT, LLC; CARILLON HOTEL AND | : | |
| SPA MASTER ASSOCIATION, INC.; SOUTH | : | |
| CARILLON BEACH CONDOMINIUM | : | |
| ASSOCIATION, INC.; and CENTRAL CARILLON | : | |
| BEACH CONDOMINIUM ASSOCIATION, INC., | : | |
| | : | |
| Defendants. | : | |

-----------------------------------------------------------------X

# Table of Contents

**Page**

COMPLAINT ........................................................................................................1

NATURE OF ACTION .........................................................................................1

JURISDICTION AND VENUE ...........................................................................8

PARTIES ..............................................................................................................8

FACTUAL BACKGROUND ..............................................................................10

 The Property ...........................................................................................10

 Associations, Declarations, Property Categories, Unit Types...............12

THE PROPERTY IS PUT UP FOR SALE .........................................................16

Z CAPITAL'S WRONGFUL CONDUCT ..........................................................16

I. Fraudulent Inducement, Unconscionable, Deceptive & Unfair Acts & Practices ...........16

 A. Z Capital's Pre-Bankruptcy Sale Deception Of Unit Owners Through Its E-Mail Campaign...............................................16

 B. Z Capital Fraudulently Induces The Associations To Enter Into The Term Sheets ..................................................22

 1. The Term Sheet With The South And Central Towers ...........................22

 2. The Term Sheet Negotiated With The North Tower At The Sale Hearing ..............................................23

 C. Z Capital Obtains Approval Of The Bankruptcy Sale.............................25

 1. The Sale Order Findings .......................................................................25

 2. The Sale Closing ..................................................................................27

II. Z Capital's Post-Bankruptcy Sale Breaches Of Contract ................................27

III. Z Capital Is Breaching Various Provisions Of The Master Declaration .........................33

 A. Overcharges And Improper Assessments .................................................33

 B. Withholding Books And Records ............................................................35

IV. Z Capital Is Violating The Florida Homeowners' Association Law...............................37

 A. Z Capital's Failure To Relinquish Control Over Master Association ..................................................37

 B. Common Areas Were Improperly Re-Designated and Re-Categorized As "Shared Facilities" ..........................................39

 C. Z Capital's Implementation Of The Master Declaration Fails The Fair And Reasonable Standards Of Florida Law ....................................39

i

V.      Master Declaration Circumvents Protections Afforded Under Florida Law For Recreational Lease Agreements ...................................................................................41

COUNTS ...................................................................................................................................42

      Count I (Fraudulent Inducement) (Against Z Capital).........................................42

      Count II (Negligent Misrepresentation) (Against Z Capital) ...............................43

      Count III (Florida Deceptive And Unfair Trade Practices Act,  Section 501.201, Fla. Stat. On Account of Pre-Sale Conduct) (Against Z Capital) ....................................................................................................................44

      Count IV (Florida Deceptive And Unfair Trade Practices Act,  Section 501.201, Fla. Stat. On Account of Post-Sale Conduct) (Against Z Capital) ....................................................................................................................45

      Count V (Breach of North Tower Term Sheet) (Against Z Capital) ...................47

      Count VI (Breach of Implied Covenant of Good Faith & Fair Dealing - North Tower Term Sheet) (Against Z Capital) ......................................48

      Count VII (Unjust Enrichment) (Against Z Capital) ...........................................48

      Count VIII (Negligence For Failure To Make Timely And Prompt Stucco Repairs) (Against Z Capital) .................................................................50

      Count IX (Breach of Covenants—Master Declaration) (Against Z Capital)........51

      Count X (Breach of Implied Covenant of Good Faith & Fair Dealing - Master Declaration) (Against Z Capital)................................................52

      Count XI (Declaratory Judgment As To Common Areas being Under the Control of the Master Association) (Against Z Capital, Master Association, South Condominium Association, Central Condominium Association, And North Beach Development)...............53

      Count XII (Declaratory Judgment Regarding Option Rights Under Recreational Lease) (Against Z Capital).................................................55

      Count XIII (Unfairness and Unreasonableness Under Chapter 718) (Against Z Capital and Master Association) .........................................56

      Count XIV (Unfairness and Unreasonableness Under Chapter 720) (Against Z Capital, Master Association, and North Beach Development) ......................................................................................57

      Count XV (Declaratory Judgment As To Majority Members of the Board of Directors And Member Voting Rights On The Master Association) (Against Z Capital and Master Association).....................58

      Count XVI (Injunctive Relief and Declaratory Judgment As To Planned Renovations And Improvements) (Against Z Capital And Master Association)................................................................................59

REQUEST FOR RELIEF.........................................................................................................61

## AMENDED COMPLAINT

Plaintiff, North Carillon Beach Condominium Association, Inc. ("NCBCA" or "Plaintiff"), acting on its own behalf and on behalf of its Unit Owners ("Unit Owners"), sues Z Capital Partners, LLC and Z Capital Florida Resort, LLC (collectively with Z Capital Partners, LLC, "Z Capital," and individually "Z Florida" or the "Hotel Lot Owner"), North Beach Development, LLC ("North Beach Development" or the "Retail Lot Owner"), Carillon Hotel and Spa Master Association Inc. (the "Master Association"), South Carillon Beach Condominium Association, Inc. (the "South Tower Condominium Association" or the "SCBCA"), and Central Carillon Beach Condominium Association, Inc. (the "Central Tower Condominium Association" or "CCBCA" and, together with NCBCA and SCBCA, the "Associations"), and in support thereof states as follows:

## NATURE OF ACTION

1. This is an action for relief from Z Capital's improper, unlawful and flagrant exploitation of Plaintiff and the Unit Owners it represents at the Carillon development (the "Property" or the "Carillon"). Z Capital, a self-described "opportunistic" private equity fund from Chicago, fraudulently induced NCBCA to enter into a term sheet which, by its terms, was part of a settlement of disputes among NCBCA and Z Capital. Following the Bankruptcy Court's approval of the Section 363 sale to it (the "Bankruptcy Sale"), Z Capital has failed to deliver on many of its numerous representations and contractual promises, dramatically and systematically reduced the quality of the operation, management, maintenance, services and staffing at the Property, including in vital areas like security, amenities, grounds maintenance, fitness classes and lectures, and the overall lifestyle and enjoyment of the Property. The reductions in quality were brought about, in large part, through cost-saving measures unilaterally imposed by Z Capital. All the while, Z Capital has improperly refused to pass along these cost

savings to the Unit Owners and the reduction of services is impairing the Unit Owners' quality of life at the Property.

2.      Even before it closed on its acquisition of the Property, Z Capital cut $2 million in annual costs by improperly and deceptively terminating the hotel and spa management and licensing contract with the world-renowned Canyon Ranch fitness and health company.   Z Capital's improper bad faith termination of Canyon Ranch robbed the Unit Owners of Canyon Ranch's unique expertise and aura, on whose 20-year management contract they had relied when buying and retaining their units.  Having improperly dismissed Canyon Ranch, Z Capital failed to replace its iconic brand with an equivalently qualified and branded operator in health and fitness as promised.  Instead, Z Capital manages and operates the hotel and spa (the "Spa") all by itself, without any relevant expertise, without a well-known and respected brand, and with only financial engineering as a motive.  Z Capital's self-serving and deceptive actions have deprived Unit Owners of the expertise, aura and lifestyle they had bought into and have directly caused a substantial loss in the value of units for the North Tower Unit Owners.

3.      Z Capital has also denied NCBCA and the Unit Owners it represents any financial transparency, accountability or support for the assessments and fees imposed upon them despite their express rights to "inspect and audit" under the Master Declaration (as defined below). Since Z Capital's acquisition of the Hotel Lot, the assessments and fees imposed upon all unit owners at the Property have exceeded roughly $18 million on an annual basis; substantially more than is charged to residents at true 5-star properties.

4.      Additionally, Z Capital has improperly denied the Master Association its legitimate control of what should be common areas of the Master Association and, despite its

status as a successor developer, has refused to relinquish control of the Master Association (as defined below) and to turn over control to the non-developer members.

5.      There are four components to Z Capital's actionable conduct:  **First**, Z Capital's fraudulent, unconscionable, unfair and deceptive inducement of the Unit Owners and the Associations, through false e-mails and other means, to enter into a term sheet (the "North Tower Term Sheet") that it now appears clear that Z Capital had no intention of honoring; **second**, post-Bankruptcy Sale, Z Capital has breached virtually all of the binding promises it made regarding how the Property would be managed and operated; **third**, post-Bankruptcy Sale, Z Capital has systematically breached many provisions of the Master Declaration, including without limitation, provisions pertaining to (a) the allocation, imposition and determination of certain assessments and fees and (b) the right of Plaintiff and its Unit Owners to "inspect and audit" financial records pertaining to such assessments; and **fourth**, post-Bankruptcy Sale, Z Capital has systematically violated certain applicable provisions of Florida's Homeowners' Association Act, including, without limitation, by failing to (a) turn over developer control of the Master Association to the non-developer members and (b) recognize, designate and relinquish control over facilities that should be "common areas" of the Master Association in accordance with applicable provisions of Florida law.

6.      **First**, when Z Capital sought to acquire the Hotel Lot it faced significant hurdles: the Associations and their Unit Owners were adamantly opposed to a sale of their high-end health, fitness and wellness-focused complex to a private equity fund that had no relevant experience managing or operating a property of the former Canyon Ranch's nature and caliber but, instead, is known for, and indeed prides itself on, its "opportunistic approach" to investing and financial value extraction.  The Associations and their Unit Owners were deeply concerned

that Z Capital's purchase would be disastrous for property values, and to the very particular health, wellness and fitness-focused lifestyle which was fundamental to the nature of their community. Instead, the Associations and the Unit Owners initially supported an alternative bid by a group of residents at the Property known as the "6801 group," which proposed a favorable plan of reorganization for the Debtors, the continuation of the Canyon Ranch brand and operation of the Spa and its health, wellness and fitness focus essential to them, and the operation of the hotel under a well-respected flag.

7. Recognizing that its bid was in trouble, Z Capital embarked upon an extensive campaign of false promises and representations in e-mails to the Unit Owners, stating, among other things, that if its acquisition were approved, Z Capital would either retain the existing brand and operator, Canyon Ranch, or bring another, similarly high-end and renowned five-star brand to the property, all while maintaining the integral focus on healthy living, serenity and general fitness. Z Capital explained that it "underst[oo]d that many, if not all of you, bought into the health and wellness lifestyle and amenities that the property provides, and you likely paid a premium for it," and that if Z Capital were the successful bidder, "[t]his fundamental character will **not** change. Period." To this end, Z Capital represented that it had created a joint venture (the "Zecha/Breene JV") with Adrian Zecha, founder of Amanresorts and GHM Ltd, and Jonathan Breene, developer and creator of The Setai residences and condo-hotel in Miami Beach, to launch a new luxury hotel flag, the "Talai," with the Property as its flagship property.

8. These representations were false and responsible for inducing NCBCA to enter into the Term Sheet which NCBCA would not have entered into but for the representations that Z Capital repeatedly made in its many e-mails to the Unit Owners. Unfortunately, Z Capital's representations were simply false, deceptive and unfair. As Hotel Lot Owner, Z has gained

control over a property that it had no expertise or experience in operating, but which offered rich opportunities for financial restructuring and value extraction.

9.     **<u>Second</u>**, once in the ownership position, Z Capital ignored the promises and binding commitments it had made and committed numerous material breaches of its contractual obligations. In the North Tower Term Sheet, Z Capital promised that the Hotel Operator would be the Zecha/Breene JV and that Z Capital would make good faith efforts to negotiate with Canyon Ranch to remain in the Spa only. The agreement also promised a level of service equivalent or comparable to the Acqualina in Sunny Isles Beach, St. Regis in Bal Harbour and the Ritz-Carlton in Ft. Lauderdale. But today, instead of the hotel, Spa, restaurant and campus being operated under the Talai "premier, luxury flag," everything is run exclusively by Z Capital. There is no Zecha/Breene JV, no Talai flag, and there never was. Moreover, instead of the Spa, health, wellness and fitness operations being run by the original operator, Canyon Ranch, or by the Zecha/Breene JV or another third-party operator of similar expertise and brand aura, these facilities are now under the exclusive control of Z Capital, under the old "Carillon" name. Carillon is not a brand, much less a 5-star brand, but merely the name of the prior hotel on the Property prior to its being re-developed as "Canyon Ranch Miami." The Carillon is being operated solely by Z Capital with an emaciated and inexperienced local management team, without any refined management approach or any hospitality marketing muscle, and with drastic cost-cutting measures being implemented by Z Capital's financial engineers in Chicago who lack any objective experience and expertise in high end hospitality and health, wellness and fitness. As a result, the room rates and reputation of the Property have plummeted to the point that rooms, along with spa treatments and food and beverage deals, were offered on deep-discount web-sites such as "Travel-Zoo," casting a down market shadow over the entire Property.

10. This arrangement provides none of the talents, experience and resources of the owners and operators of some of the world's finest resorts and residences as Z Capital promised. Instead, the current arrangement affords significant cost-savings for Z Capital. As a result, in a Miami Beach market that is booming, the Unit Owners have seen the value and liquidity of their condominium units fall precipitously relative to comparable properties, as the service quality, brand aura, and high end health, wellness and fitness lifestyle (for which they purchased and retained their units and for which the Property had become known) have been eroded away.

11. **Third**, Z Capital has continuously denied and deprived Plaintiff and its Unit Owners of their rights and protections under, and has systematically breached and violated, the Master Declaration. For example, despite repeated requests and demands from NCBCA, Z Capital has refused to provide any financial books or records, or other financial transparency or accountability for the general and special assessments imposed upon the Unit Owners, other than bare-bones operating budgets, in clear violation of NCBCA's rights under the Master Declaration to "inspect and audit" the books and records for the shared facilities. Additionally, Z Capital has been imposing upon the Unit Owners improper assessments and fees, in a manner that violates the Master Declaration, including, but not limited to, (a) assessments that fail to accurately account for the reduced expenses resulting from Z Capital's drastic cost-savings measures, (b) improperly assessing, or over-assessing, Unit Owners for all or most of the expenses for certain facilities, and (c) imposing and collecting special assessments from the Unit Owners for all or substantially all expenses for renovation of the hotel lobby and reception areas.

12. **Finally**, Z Capital has systematically violated protections that the Florida Condominium Act (Chapter 718) and the Florida Homeowners' Association Act (Chapter 720) affords to Unit Owners. Z Capital has: (a) interpreted and/or implemented certain provisions of

the Master Declaration in a manner that is not fair and reasonable, in violation of Sections 718.302 and 720.309, Fla. Statutes, or otherwise in a manner that is arbitrary and capricious, and/or unconscionable, in violation of Florida law; (b) failed to turn over control of the Master Association, and retained post-turnover, successor-developer control of the board of the Master Association, including super-majority voting rights, and has unilaterally amended the Master Declaration, in violation of Florida law; (c) failed to recognize or permit the Master Association's right to operate and control (separate and apart from Z Capital's ownership of) certain facilities and other areas, intended solely or primarily for use by unit owners in the Community, and their tenants and guests, which fall squarely within the definition of "Common Property/common areas" of the Master Association under the Florida Homeowners' Association Act; (d) embedded a recreational lease within the Master Declaration, in such a manner as to deprive the Unit Owners of their statutory option to purchase said recreational lease for cash; and (e) modified, and plans to further modify, the Property in a manner that destroys the general plan of development, as a community with a primary focus on health, wellness and fitness, in violation of protections afforded under the Florida Homeowners' Association Act, and/or other applicable law. These egregious, deceptive, unfair and unconscionable abuses are exemplified by Z Capital's current plan to dramatically change the nature of the Property by rebranding the hotel as a self-described "Rat-Pack" themed destination in stark contrast to the health and wellness focus embodied by its redevelopment in 2008.

13. In summary, this is an action for relief from multiple forms of predatory deceit and exploitation of all Unit Owners by a private equity fund that gained control over this Property based on fraudulent misrepresentations to NCBCA and the Unit Owners and other misconduct. Plaintiff asks the Court to address these fraudulent, deceptive, unfair and

unconscionable acts and practices by Z Capital, to stop these egregious breaches of contract and law, to compensate Plaintiff for the substantial losses incurred, to provide Plaintiff with the benefit of its bargain and to end this unconscionable, unfair, deceptive and unreasonable abuse of power and predatory exploitation of the NCBCA and its Unit Owners.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over portions of this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1409(a).  Certain portions of this adversary proceeding are core proceedings pursuant to 28 U.S.C. § 157(b)(2).  Plaintiff believes that it has satisfied all of the elements for permissive abstention with regard to the continued prosecution of those elements of this adversary proceeding that are core.

## PARTIES

15.     The North Carillon Beach Condominium Association, Inc., is a Florida not-for-profit corporation located in Miami-Dade County, Florida, and is a condominium association organized pursuant to the provisions of Chapter 718 of the Florida Statutes, for the North Carillon Beach Condominium (the "North Tower").  The North Tower was established as a condominium by the recording of its Declaration of Condominium on August 27, 2008 in Official Records Book 26542 at Page 15 of the Miami-Dade County public records (the "North Tower Condominium Declaration").  Control of the association was turned over by the developer to the Unit Owners on or around February 7, 2013.  Plaintiff brings this action pursuant to Section 718.111, Fla. Stat., and Florida Rule of Procedure 1.221 in its own right and as the lawful representative of Unit Owners of the North Tower.  The causes of action brought by this Complaint concern matters of common interest to most or all of the Unit Owners.

16.     Z Capital Partners, LLC, is a Delaware limited liability company with offices in New York, New York; Lake Forest, Illinois; and Zurich, Switzerland. Z Capital Partners, LLC, stands in the shoes of the original Hotel Lot Owner and the original developer of the Carillon, after entering into a purchase agreement to purchase certain Carillon assets pursuant to the Bankruptcy Court's November 2014 order (the "Sale Order").

17.     Z Florida is a Delaware limited liability company with its principal place of business in Lake Forest, Illinois that is registered to transact business in Florida. Z Capital Partners, LLC, assigned its interests to its affiliate Z Capital Florida Resort, LLC.

18.     North Beach Development is a Florida limited liability company with its principal address in Miami Dade County, Florida.  North Beach Development recently purchased the Retail Lot at the Carillon from Z Capital.  North Beach Development is listed as a defendant in this action solely pursuant to Section 86.091, Fla. Stat., since it may be affected by the declaratory relief sought herein.

19.     The Master Association is a Florida not-for-profit corporation located in Miami Dade County, Florida. The Master Association was established by a Declaration of Covenants, Restrictions and Easements recorded on December 3, 2007 in Official Records Book 26080 at Page 4905 of the Miami-Dade County Public Records (as amended, the "Master Declaration"), in order "to ensure the orderly development, operation and maintenance of the Properties," as stated in Section 8.1 thereof.  The Master Declaration was amended on August 8, 2008 to supplement the definition of the Hotel Lot.  The amendment was recorded in Official Records Book 26542 at Page 1 of the Miami-Dade Public Records.  The Declarant's rights and obligations under the Master Declaration were assigned to Z Florida by Assignment of Declarant's Rights, recorded in Official Records Book 29469 at Page 3199 of the Miami-Dade

Public Records, pursuant to which it became the successor to the original developer. The Master Association is listed as a defendant in this action solely pursuant to Section 86.091, Fla. Stat., since it may be affected by the declaratory relief sought herein.

20.     The SCBCA is a condominium association organized pursuant to the provisions of Chapter 718 of the Florida Statutes for the South Carillon Beach Condominium (the "South Tower"). The South Tower was established as a condominium by the recording of its Declaration of Condominium on December 3, 2007 in Official Records Book 26080 at Page 4764 of the Miami-Dade County public records (the "South Tower Condominium Declaration"). The South Association is listed as a defendant in this action solely pursuant to Section 86.091, Fla. Stat., since it may be affected by the declaratory relief sought herein.

21.     The CCBCA is a condominium association organized pursuant to the provisions of Chapter 718 of the Florida Statutes for the Central Carillon Beach Condominium (the "Central Tower"). The Central Tower was established as a condominium by the recording of its Declaration of Condominium on October 15, 2008 in Official Records Book 26610 at Page 735 of the Miami-Dade County public records (the "Central Tower Declaration"). The Central Association is listed as a defendant in this action solely pursuant to Section 86.091, Fla. Stat., since it may be affected by the declaratory relief sought herein.

## FACTUAL BACKGROUND

### THE PROPERTY

22.     The Property first opened in 1958, in the form of a single building known as The Carillon Hotel.

23.     Around 2008, the Property was redeveloped into a much larger project comprised of condominium units, located in two newly-constructed towers, and the fully-renovated Central

Tower, with hotel and spa amenities and facilities which include a restaurant, bar, health and wellness and retail facilities, as well as a large and well equipped Spa and treatment area.

24. With the 2008 redevelopment, the Property became operated by Canyon Ranch and marketed and known as *Canyon Ranch Miami Beach*. Canyon Ranch is renowned for its world leadership in high-end integrated health, wellness and fitness management. Since Canyon Ranch first began operations, it received countless awards and accolades for its innovative approach to health and fitness, advancing especially the concept of healthy aging, and for the serene, relaxing and inspiring spa environments.

25. Part of Canyon Ranch's innovative approach included expanding the concept of a spa resort by introducing an integrated health and wellness approach, with a staff that included registered nutritionists, board-certified physicians, exercise physiologists, acupuncturists, licensed physical therapists and other highly skilled, caring staff in order to provide guests with preventative and therapeutic health and wellness resources. Under Canyon Ranch's direction, all restaurants on the Property offered only health-oriented and highly informative menus. These and other innovations were implemented at the Property to widespread international critical acclaim.

26. Unit Owners, when they bought into the Property, were attracted by the promise that they would be part of a "university of healthy aging." They purchased and/or retained their units in reliance on Canyon Ranch's much mentioned long-term management contract at the Carillon which would be in effect through 2028 and the certain lifestyle of health, wellness, casual comfort and amenities associated with the Canyon Ranch management and brand. In fact, the Canyon Ranch brand and lifestyle allowed the original developer to sell these units at a substantial premium over otherwise comparable units in the relevant market.

27.     The North, Central and South towers (each, a "Tower" and collectively, the "Towers") each have their own condominium declaration and are governed by their own condominium association.  The Master Declaration governs the rights not only of the unit owners in the Towers and their respective condominium associations, but also the Hotel Lot Owner (now Z Capital) and the Retail Lot Owner.  In case of a conflict between any of the condominium declarations and the Master Declaration, the Master Declaration prevails.

28.     The Master Declaration provides for a Master Association, whose purpose, as stated in Section 8.1 thereof, is "to ensure the orderly development, operation and maintenance of the Properties."

29.     Turnover is defined, according to the Homeowners' Association Act, as occurring when 90% of the units and other parcels in the community have been conveyed to someone other than the declarant.  Here, the Articles of Incorporation for the Master Association contain a similar provision.  Prior to turnover, the Master Association has six voting members.  There are five Class A voting members: the Condominium South Lot, the Condominium Central Lot, the Condominium North Lot, the Retail Lot, and the Hotel Lot.  The Master Association also provides for a single Class B voting member: the declarant (which may or may not be the same as the Hotel Lot Owner).  Until turnover, the declarant or successor-declarant (presently Z Florida), by virtue of its Class B voting membership, is guaranteed a voting majority by the Articles of Incorporation of the Master Association.

30.     Under Section 720.307(1) of the Homeowners' Association Act, after turnover, members of a master association, other than the developer, are entitled to elect at least a majority of the members of the board of directors of the master association.  At the Carillon, however, although the declarant's Class B membership terminates at turnover, the Articles of

12

Incorporation of the Master Association, in clear violation of the Homeowners' Association Act, still affords Z Capital, as the Hotel Lot Owner (even though it is a successor developer), a majority of the votes in the Master Association by allotting the Hotel Lot Owner five of the nine votes after turnover and only one vote each to the North, Central and South condominium associations and the Retail Lot Owner. This is the case even if the Hotel Lot Owner is the developer.

31. Further, the supermajority voting rights, as well as the provision allowing the Hotel Lot Owner to amend the Master Declaration as long as it owns a lot, violate the prohibition set forth in Section 720.3075 against post-turnover unilateral amendments by the developer.

32. This allocation of post-turnover voting rights also violates Section 720.307(3) which states: "After the developer relinquishes control of the homeowners' association, the developer may exercise the right to vote any developer-owned voting interests **in the same manner as any other member, except for purposes of reacquiring control of the homeowners' association or selecting the majority of the members of the board of directors**." (emphasis added).

33. The "Shared Facilities" are limited to those facilities that are specifically listed in the applicable "Shared Facilities" description in the Master Declaration.

34. The Master Declaration divides the Property into four categories:

a) "Condominium Shared Facilities" are facilities that serve either one Tower exclusively or one Tower and the Hotel Lot, but not the other Property lots. In this category there are the Condominium North Shared Facilities, Condominium Central Shared Facilities and Condominium South Shared Facilities.

b)     "Non-Retail Shared Facilities" serve either the Central Tower, North Tower, and the South Tower exclusively, and/or the Hotel Lot, the Central Tower, North Tower, and the South Tower only, but not the Retail Lot.

c)     The "General Shared Facilities" are areas that serve all the Property lot owners, including the Retail Lot owner.

d)     Finally, "Common Property" is all other property at the Carillon complex that does not fall under any of the above categories; the term "Common Property" encompasses the same property as "common areas" under section 720 of the Florida Homeowners' Association Act, described below.

35.     Under the Master Declaration, the Condominium Shared Facilities, the Non-Retail Shared Facilities, and the General Shared Facilities are all part of the Hotel Lot and owned exclusively by the Hotel Lot Owner.  The Hotel Lot Owner also manages and maintains the various categories of shared facilities and unilaterally sets the assessment levels for doing so, even though the unit owners in the Towers pay all or most of the costs of maintaining and operating the different categories of expenses in the shared facilities budgets.

36.     Because the Property is primarily residential in nature, composed of three condominium towers as well as a hotel lot and a retail lot, the Florida Homeowners' Association Act applies to the overall community.  The Florida Homeowners' Association Act governs communities with homeowners' associations which are primarily residential, including those that include multiple, separate condominium parcels.  Under the Florida Homeowners' Association Act, "common areas"[1] are defined as "all real property within a community which is owned or

---

[1]     "Common areas" under section 720 of the Florida Homeowners' Association Act is a concept that is separate and distinct from "common elements" under section 718 of the Florida Condominium Act. "Common areas" are operated and maintained by the Master Association, but are owned by either the Hotel Lot Owner or the

leased by an association **or dedicated for use or maintenance by the association or its members**, including, regardless of whether title has been conveyed to the association." (emphasis added). Fla. Stat. 720.301(2). Certain portions of the North Tower were improperly re-designated in Z Capital's unlawful March 2016 Amendment (defined below) to become part of the Non-Retail Shared Facilities. Those portions of the North Tower that were re-designated were or should have been "Common Property/common areas" of the Master Association under the Florida Homeowners' Association Act. Z Capital may own these portions of the North Tower, but they should be under the **maintenance, operation and control** of the Master Association with the budget for the common areas set by the Master Association, as "Common Property/common areas," as defined by the Master Declaration.

37. While the North and South Towers have only traditional units, the Central Tower has several types of units. Traditional units are individually furnished and decorated, and are not rentable for periods of six months or less. The North Tower contains 207 traditional residential units and the South Tower contains 143 traditional residential units. The Central Tower contains 231 units, of which 80 are traditional residential units, 59 units are uniformly decorated hotel rooms, which Z Florida purchased from individual homeowners following the Bankruptcy Sale, 91 are transient units which are individually owned by other unit owners (some of which are uniformly decorated and participate in the Carillon Hotel's Rental Property Agreement ("RPA") program, and some are individually furnished and decorated but can be rented on a transient basis outside the RPA program), and one is a "shared components" unit owned by Z Florida, which is comprised of the hotel hallways from the second to the tenth floors.

---

Master Association. Conversely, "common elements" are elements within a condominium that are owned jointly by the unit holders of that condominium.

## THE PROPERTY IS PUT UP FOR SALE

38.　　The Property was known to be for sale since summer 2013.  A group of Unit Owners, referred to as "6801," emerged and expressed its interest in acquiring the Hotel Lot. The central motive of "6801" was to ensure that the Property's high-end health and wellness emphasis and the Canyon Ranch brand and lifestyle, and its impact on property values, were safeguarded.

39.　　On or around June 1, 2014, the entities that developed Canyon Ranch Miami Beach filed a voluntary petition under chapter 11 of the United States Code, 11 U.S.C. §§ 101, *et. seq.*, in the United States Bankruptcy Court for the Southern District of New York.  When the Debtors' chapter 11 cases were filed, there were two lawsuits pending against the then equity owner, an affiliate of Lehman Brothers ("Lehman").  Plaintiff's suit was about annexation of an additional property, and the other two Associations jointly sued about double charging and other issues.

40.　　After commencement of the chapter 11 cases, the "6801" group continued to express its interest in acquiring the Hotel Lot either through a sale or a plan of reorganization.

## Z CAPITAL'S WRONGFUL CONDUCT

I.　　**Fraudulent Inducement, Unconscionable, Deceptive & Unfair Acts & Practices**

　　A.　　*Z Capital's Pre-Bankruptcy Sale Deception Of Unit Owners Through Its E-Mail Campaign*

41.　　The Debtors announced on August 21, 2014 that Z Capital submitted the "highest Qualified Bid" for the Debtors' interest in the Hotel Lot.  One of the Debtors' principal decision makers was a Managing Director at Lehman Brothers, Ms. Joelle Halperin, who in the spring of 2016 would join Z Capital as a Managing Director.  Immediately after the Debtors'

announcement, Z Capital and the Debtors encountered pronounced resistance from the Associations and their respective Unit Owners to the sale of the Hotel Lot to Z Capital.

42.     Because of the "6801" organizational efforts and Unit Owners' general skepticism that Z Capital would be a suitable manager of the Property, Z Capital engaged in a campaign of false and deceptive representations to the Associations, and the Unit Owners regarding its plans for the Property.  These representations related to the retention of Canyon Ranch and promises to maintain the Property with its unique focus on health, wellness and fitness and a commitment to a joint venture, headed by world-renowned hoteliers (*i.e.*, the Zecha/Breene JV), that would operate and re-brand the hotel and do so as a five-star facility.  Indeed, Z Capital purported to have a whole new brand concept ready, with an Asian wellness focused concept called "Talai," for which the Property would become the launch platform and long term "flagship."

43.     For example, on September 12, 2014, Z Capital represented that it "intend[ed] to not only maintain the Canyon Ranch sort of status and prestige, but to even elevate it." Transcript of Hearing re: Status Conference at 34-35, In re FL 6801 Spirits LLC, No. 14-11691-scc (Sept. 12, 2014) [Docket No. 147].

44.     On or about September 29, 2014, Z Capital publicly filed a letter regarding the status of [Z Capital's] plans for the operation of Canyon Ranch Miami."  Letter filed by James J. Ktsanes on behalf of Z Capital [Docket No. 149] at 1.  In its filing, Z Capital represented the following:

a)      "As we have repeatedly told the . . . objecting homeowners' associations [], Z Capital is **committed to maintaining or even improving the standards at the Property**. Since the auction, we have been in negotiations with Canyon Ranch and

other five-star hotel and spa operators to allow us to deliver on that promise." *Id.* at 1 (emphasis added).

b) "We are pleased to report that Z Capital **has executed an agreement** today that will create a joint venture with Adrian Zecha, founder of Amanresorts and GHM Ltd, and Jonathan Breene, developer and creator of The Setai, South Beach, to launch a new luxury hotel flag, with the Property as its flagship property. The Property will be enhanced and operated to meet the physical and operational luxury standards of Mr. Zecha's other 5-star resorts – widely regarded as among the very finest in the world." *Id.* (emphasis added).

c) "The Property will be the first project of the joint venture, which will create a premier, luxury flag. . . We believe this announcement demonstrates Z Capital's commitment to the Property. It should also eliminate any concern that homeowners will enjoy anything less than the standards they expected when they bought into the Property, as well as the claims of the Associations that Z Capital is not a hotel operator and is interested in only a 'free option' or short-term economic flip." *Id.* at 2.

45.  On or about September 29, 2014, Z Capital sent an e-mail to all Unit Owners explaining that Z Capital "has entered into an agreement with Adrian Zecha, founder of Amanresorts and GHM Hotels Ltd, and Jonathan Breene, developer and creator of The Setai, South Beach, to launch a new luxury hotel flag, with the Carillon Hotel and Spa as its initial flagship property." Sept. 29, 2014 E-mail from Z Capital, "Z Capital Message To Carillon Homeowners." The e-mail went on to explain: "The Carillon Hotel and Spa will be the first project of the joint venture, which is expected to create a premier, luxury flag with exclusive,

unique locations around the world. Mr. Zecha has created award-winning resorts in Indonesia, Oman, Switzerland, and Vietnam, which are synonymous with style, service and serenity." *Id.* The e-mail emphasized Zecha and Breene's connections to well-known and established luxury brands. For example, it explained that "[a]s the founder of world renowned Amanresorts and GHM Hotels, Mr. Zecha is celebrated for developing distinctive properties that redefine the destinations in which they are set." Likewise, it elaborated on Breene's role in The Setai: "Mr. Breene's depth of real estate experience combined with his broad international perspective on development has helped to establish a unique vision for The Setai. Mr. Breene was responsible for the development and creation of The Setai, South Beach, ***where his efforts drove unprecedented value for homeowners***." (emphasis added).

46. On or about October 3, 2014, Z Capital sent an e-mail to the Unit Owners representing that Canyon Ranch Miami Beach would, upon its acquisition by Z Capital, "be a true 5-star Adrian Zecha branded property." Oct. 3, 2014 E-mail from Z Capital Partners, "Carillon – The new vision by Zecha, Breene & Z Capital." Recognizing the importance of creating the right brand, Z Capital informed Unit Owners: "Each of Mr. Zecha's 5-star properties has a unique design, finish and feel with an individualized brand name to match. Like choosing the name for your child, we want it to be just right. Rest assured it will be tasteful, classy, and will convey the sense of luxury for which Mr. Zecha is known. ***Everyone will know this is a 'Zecha' property***." *Id.* (emphasis added). Emphasizing Zecha's importance and his connection to other world-renowned properties, the e-mail stated: "The offerings will be enhanced by thoughtfully incorporating touches from Adrian Zecha's incomparable properties with treatments and services infusing a holistic approach to wellness of the mind and body that has been mastered through the ages. . . If you have ever been to one of Mr. Zecha's properties, we think

you will agree that the level of service has no equal.  We plan to upgrade the service at the property to meet or exceed the strict, world-class standards set for all of his 5-star properties." *Id*.

47.     In the same e-mail to the Unit Owners, Z Capital explained that it "underst[oo]d that many, if not all of you, bought into the health and wellness lifestyle and amenities that the property provides, and you likely paid a premium for it. . . This fundamental character will **not** change.  Period." *Id*.  In an acknowledgement that its representations regarding the five-star nature of the Property and the services provided by Canyon Ranch and its commitment to operating the hotel at a five-star level would impact property values, Z Capital explained that these decisions ***"will impact [Unit Owners'] home values for years to come."*** *Id*. (emphasis added).

48.     Finally, the same e-mail stated that Z Capital "will have an ownership interest in the management company joint venture with Adrian Zecha and Jonathan Breene for which this property will be the showcase and a platform for future development. . . **We believe we've assembled a "dream team" of operators tailored to the property**.  Mr. Zecha has been the genius behind many of the world's greatest luxury hotels and provides a global influence for a truly international destination.  Jonathan Breene, having developed the premier luxury property in recent Miami history, brings the local connections to ensure the property amenities are relevant and fitting to a property of its stature." *Id*.

49.     On or about October 8, 2014, Z Capital sent another e-mail to the Unit Owners stating that it acknowledged they "bought into the Canyon Ranch lifestyle," that Z Capital had "every intention of preserving (and protecting!) the sanctuary that you have enjoyed at Canyon Ranch." Oct. 8, 2014 E-mail from Z Capital, "Z Capital FAQ for Homeowner Review."

50.     In the same e-mail, Z Capital again discussed the Zecha/Breene JV, and its importance for branding: "the Property's affiliation with Mr. Zecha will signal to both prospective owners and guests that the Property is among the finest in the world, which we believe will drive hotel revenue with some of the highest Average Daily Rates in the market." *Id.*

51.     On October 26, 2014, Z Capital sent another e-mail to Unit Owners "announc[ing] the unveiling of **the new brand Adrian Zecha developed with you in mind – Talai – which will embody the ethos of service, health and wellness** at luxury properties around the world. Your property will be the flagship to showcase all that we have in mind." Oct. 26, 2014 E-mail from Z Capital, "Z Capital Introduces New Luxury Hotel Flag to Homeowners."

52.     In the same e-mail, Z Capital represented: "Your message was heard loud and clear – many of you want Canyon Ranch to remain involved with the property. As we considered it further, *the combination of Adrian Zecha and Canyon Ranch has exceptional potential for value creation at the property*.  We propose to retain Canyon Ranch in the spa, provided the interest is mutual - with some encouragement by you we believe they will be a willing partner. If Canyon Ranch chooses to move on, Talai will operate the classes, health, wellness and spa consistent with the service levels to which you are accustomed, retaining the best instructors, while adding touches from Adrian Zecha's world renowned spas." *Id.* (emphasis added).

53.     The same e-mail included an attachment describing in detail the plans for this supposed "flagship" of the new Talai brand and the Zecha/Breene JV that would run it. Toward the end of the attachment, Z Capital represented to the Unit Owners that Jonathan Breene "was responsible for the development and creation of The Setai, South Beach, where his efforts drove unprecedented values for homeowners, as shown on the following page."  The "following page"

reflected "Average Sales per sq. ft." from 2001-2014.  In 2001, there was a "$705/Sq Ft" average.  By 2014, there was a "$2,981/Sq Ft" average.  *Id.*, attachment, at 26-27.

54.     The Unit Owners and NCBCA, through the constant barrage of promises by Z Capital, were unlawfully deceived into believing Z Capital would deliver on these specific promises. As set forth below, Z Capital has since failed to live up to any of these representations.

**B.      *Z Capital Fraudulently Induces The Associations To Enter Into The Term Sheets***

55.     Prior to the entry of the Sale Order and approval of the Sale, Z Capital negotiated certain term sheets with the Associations.

*1.   The Term Sheet With The South And Central Towers*

56.     These negotiations first culminated in Z Capital entering into a Term Sheet with the South and Central Towers on or about October 28, 2014.  Among the obligations agreed to in the South/Central Term Sheet, the following are particularly relevant:

a)      **Hotel Operator**:  Z Capital promised that the Hotel Operator would be "[a] joint venture among Adrian Zecha, Jonathan Breene and Z Capital, to be led by Tom Wicky." *Id.* at 2.

b)      **Spa**: Recognizing that the South and Central Towers "wish[ed] to retain Canyon Ranch as the hotel and spa operator," *id.* at 1, Z Capital promised that it would "make good faith efforts to negotiate with Canyon Ranch to remain in the spa only and further, provided that Z Capital can reach agreement on economic and operational terms, Z Capital will agree to have Canyon Ranch remain the spa operator for an initial period of 2 years. . ." *Id.*  "Otherwise, the Zecha/Breene/ Z Capital joint venture will operate the spa, or choose a third party operator at its

sole discretion, and continue to provide spa services, health and wellness offerings, and fitness classes consistent with previous offerings." *Id.*

c)  **Spa Memberships**: Z Capital agreed that a "Unit Owner Selection Committee … will be established to invite, review and extend offers for prospective spa members" and that annual Spa membership fees would be targeted at $10,000 and not lower than $7,500. *Id.* at 2.

d)  **Operating Standards**: "The Hotel Lot and the exteriors and interiors of the North Tower and the South Tower will be operated to a level of service equivalent or comparable to the Aqualina in Sunny Isles Beach, the St. Regis in Bal Harbour and the Ritz-Carlton in Fort Lauderdale, all in Florida." *Id.* at 5.

e)  **Capital Investment in Property**: Z Capital agreed that if it could purchase the Property "in a manner which provides for a reduction in total consideration paid to Lehman Brothers . . . relative to the current . . . agreement," it would "apply the first $3.5 million of the difference in total consideration to a reserve for capital improvements to the property." *Id.* at 4.

f)  **Parking**: "Z Capital will evaluate guest daily and overnight parking rates and discounts relative to comparable properties and adjust accordingly."

2.  *The Term Sheet Negotiated With The North Tower At The Sale Hearing*

57.  On November 24, 2014, the Bankruptcy Court began the sale hearing. The sale hearing was halted at various times during the day to allow Z Capital and Plaintiff to explore settlement of their disputes.

58.  Plaintiff, in full recognition of and reliance on the various representations previously made by Z Capital in the barrage of e-mails, ultimately executed the North Tower Term Sheet which expressly adopted the South/Central Term Sheet in its entirety, other than

23

provisions requiring the dismissal of lawsuits and the release of claims, and contained certain additional contractual undertakings. The additional terms included the following:

a)   **Valet Charges**: "Z Capital shall, to the extent practicable, review actual valet parking usage and the current cost allocation for such services within a commercially reasonable period of time after Closing, and, as necessary in Z Capital's discretion, adjust such allocation taking into account usage."

b)   **Limitation on Alteration of Facilities**: "Z Capital agrees that it will not, without consulting the Associations, remove any facilities from the use of the Unit Owners, and will not limit use of any facilities or charge any additional amounts for use of any facility unless, within one-year of the Closing, Z Capital reasonably determines (and notifies the Associations) that continuation of the *status quo* is unreasonable and impracticable."

c)   **Destination Restaurant**: Z Capital promised to "use its reasonable best efforts to provide a destination restaurant on the Property."

d)   **Binding Nature**: Both parties acknowledged that by signing the North Tower Term Sheet, each was "bound by the entirety of the foregoing."

e)   **Conclusion**: The North Tower Term Sheet concluded by noting: "After having met and reviewed the credentials of our esteemed team of operators, we hope you are gaining confidence that they will not just preserve *but enhance* the stature of the property to 5-star status. We know as you do, that delivering 5 star service and a luxury experience is not a one size fits all endeavor, and we are willing to personalize our service offerings to meet the needs of all our customers." (emphasis added).

59.     Each of the promises and representations contained in the numerous e-mails sent by Z Capital to the Unit Owners, including with regard to the Talai rebranding, the preservation of the health and wellness ethos at the Property, as well as the contractual obligations assumed by Z Capital in the North Tower Term Sheet (which incorporated the terms and conditions of the South/Central Term Sheet) were made to ultimately induce Plaintiff to enter into the North Tower Term Sheet.  As set forth below, Z Capital ultimately failed to deliver on all or virtually all of its representations and commitments to NCBCA and its Unit Owners.  It is now apparent that Z Capital never intended to deliver on the representations and promises contained in the emails or its contractual commitments.   In so doing, Z Capital engaged in fraudulent, unconscionable, unfair and deceptive acts and practices in inducing NCBCA to enter into the North Tower Term Sheet.

### C.     *Z Capital Obtains Approval Of The Bankruptcy Sale*

60.     On or about November 26, 2014, the Bankruptcy Court approved the Purchase and Sale Agreement (the "Sale Agreement") between the Debtors and Z Capital attached as an exhibit to the Sale Order.  In its Sale Order, the Court approved the Term Sheet entered into by the North Tower and also the Term Sheet entered into by the Central and South Towers and stated that approval of the term sheets was "part of the Court's approval of the sale."

### 1. *The Sale Order Findings*

61.     At Z Capital's insistence, and in order to settle only those issues previously raised by the Associations, the Sale Order also contained certain specific findings that, in summary, granted Z Capital the right to (i) allow non-Unit Owners access to certain portions of the Property; (ii) regulate the use of certain facilities by Unit Owners; (iii) levy assessments with regard to Shared Facilities; (iv) include the expense of valet parking in its assessments; and (v) assess utility costs based on square footage.

62.     At a subsequent hearing on NCBCA's Motion to Reopen the Chapter 11 Cases [Docket No. 364], the Court explained that it clarified certain "ambiguities or issues that were raised with respect to the declarations" but did not intend to resolve all challenges that might be raised with respect to the declarations in the Florida courts or elsewhere.  Transcript of Hearing re: Doc # 364 Motion of North Carillon Beach Condominium Association, Inc. for Entry of an Order Reopening These Chapter 11 Cases at 57, In re FL 6801 Spirits LLC, No. 14-11691-scc (Sept. 22, 2016).

63.     At a later hearing on Z Capital's Motion to Dismiss NCBCA's Adversary Complaint [Adv. Pro. Docket No. 23], the Court explained:

> So the assets sold, to use a simplistic formulation, as is, where is.  There were any number of issues that were lurking about, that were raised, some that weren't raised, which were not adjudicated, were not decided, and indeed, were purposefully not decided by the Court, because the parties settled . . . With respect to the contours of res judicata, the property was sold pursuant to the declarations. Nothing in the order constitutes an amendment or modifications of the declarations.  The declarations are enforceable subject to Florida law.  That was and is the intent of this Court in making the findings that I did, and that was my understanding as to a go-forward template and game plan for the parties to resolve their differences going forward.

Transcript of Hearing re: 16-01259-scc Pre-trial Conference, Hearing re: 16-01259-scc Doc #23 Z Capital Partners, LLC and Z Capital Florida Resort, LLCs Motion to Dismiss North Carillon Beach Condominium Association, Inc.'s Adversary Complaint, Hearing re: 14-11691-scc Doc #400 Motion for Entry of an Order Abstaining from Adjudicating Adversary Proceeding filed by Edward S. Weisfelner on behalf of North Carillon Beach Condominium Association, Inc. at 155-6, North Carillon Beach Condo. Ass'n, Inc. v. Z Capital Partners, LLC (In re FL 6801 Spirits LLC), Nos. 14-11691-scc, 16-01259-scc (Jan. 23, 2017).

64.     Beyond the specific findings referenced above, there was no intention to waive or relinquish any other contentions that the Associations could have raised with regard to future interpretations of the Master Declaration or Florida law as it relates to the Property.

2. *The Sale Closing*

65.     On or about December 16, 2014, Z Capital Partners LLC assigned its interest in the Sale Agreement to Z Capital Florida Resort, LLC.

66.     On or about January 9, 2015, Z Capital informed Plaintiff and the Unit Owners that Canyon Ranch was being terminated but that Z Capital remained "**deeply** committed to maintaining the property's fundamental character and lifestyle that you originally invested in." Notwithstanding Z Capital's obligation under the Term Sheets, it failed to undertake good faith efforts to negotiate with Canyon Ranch to remain the Spa operator and misrepresented the reasons for Canyon Ranch's termination.  This has resulted in significant damage to NCBCA and its Unit Owners.  To Z Capital, however, this led to an immediate savings of Canyon Ranch's annual $2 million management fee.

67.     On or about January 14, 2015, Z Capital closed on the Sale of the Debtors' Assets.  Notice of Sale Closing [Docket No. 246].

68.     Z Capital acquired the Hotel Lot subject to the Master Declaration, the North Tower Declaration, and applicable Florida law (including the Florida Condominium Act and the Florida Homeowners' Association Act).

## II.     Z Capital's Post-Bankruptcy Sale Breaches Of Contract

69.     Following entry of the Sale Order, Z Capital has repeatedly and knowingly breached numerous of its obligations under the Term Sheets as listed below:

a)      The hotel and remainder of the property were never redesigned nor operated by the Zecha/Breene JV.  Nor is there any indication that a replacement for the

Zecha/Breene JV was ever sought or even contemplated, or that Z Capital ever intended anything other than to embark on a program of drastic cost-savings measures. Instead, and in violation of its promises and inducements, Z Capital is running the hotel, restaurant and the upkeep of the Property by itself, without any relevant high end hospitality experience and without the strength of a major hotel chain or specialized boutique hotel chain to appropriately market the hotel rooms. Major operations decisions at the Property appear to be made either by inexperienced local staff or, in most cases, by individuals detached from the operations of the Property at Z Capital in Chicago.

b)   After Canyon Ranch's improper dismissal by Z Capital, the Zecha/Breene JV neither operated the Spa nor did any such joint venture choose a third party operator. Nor is there any indication that a suitable spa operator replacement for Canyon Ranch or the nonexistent Zecha/Breene JV was ever sought or even contemplated. Instead, Z Capital is running the Spa itself. The Spa services, health and wellness offerings and fitness classes being provided by Z Capital at the Property are not consistent with, let alone an improvement upon, pre-Bankruptcy Sale offerings as previously promised and required by the Term Sheets.

c)   Z Capital has failed to operate the exterior and interior of the North Tower to a level of service equivalent or comparable to the Acqualina in Sunny Isles Beach, St. Regis in Bal Harbour and the Ritz-Carlton in Fort Lauderdale. Indeed, while extensive renovations are planned for the restaurant, bar and the lobby, reception and other portions of the Central Tower, the interiors and exteriors of the North

Tower have been completely neglected. For example, Z Capital improperly delayed applying for permits for necessary stucco and water-proofing repair work to the North Tower for 16 months. As a result, the North Tower has suffered further weather-related damage, including severe water damage to many units. The NCBCA has also repeatedly requested drastically needed flooring replacements in the North Tower lobby. Such replacement, ironically, would be at Plaintiff's sole expense, but Z Capital's response was that such a request was "not high on [its] list of priorities."

d)      Z Capital has not applied the $3 million reduction in the total consideration it paid to the Debtor, after its expenditure on stucco repairs, to a reserve for capital improvements to the Property, despite the contractual obligation to do so.

e)      Z Capital did not use its reasonable best efforts to provide a destination restaurant on the Property.

f)      Z Capital failed to review actual valet parking usage and the current cost allocation for such services within a commercially reasonable period of time after Closing and has failed to adjust such allocation taking into account usage.

g)      Z Capital did not evaluate guest daily and overnight parking rates and discounts relative to comparable properties and adjust accordingly.

h)      Z Capital failed to establish a Unit Owner Selection Committee to invite, review and extend offers for prospective Spa members. Instead, Z Capital has failed to provide membership applications prior to approving prospective members and has mandated that such a committee would not be entitled, in any event, to approve or reject prospective members. Z Capital has failed to adhere to the agreed annual

price target of $10,000, and went below the agreed minimum of $7,500, thus adding to Z Capital's overall down-market effect on the property.

i)  More recently, Z Capital has announced its plans to undertake major renovations which will involve taking property that used to be part of the access rights included in the Shared Facilities (with shared access rights for Unit Owners) and to make such property exclusively part of the private portions of the Hotel Lot, in violation of Z Capital's binding promise "not, without consulting the Associations, [to] remove any facilities from the use of the unit owners . . . unless, within one-year of the Closing, Z Capital reasonably determines (and notifies the Associations) that continuation of the *status quo* is unreasonable and impracticable." Z Capital never notified the Associations, within one year of the Bankruptcy Sale, that continuation of the "status quo" was unreasonable or impracticable. Therefore, such planned renovations, if undertaken, are breaches of the North Tower Term Sheet.

70.  In changes that have caused the absolute decimation of the health and wellness offerings at the Property in breach of its pre-Sale representations and the North Tower Term Sheet, Z Capital has systematically eviscerated the management and fitness staff, as well as the related class numbers, and the depth and breadth of related private instruction and private treatment capabilities. In an effort to cut its own costs, Z Capital has undermined quality, discipline, career path perspectives, the stimulation of learning and knowledge sharing, and the ability to stay abreast of constantly evolving medical and physiological discovery and innovation.

71.     From the world-renowned Canyon Ranch model of an integrated medical, physiological, fitness and spiritual self-improvement, a "university of life," Carillon, under Z Capital, is rapidly plunging to the level of an average sweatshop gym.   Under Z Capital's control, there is no longer the opportunity for either a Unit Owner or hotel guest getting a personalized and integrated medical, physiological, nutritional and spiritual web of private training, treatments and monitoring sessions.   The entire wellness and training ethos that Unit Owners relied on is systematically being dismantled under Z Capital's leadership.

72.     Indeed, in order to save costs, a number of the doctors and top tier staff have been terminated under Z Capital's leadership.   The reductions and departures have focused on full time staff, the most experienced and senior staff, and the staff providing most private training and treatments.   By so doing, instructor connections to the community of Unit Owners and their individual physical needs have been systematically eroded.   For instance, Dr. Karen Koffler, head of wellness and fitness and thus the senior thought leader and integrator of the Carillon's intended cross disciplinary practice, is now gone without replacement; Jeff Dolgan, head of sports physiology, is now gone and not replaced, and Dr. Yoav Suprun, head of physiotherapy, has been reduced from a regular weekly schedule to an "on call" status.   The manager of the fitness instructors is gone without replacement.   With these four removals, the wellness aspect of the Property has been denuded of its whole managerial and intellectual infrastructure, which alone ensures high performance, career development, thought leadership, orderly import of new learning and discoveries into daily wellness practice, and inter-disciplinary collaboration around individual Unit Owner's physical and nutritional health problems.   Below that senior level, staff reductions have been dramatic.   The number of fitness instructors has shrunk dramatically and 17 of Canyon Ranch's original instructors are gone.

73. Despite Z Capital's promise that it would keep and even increase the focus on health and wellness, it has done the exact opposite. For example, the number of weekly classes has been reduced. Stretch classes, in particular (one of the most important routines for healthy aging), have been reduced from 23 to 8 per week. The daily schedule has lost the regularity and the progression from cardio to muscle that allows individual Unit Owners to each build their optimum personal training plan. Weekly lectures have been reduced with an overall 92% reduction of serious wellness lectures.

74. Z Capital, in filing for the necessary permits for the North Tower stucco and water-proofing repair work discussed above, reaffirmed its culture of deceit and neglect. While offering, throughout 2015, almost monthly excuses for the start of the work being delayed, the City of Miami Beach records show that Z Capital did not even apply for the permit until April 14, 2016. The start of the work was delayed for over a year and a half, not because of "unexpected difficulties," but because Z Capital either had no interest in performing the work, and/or delayed the work in an effort to further its overarching drastic cost-cutting strategy for the Property contrary to its "5-star" operating standard commitment. Z Capital was not concerned with what this delay caused to the soundness or water-proofing system of the building and to the health and welfare of those residents whose units incurred water-related damage as a result of the repair delays. Meanwhile, a review of those applications that finally were filed in 2016 reveals that while Z Capital received a $3 million credit against the sale price for assuming the Debtors' obligation to perform stucco and water-proofing work, the performance bond was only for about $1.54 million. Additionally, the applications reflect that Z Capital reduced the standard contractor's warranty from five to three years.

75.     By these and other acts and omissions, Z Capital materially breached its contractual obligations.  Plaintiff has suffered and continues to suffer substantial damages due to Z Capital's breach of contract. These damages include:

a)      Significantly diminished property values, declining rental values and loss of liquidity for the condominium units in the North Tower;

b)      While the quality of services has declined substantially and is far below the "5-star" standard that was contractually promised, Z Capital continues to impose assessments and fees upon the Unit Owners at levels around pre-Bankruptcy Sale levels and substantially above those for other true "5-star" establishments in the area. The gap between the monthly assessments and fees charged and the services actually offered is another measure of damages suffered by Unit Owners.

## III.    Z Capital Is Breaching Various Provisions Of The Master Declaration

### A.     Overcharges And Improper Assessments

76.     Z Capital has imposed numerous periodic and special assessments that violate the Master Declaration.  One consistent thread running through the various categories of expenses in the budgets for the Shared Facilities is that Z Capital does not pay any of the costs of maintaining the Shared Facilities.  Rather, the Towers' unit owners pay 100% of those costs.  By shifting all the costs of maintaining these facilities onto the unit owners, Z Capital avoids the cost of running certain facilities that support the hotel, Spa, restaurant, and bar, and so maximizes its profits.  Such acts and practices are unconscionable, unfair and deceptive.  For example:

a)      Current assessments fail to accurately account both for the huge reductions in expenses resulting from Z Capital's drastic cost-cutting measures and the revenue Z Capital earns from hotel and Spa guests, outside memberships and other sources.

b)     Assessments have included amounts for expenses related to "common areas" of the Master Association under the Florida Homeowners' Association Act, and therefore may not be part of an assessment for "Shared Facilities" unilaterally imposed by Z Capital.

c)     On information and belief, assessments have imposed all or almost all of the costs of operating and maintaining the Shared Facilities and certain facilities within the "Spa" on the Towers' unit owners while imposing little or none of the costs on Z Capital. This allocation and assessment is unfair and unreasonable, arbitrary, capricious and unconscionable in violation of the Florida Homeowners' Association Act, the Florida Condominium Act and other applicable Florida laws.

d)     Charges have included improper, unfair, and excessive assessments and fees relating to, among other things, operation and maintenance of Shared Facilities. As it relates to the Spa, NCBCA does not dispute the Sale Order's finding with respect to Z Capital's ability to both levy assessments and collect fixed fees (the "Fixed Fees") relating to the Limited Spa Rights. Indeed, NCBCA does not claim that either it or the Master Association is entitled to these fees. However, these assessments and fees are still subject to scrutiny under the terms of the Master Declaration and under Florida law. For instance, on information and belief, each assessment relating to the Limited Spa Rights contained no reduction, or an insufficient reduction, for the substantial revenue that Z Capital receives by selling external memberships and by collecting resort fees and other fees and charges for use of the Spa. Z Capital's refusal to provide any information about how the Fixed Fees for Spa usage are derived, and what it pays for and collects;

as well as its refusal to provide NCBCA with reasonable access to review and audit the budgets, expenses, revenues and assessments for the shared facilities budgets, allows Z Capital to charge and assess the Unit Owners without any verification or accountability whatsoever.

e)      Assessments were imposed without any meaningful vote or input from the Unit Owners.

f)      Assessments were imposed without any opportunity for audit or inspection of the relevant financial books and records by Plaintiff or the Unit Owners.

g)      Z Capital has announced its intention to assess Unit Owners for a new and expensive renovation project that will convert areas that are currently assessed to the Unit Owners under one of the Shared Facilities' budgets (and made available for their use) into the exclusive property of Z Capital.  In addition to being a breach of the North Tower Term Sheet and a violation of the Homeowners' Association Act and the Master Declaration, assessments related to this renovation will unfairly place a large portion of the burden of certain portions of this renovation on Unit Owners, including renovations to the hotel lobby and reception, while placing a relatively small burden on Z Capital, which will enjoy all of the resulting revenues.

**B.      *Withholding Books And Records***

77.      Pursuant to the Master Declaration, Z Capital is required to maintain financial books and records with respect to the Shared Facilities. Such records are then subject to inspection and audit by any "Member" of the Master Association. The relevant provision of the Master Declaration reads as follows:

The Hotel Lot Owner shall maintain **financial books and records** showing its actual receipts and expenditures with respect to the maintenance, operation, repair, replacement, alteration and relocation of the General, Non-Retail, Condominium North, Condominium Central and Condominium South Shared Facilities, including the then current budget and any then proposed budget (the "Facilities Records"). The Facilities Records need not be audited or reviewed by a Certified Public Accountant. **The Facilities Records shall at all times, during reasonable business hours, be subject to the inspection and <u>audit</u> of any Member of the Association.**

Master Declaration § 16.8 (emphasis added). In order to audit the Facilities Records, Members of the Master Association and their agents and auditors must be able to confirm that the books and records accurately reflect actual receipts and expenditures. Therefore, Members of the Master Association and their auditors or other agents must have access to the supporting invoices, receipts, and other documents to verify and audit the bare-bones operating budgets provided by Z Capital.

78. Z Capital, with no oversight, determines assessments for the various categories of Shared Facilities, without any of the normal checks and balances which are afforded to condominium Unit Owners in other residential communities: the right to elect association directors with the authority to set assessments for maintenance and other needed expenses, and the corresponding right to vote the directors out of office. Access to the books and records of the Shared Facilities, including the supporting invoices and receipts, is crucial so that Plaintiff, Unit Owners, and their auditors can determine whether the assessments imposed by Z Capital are accurately and properly calculated and authorized.

79. Z Capital is collecting assessments for reserves based on detailed cost projections but has refused to share with NCBCA (or the Unit Owners it represents) the study, if any, upon which such projections are based, or any other supporting documents for such expenses.

80. Z Capital has denied NCBCA, the Unit Owners it represents, and their agents required access to the needed books and records and supporting documents (including actual

receipts and expenditures and the reserve study) that would enable Plaintiff to determine whether assessments and fees Z Capital is imposing are accurate and otherwise proper. Consequently, Z Capital has also denied NCBCA, the Unit Owners it represents, and their agents the right to "review and audit" those books and records pursuant to the Master Declaration. In addition to violating the Master Declaration, such conduct is unlawfully deceptive, unfair and unconscionable under applicable Florida law.

## IV.   **Z Capital Is Violating The Florida Homeowners' Association Law**

### A.   *Z Capital's Failure To Relinquish Control Over Master Association*

81.     Section 720.307(1), Fla. Stat., provides that members of the association "other than the developer are entitled to elect at least a majority of the members of the board of directors of the homeowners' association. . . [t]hree months after 90 percent of the parcels in all phases of the community that will ultimately be operated by the homeowners' association have been conveyed to members." Likewise, Section 2 of Article IV of the Articles of Incorporation of the Master Association provides that developer control of the Master Association will be turned over to its members "three (3) months after ninety percent (90%) of all Condominium Units (as to any Lot that has been submitted to the condominium form of ownership) and Lots (as to those which have not been submitted to the condominium form of ownership) within The Properties have been sold and conveyed . . ." (collectively, with Section 720.307(1)(a), Fla. Stat., the "Turnover Conditions Precedent").

82.     However, the Articles of Incorporation of the Master Association, which are an exhibit to the Master Declaration, purport to enable Z Capital, post-turnover, to continue to elect a majority of members of the Master Association. Even though the Turnover Conditions Precedent have been met, and even though it has acknowledged that the turnover has or should have occurred, Z Capital, as the successor to the original developer under the Master

Declaration, has violated Sections 720.307(1) and 720.307(3) of the Florida Homeowners' Association Act by refusing to relinquish the right to elect a majority of the Board of Directors of the Master Association to the non-developer members.

83.     By blocking any Master Association process, Z Capital has unlawfully prevented a non-developer controlled Master Association from "ensur[ing] the orderly development, operation and maintenance of the Properties . . . "  Specifically and by way of example, Z Capital has utilized its purported post-turnover developer voting majority to unilaterally amend the Master Declaration, in clear violation of Section 720.3075(1)(a) of the Florida Homeowners' Association Act.  Additionally, Z Capital has illegally utilized its voting majority, on a post-turnover basis, to avoid designating and relinquishing control to the Master Association of those portions of the Community were originally designated, and which are deemed to be "common areas" under Section 720.301(2) of the Florida Homeowners' Association Act.  Finally, Z Capital has failed to hold meetings and enact budgets, and has otherwise fully usurped control of and emasculated, what should be the critical role of the Master Association in the operation of the Property which, as stated in section 8.1 of the Master Declaration, is to "ensure the orderly development, operation and maintenance of The Properties."  Accordingly, despite the fact that it may be the Hotel Lot Owner, by refusing to relinquish control, Z Capital has illegally blocked the Master Association from properly functioning, to the detriment of the Unit Owners.

84.     On March 8, 2016, while improperly in control of the board of directors of the Master Association, and/or while improperly exercising its unlawful post-turnover developer rights, Z Capital purported to unilaterally amend the Master Declaration (the "March 2016 Amendment") in violation of Section 720.3075(1)(a), Fla. Stat.  The March 2016 Amendment also purports to be a "Supplemental Declaration," that was made for the purpose of re-

categorizing certain facilities within the North Tower (the "Future Development Property"), in clear violation of sections 2.2 and 2.4 of the Master Declaration. The March 2016 Amendment was undertaken to facilitate Z Capital's sale of the Retail Lot to North Beach Development, LLC. Such amendment to the Master Declaration not only re-designated common areas as Shared Facilities, but also created yet another "Shared Facility" category.

   **B.    Common Areas Were Improperly Re-Designated and Re-Categorized As "Shared Facilities"**

85.    Certain facilities within the Property, which are dedicated for the use of all unit owners, and/or the other members of the Master Association, fall within the meaning of "common areas" under the Florida Homeowners' Association Act. These facilities have been illegally re-characterized and re-designated as "Shared Facilities" by the March 2016 Amendment and have not been properly designated and placed under the control (as distinguished from ownership) of the Master Association as "common areas," as described above. These facilities include the newly re-designated (by the March 2016 Amendment) North Tower Lobby and Reception, North Tower Beach Pool, North Tower 6th Floor Pool and North Tower Fitness Room , which are intended solely or primarily for the use and benefit of the Unit Owners in the Community.

   **C.    Z Capital's Implementation Of The Master Declaration Fails The Fair And Reasonable Standards Of Florida Law**

86.    Certain provisions of the Master Declaration as written, or as construed and implemented by Z Capital, do not meet the fair and reasonable, arbitrary and capricious, and/or unconscionability standards mandated under Section 718.302 of the Florida Condominium Act, Section 720.309 of the Homeowners' Association Act, and/or Florida case law.

87.     For example, Section 718.302(1) of the Florida Condominium Act requires that:

Any grant or reservation made by a declaration, lease, or other document, and any contract made by an association prior to assumption of control of the association by unit owners other than the developer, that provides for operation, maintenance, or management of a condominium association or property serving the unit owners of a condominium shall be **fair and reasonable**… (emphasis added).

88.     The Master Declaration contains grants or reservations that provide for the operation, maintenance, or management of property serving the Unit Owners, which are not fair and reasonable.  These provisions include:

a)      The provisions of Section 16.8, which Z Capital claims (and Plaintiff contests) authorize it to withhold access to all financial books and records, other than unverified budgets.

b)      The provisions of Section 16.3, which Z Capital claims (and Plaintiff contests) authorize it to assess to the Towers' unit owners all or most of certain expenses under budgets for the Shared Facilities, without accounting for the enormous fees and other revenues derived therefrom by the Hotel Lot Owner.

c)      The provisions of Section 16.3, which Z Capital claims (and Plaintiff contests) authorize it to collect special assessments from the Unit Owners in the North Tower for 46% of the costs of capital improvements to the Central Tower (hotel) lobby and reception, which primarily inure to the benefit of Z Capital, while ignoring much needed renovations to the North Tower lobby.

d)      The provisions of Section 16.3, which Z Capital claims (and Plaintiff contests) authorize it to increase the "Fixed Charge" to Unit Owners by 10% per year.

e)      The provision in the Articles of Incorporation of the Master Association, attached as an exhibit to the Master Declaration, purporting to permit the declarant to elect a majority of the members of the Master Association post-turnover.

## V.  Master Declaration Circumvents Protections Afforded Under Florida Law For Recreational Lease Agreements

89.     The Master Declaration governs the Unit Owners' access to certain recreational facilities, including, but not limited to, the health and fitness center, fitness studios and labs, pilates room, rock climbing wall, cardio/weight room, men's and women's locker rooms, South Tower beach pool, North Tower beach pool, North Tower 6th floor pool, and North Tower fitness room.

90.     The Towers' unit owners are charged a Fixed Charge on a monthly basis for use of the recreational facilities, even though they are also assessed for most or all of the Spa expenses.  That Fixed Charge is levied against every Unit Owner every month regardless of whether the Unit Owner or the other occupants of the unit use the recreational facilities.

91.     Z Capital, as the Hotel Lot Owner, can raise that Fixed Fee every year, without regard to any increase in actual expenses, but cannot increase the charge more than 10% in a single year.

92.     Z Capital also assesses all Unit Owners for Limited Spa Rights (*i.e.*, use of the Spa), regardless of whether they use the Spa, as part of the budget for the Non-Retail Shared Facilities.

93.     The provisions in the Master Declaration governing Unit Owners' access to the recreational facilities and the Fixed Fees and assessments that Unit Owners must pay for that access are the legal equivalent of a recreational lease embedded in the Master Declaration.

94.     The North Tower Condominium Declaration specifies that accepting a deed for a unit "shall constitute an adoption and ratification of the provisions of this [North Tower Condominium] Declaration . . . and the Master Covenants [defined in 2.30 of the North Tower

Condominium Declaration to include the Master Association] . . ." Thus, Unit Owners are required to enter into the embedded recreational lease by accepting a deed for a unit.

95.     Florida law provides condominium Unit Owners with certain rights in connection with recreational leases, unconscionable or otherwise. Fla. Stat. 718.401(f)(1) states:

> A lease of recreational or other commonly used facilities entered into by the association or Unit Owners prior to the time when the control of the association is turned over to Unit Owners other than the developer shall grant to the lessee an option to purchase the leased property, payable in cash, on any anniversary date of the beginning of the lease term after the 10th anniversary, at a price then determined by agreement. If there is no agreement as to the price, then the price shall be determined by arbitration conducted pursuant to chapter 44 or chapter 682. This paragraph shall be applied to contracts entered into on, before, or after January 1, 1977, regardless of the duration of the lease. . .

96.     The declarant incorporated the provisions of a recreational lease in the Master Declaration and, therefore, Plaintiff is entitled to a declaration that after the 10th anniversary of said lease, it has the option to purchase the recreational facilities.

## COUNTS

### COUNT I
### (FRAUDULENT INDUCEMENT)
### (AGAINST Z CAPITAL)

97.     Plaintiff incorporates and adopts paragraphs 1 through 96 above as if fully set forth herein.

98.     Prior to the execution of the North Tower Term Sheet, Z Capital implemented a fraudulent scheme, through false and misleading emails to the Unit Owners and other means, to induce the Plaintiff, including the Unit Owners it represents, to enter into the Term Sheet. These and other related representations regarding, among other matters, the Zecha/Breene JV and the creation of a "true 5-star Adrian Zecha branded property," the effort to retain Canyon Ranch, and the high standards at which the Property would be operated, were false.

99. Z Capital made these and other false and misleading misrepresentations and omissions knowingly or with reckless and utter disregard for their truth or falsity, and with the intent to induce Plaintiff (including the Unit Owners it represents) to rely upon them.

100. Plaintiff justifiably relied upon the false representations made by Z Capital in the email campaign when entering into the Term Sheet with Z Capital.

101. As a direct and proximate result of its reliance upon the false representations and omissions of Z Capital, Plaintiff (including the Unit Owners it represents) has been damaged by Z Capital's failure to fulfill its representations and the resulting steep drop in property values.

102. Because of the outrageous nature of Z Capital's willful and wanton conduct, Plaintiff will seek leave to seek punitive damages under applicable law.

### COUNT II
### (NEGLIGENT MISREPRESENTATION)
### (AGAINST Z CAPITAL)

103. Plaintiff incorporates and adopts paragraphs 1 through 102 above as if fully set forth herein.

104. Z Capital represented to the NCBCA and its Unit Owners that it and its partners had unique or special expertise relating to the management of similar properties and the ability to create a new 5-star brand for the Property.

105. Z Capital represented to NCBCA and its Unit Owners that Z Capital and its partners purported to have unique or special expertise that would make them uniquely situated to purchase the Hotel Lot, and also represented that the Unit Owners would see an increase in the average sale price per square foot for the units located in the North Tower. Instead, when compared to similar units at other properties, property values at the Carillon have not kept pace.

106.    Z Capital built a special or unique relationship with Plaintiff based upon Z Capital's purported expertise, which created a duty on the part of Z Capital to provide Plaintiff with full and correct information.

107.    Z Capital failed to disclose material information, which rendered their other representations false and misleading.

108.    Z Capital made the false representations and material omissions knowing or recklessly disregarding that NCBCA and the Unit Owners it represents would use and rely upon the representations and omissions for the particular purpose of determining whether to enter into the Term Sheet.    Plaintiff and the Unit Owners it represents justifiably relied upon the representations regarding, among other matters, the Zecha/Breene JV, the effort to retain Canyon Ranch, the plans for rebranding of the Property, and the high standards on which the Property would be operated, and also justifiably relied on Z Capital's material omissions, which were made in furtherance of inducing Plaintiff's reliance.

109.    As a result of Plaintiff's reliance on Z Capital's misrepresentations and material omissions, Plaintiff has suffered compensatory damages.

110.    Because of the outrageous nature of Z Capital's willful and wanton misconduct, Plaintiff will seek leave to seek punitive damages.

## COUNT III
### (FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, SECTION 501.201, FLA. STAT. ON ACCOUNT OF PRE-SALE CONDUCT)
### (AGAINST Z CAPITAL)

111.    Plaintiff incorporates and adopts paragraphs 1 through 110 above as if fully set forth herein.

112. Florida's Deceptive and Unfair Trade Practices Act provides that unconscionable acts or practices and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful. Fla. Stat. § 501.204(1).

113. In relation to the Property, prior to the Bankruptcy Sale, Z Capital engaged in unconscionable, unfair and deceptive acts and practices in the conduct of trade or commerce.

114. Z Capital made deceptive representations in multiple emails to the Unit Owners and other documents, regarding how Z Capital would operate the Property in order to induce Plaintiff to enter into the Term Sheet.

115. As a result of these deceptive, unfair, and unconscionable practices, Plaintiff and the Unit Owners it represents have suffered substantial actual damages, including reduced property values.

**COUNT IV**
**(FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT,**
**SECTION 501.201, FLA. STAT. ON ACCOUNT OF POST-SALE CONDUCT)**
**(AGAINST Z CAPITAL)**

116. Plaintiff incorporates and adopts paragraphs 1 through 115 above as if fully set forth herein.

117. Florida's Deceptive and Unfair Trade Practices Act provides that unconscionable acts or practices and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful. Fla. Stat. § 501.204(1).

118. In relation to the Property, following the Bankruptcy Sale, Z Capital has engaged and continues to engage in unconscionable, unfair and deceptive acts and practices in the conduct of trade or commerce.

119. Those unconscionable, unfair and deceptive acts and practices include:

a) Unfairly maintaining total control over the monthly rates and occasional special assessments levied against Unit Owners and the fees that they are charged while steadfastly refusing to allow any inspection or auditing of the financial books and records pertaining to these assessments whatsoever.

b) Charging Unit Owners substantially the same assessments and fees despite drastic cutbacks in expenses, including offering services that do not meet those earlier provided to Plaintiff and the Unit Owners, and failing to account to the Unit Owners for all or a substantial portion of the cost savings and the additional revenue which Z Capital collects.

c) Continuing to charge Plaintiff and the Unit Owners for the provision of "5-star" services, although Z Capital has failed to provide "5-star" services in the Property, including the residences, hotel, restaurant and Spa.

d) Imposing assessments which have been improperly calculated, allocated or otherwise determined, and including expenses for which Z Capital does not have the right to assess the Unit Owners within the meaning of applicable provisions of the Master Declaration or under Florida law.

e) Causing Unit Owners to be overcharged in assessments for certain rights and services while concealing the full extent of those charges.

120. Post-Bankruptcy Sale, Z Capital has also degraded the Property's image and depressed property values with its hotel and restaurant marketing policy. Having reneged on their promise to bring the aura of Adrian Zecha and Jonathan Breene to the hotel, having reneged on the promise to turn the restaurant into a "destination restaurant," Z Capital has descended to promoting its hotel rooms on "Travel Zoo," a deep discount internet travel site, and to offering

discounted day passes to the Spa and restaurant. It also heavily promotes the bar, parties, and events. From a high-end health and fitness focus, under a strong globally admired brand, and with a strong sense of community among like-minded residents and hotel guests, Z Capital – whether for lack of ability or by design, but in flagrant violation of its promises and its contractual obligations – is morphing the Property into a second-rate bar and beach resort in Miami Beach, with devastating short and long term effects on Unit Owners' property values and lifestyle.

121. Z Capital is actually profiting from the destruction of quality, reputation and property prices by purchasing a large number of condo-hotel units in the Central Tower at depressed prices. Z Capital, since its arrival in January 2015, has purchased approximately sixty units at the Property (or almost three units per month). These units would have been much more expensive to acquire had Z Capital lived up to the high standards that it represented and promised to deliver.

122. As a result of these deceptive, unfair, and unconscionable practices, Plaintiff and the Unit Owners it represents have suffered substantial actual damages, including:

a)      Reduced property values; and

b)      Payment of overcharges and other improper charges related to the assessments under the budgets for the Shared Facilities.

### COUNT V
### (BREACH OF NORTH TOWER TERM SHEET)
### (AGAINST Z CAPITAL)

123. Plaintiff incorporates and adopts paragraphs 1 through 122 above as if fully set forth herein.

124. The North Tower Term Sheet is a binding and enforceable contract.

125.     The North Tower Term Sheet incorporated the South/Central Term Sheet which was also a binding and enforceable contract.

126.     Z Capital has committed numerous breaches of the North Tower Term Sheet and the South/Central Tower Term Sheet, some of which are continuing breaches.  Z Capital's breaches are substantial and material, and have caused Plaintiff and the Unit Owners it represents substantial damage.

### COUNT VI
### (BREACH OF IMPLIED COVENANT OF GOOD FAITH & FAIR DEALING - NORTH TOWER TERM SHEET)
### (AGAINST Z CAPITAL)

127.     Plaintiff incorporates and adopts paragraphs 1 through 126 above as if fully set forth herein.

128.     The North Tower Term Sheet contains an implied covenant of good faith and fair dealing.

129.     Z Capital's actions, including its failure to engage an entity to manage the Property of equivalent caliber to the purported Zecha/Breene JV once it became clear that such a joint venture was not going to manage the Property, constitute a breach of the implied covenant of good faith and fair dealing, and deprived the Plaintiff of the right to receive the benefits of the North Tower Term Sheet and the South/Central Term Sheet.  Z Capital's breaches of the implied covenant are substantial and material, and have caused Plaintiff and the Unit Owners it represents substantial damage.

### COUNT VII
### (UNJUST ENRICHMENT)
### (AGAINST Z CAPITAL)

130.     Plaintiff incorporates and adopts paragraphs 1 through 129 above as if fully set forth herein.

131.     Z Capital unfairly and illegally maintains total control over the assessments levied against Unit Owners and the fees that they are charged while steadfastly refusing to allow any inspection or auditing whatsoever of the financial books and records pertaining to these assessments.

132.     Z Capital has charged Unit Owners substantially the same assessments and fees despite drastic cutbacks in expenses, including offering services that do not meet those earlier provided to Plaintiff and the Unit Owners, and has failed to accurately account to the Unit Owners for all or a substantial portion of the cost savings.

133.     Z Capital has continued to charge Plaintiff and the Unit Owners for the provision of "5-star" services, although Z Capital has failed to provide "5-star" services within the Property, including in the residences, hotel, restaurant and Spa.

134.     Z Capital has caused the Unit Owners to be overcharged, or otherwise improperly charged, for assessments while concealing the full extent of those charges and not offsetting revenues collected from third parties for access to Shared Facilities and the Spa.

135.     Z Capital has improperly retained for itself the full benefit of the $3 million credit it received for repairing the North Tower stucco and has delayed the repairs to such an extent that substantial additional damage to the North Tower has resulted.

136.     Plaintiff has conferred the benefits enumerated above on Z Capital which has knowledge of those benefits and has accepted and retained the benefits.

137.     Under these circumstances, justice and equity require restitution by Z Capital to the Plaintiff of the benefit accruing to Z Capital from these charges and unjust retentions of funds.

138.   Plaintiff incorporates and adopts paragraphs 1 through 137 above as if fully set forth herein.

139.   Before the Hotel Lot was sold, the Debtor had obtained sounding tests for the North Tower, and both the Debtor and Z Capital had acknowledged and documented the damage and the need for extensive stucco and water-proofing repairs at the North Tower.  The Debtors had plans in place to perform the stucco and water-proofing repairs.

140.   Z Capital was able to structure the sale to receive a $3 million credit against the purchase price for the Hotel Lot in exchange for assuming the Debtors' responsibility for performing the urgently needed stucco and water-proofing repairs on the North Tower.

141.   Z Capital, in order to enable itself to shop for cheaper alternatives, did not pursue the Debtors' stucco repair plans when it purchased the Hotel Lot.

142.   Although the stucco and water-proofing repairs were urgently needed because water continued to infiltrate the building through cracks and other defects in the stucco and water-proofing, resulting in additional structural damage, including direct damage to some units, Z Capital delayed commencement of the work well beyond a reasonable period of time.

143.   Z Capital did not even bother to apply for a permit for the stucco and water-proofing repairs until April 2016.  During this protracted, neglectful and continuing period of delay, numerous units in the North Tower have suffered significant and penetrating moisture damage due to Z Capital's failure to timely, adequately, and reasonably commence and pursue the stucco and water-proofing repairs.  When Z Capital finally commenced the work in June 2016, over 18 months after it closed on the sale, it did so in such an unreasonably dilatory and

neglectful manner that the work is taking significantly longer to complete than it should have, and, based on information and belief, is being improperly performed.

144.    Z Capital has repeatedly refused to provide Plaintiff with any engineering, sounding or other studies, if any; or contracts, permits, insurance certificates, warranties or other documents it has obtained, relating to this work.

145.    Based on information and belief, as part of its continuing drastic and unreasonable cost-cutting measures and neglect, Z Capital is proceeding with the repairs without obtaining updated sounding or other tests, even though the prior sounding tests were performed well over 18 months prior to commencement.  When Z Capital finally commenced the work, it obtained a performance bond for only $1.54 million, and it reduced the standard contractor's warranty from five to three years.

146.    Both the sale and rental value of all the units in the North Tower have been negatively impacted by the delayed and otherwise negligently performed stucco and water-proofing repairs, and the additional and ongoing water penetration.  The magnitude of this impact continues to mount as the repairs continue to be performed at a dilatory pace.

147.    As a direct, proximate, and foreseeable result of Z Capital's negligence in performing the stucco and water-proofing repairs at the North Tower, including, without limitation, its protracted delays in commencing and performing the work, and its extreme cost-cutting measures, the NCBCA (and the Unit Owners it represents) have suffered and continue to suffer substantial damages.

## COUNT IX
### (BREACH OF COVENANTS—MASTER DECLARATION)
### (AGAINST Z CAPITAL)

148.    Plaintiff incorporates and adopts paragraphs 1 through 147 above as if fully set forth herein.

149.     Z Capital is a member of the Master Association and is bound by the Master Declaration, which imposes obligations on Z Capital.

150.     Plaintiff is a member of the Master Association and Unit Owners are "Owners" under the Master Declaration.  Thus, they may bring an action to redress failures to comply with the Master Declaration, under principles of contract law and under Fla. Stat. 720.305(1)(b).

151.     Z Capital has failed to comply with various portions of the Master Declaration, including, without limitation, refusing to grant Plaintiff access to books and records, which failure has deprived Plaintiff and the Unit Owners of all financial accountability.

152.     As a result of these breaches, Plaintiff and Unit Owners have suffered and will continue to suffer damages.

## COUNT X
### (BREACH OF IMPLIED COVENANT OF GOOD FAITH & FAIR DEALING - MASTER DECLARATION)
### (AGAINST Z CAPITAL)

153.     Plaintiff incorporates and adopts paragraphs 1 through 152 above as if fully set forth herein.

154.     Under the Master Declaration, Z Capital is required to perform certain obligations.  The Master Declaration contains an implied covenant of good faith and fair dealing related to those obligations.

155.     Z Capital has breached the implied covenant of good faith and fair dealing, including by its refusal to permit Plaintiff and its agents to inspect, copy and audit the Facilities Records and underlying supporting documentation, and by virtue of certain of its other acts and failures set forth in this Complaint.

## COUNT XI
## (DECLARATORY JUDGMENT AS TO COMMON AREAS BEING UNDER THE CONTROL OF THE MASTER ASSOCIATION)
### (AGAINST Z CAPITAL, MASTER ASSOCIATION, SOUTH CONDOMINIUM ASSOCIATION, CENTRAL CONDOMINIUM ASSOCIATION, AND NORTH BEACH DEVELOPMENT)

156.     Plaintiff incorporates and adopts paragraphs 1 through 155 above as if fully set forth herein.

157.     Section 720.301(2), Fla. Stat., defines a "Community" as "real property that is or will be subject to a declaration of covenants which is recorded in the county where the property is located."

158.     Section 720.301(2), Fla. Stat., defines "Common area[s]" as "all real property within a community which is owned or leased by an association or dedicated for use or maintenance by the association or its members [.]"

159.     Section 720.303(1), Fla. Stat., provides that:

[a]fter control of the association is obtained by members other than the developer, the association may institute, maintain, settle, or appeal actions or hearings in its name on behalf of all members concerning matters of common interest to the members, including, but not limited to, the common areas; roof or structural components of a building, or other improvements for which the association is responsible; mechanical, electrical, or plumbing elements serving an improvement or building for which the association is responsible; representations of the developer pertaining to any existing or proposed commonly used facility; and protesting ad valorem taxes on commonly used facilities.

160.     Article III of the Articles of Incorporation of the Master Association states that one of the "objects and purposes" of the Master Association is "to maintain the Common Properties [*i.e.*, common areas] thereof for the benefit of the Members of the Association."  The Master Declaration provides, in Section 8.1 thereto, that the Master Association was established "to ensure the orderly development, operation and maintenance of The Properties."  Despite this provision, the Master Association has been stripped of all of its functions, power, authority, and responsibilities, including as a result of the actions of Z Florida to attempt to re-designate,

53

pursuant to the March 2016 Amendment, and to re-characterize what were or should be "common areas" under Chapter 720 of the Florida Statutes as "Shared Facilities" or as portions of the "Spa," which are purportedly subject to Z Capital's unregulated and unrestricted discretion.

161.　　Those Common Properties/common areas, as defined by Section 720.303(1), Fla. Stat., of the Master Association were re-designated by the March 2016 Amendment in violation of Florida law, as part of the Shared Facilities, or the "Spa" facilities, of the Hotel Lot, and include, for example, the North Tower Lobby and Reception, North Tower Beach Pool, North Tower 6th Floor Pool and North Tower Fitness Room and other common facilities within the North Tower dedicated or intended for the use of the members of the Master Association.  By enacting the March 2016 Amendment, Z Capital attempted to convert these enumerated Common Properties/common areas into "Non-Retail Shared Facilities" and to re-categorize certain facilities within the North Tower in violation of sections 2.2 and 2.4 of the Master Declaration.

162.　　As a direct and proximate result of re-designating, pursuant to the March 2016 Amendment, all of what were or should be common areas into "Shared Facilities" or "Spa" facilities, and giving control over those facilities to Z Capital, and otherwise depriving the Master Association of any role whatsoever in controlling what were originally, and what are customarily, common areas, there is a bona fide, actual, present dispute and thus a practical need for a declaration of the parties' respective rights, status and other equitable or legal rights regarding what should be the Master Association's common areas under the Master Declaration and under Chapter 720 of the Florida Statutes.

163.    Additionally, Plaintiff seeks incidental or supplemental relief.  In each assessment and budget, Z Capital has included charges in the Shared Facilities budgets for items related to property that should be part of the Master Association's common areas, and thus assessed only by the Master Association, through a Board of Directors, the majority of whom should be elected by its non-developer members.   As a result, Unit Owners have been damaged by being improperly charged by Z Capital for assessments that, under the Florida Homeowners' Association Act, may only be imposed by a homeowners' association in which Plaintiff is represented.

**COUNT XII**
**(DECLARATORY JUDGMENT REGARDING OPTION RIGHTS UNDER RECREATIONAL LEASE)**
**(AGAINST Z CAPITAL)**

164.    Plaintiff incorporates and adopts paragraphs 1 through 163 above as if fully set forth herein.

165.    Because the Master Declaration controls the Unit Owners' rights to use the Spa, which is defined to include the recreational facilities at the Property, and specifies the charges they must pay for those rights, the Master Declaration functionally contains an embedded recreational lease, which Unit Owners are required to enter into by accepting a deed for a unit.

166.    The declarant did not require the Unit Owners to sign a separate recreational lease, governing the rights to use the recreational facilities at the Property and the charges for those rights, but chose instead to incorporate the provisions of such a lease in the Master Declaration.

167.    The declarant, and Z Capital as its successor, should not be allowed to eviscerate the protections afforded Unit Owners under Fla. Stat. 718.401(f)(1) by the simple expedient of embedding a recreational lease in the Master Declaration, as opposed to having it in a separate, stand-alone document.

168. There is a bona fide, actual, present dispute and thus a practical need for a declaration of the parties' respective rights, status and other equitable or legal rights, including the right, through the exercise of an option, to purchase the subject property, regarding whether Fla. Stat. 718.401(f)(1) applies to the embedded recreational lease in the Master Declaration.

## COUNT XIII
### (UNFAIRNESS AND UNREASONABLENESS UNDER CHAPTER 718)
#### (AGAINST Z CAPITAL AND MASTER ASSOCIATION)

169. Plaintiff incorporates and adopts paragraphs 1 through 168 above as if fully set forth herein.

170. Certain provisions of the Master Declaration as written, or as construed and implemented by Z Capital, do not meet the fair and reasonable, arbitrary and capricious, and/or unconscionability standards mandated under Section 718.302 of the Florida Condominium Act.

171. Plaintiff is required to pay an unfair and unreasonable portion of the expenses for maintenance, improvement, operation, repair, replacement and renovation for certain facilities that primarily benefit the hotel, Spa and retail facilities while, on information and belief, Z Capital pays little or *none* of these expenses.

172. As a direct and proximate result of the above described arrangement, there is a bona fide, actual, present dispute and thus a practical need for a declaration of the parties' respective rights, status and other equitable or legal relations relative to Plaintiff's rights under Chapter 718 of the Florida Statutes.

173. Additionally, Plaintiff seeks the return of those assessments, fees, and other charges that have been collected by Z Florida in violation of section 718.302, Fla. Stat., and other applicable laws.

## COUNT XIV
### (UNFAIRNESS AND UNREASONABLENESS UNDER CHAPTER 720)
### (AGAINST Z CAPITAL, MASTER ASSOCIATION, AND NORTH BEACH DEVELOPMENT)

174.    Plaintiff incorporates and adopts paragraphs 1 through 173 above as if fully set forth herein.

175.    Z Capital is operating the Property, and utilizing the Master Declaration, in an unfair and unreasonable manner, in violation of Section 720.309(1), Fla. Stat., including (without limitation) by entirely excluding Plaintiff and the Unit Owners, and the other non-developer members of the Master Association, from having the sort of post-turnover input, oversight, and control over areas that originally were, and are contemplated under Chapter 720 of the Florida Statutes to be "common areas". Z Capital is arbitrarily and capriciously, and unfairly and unreasonably, running the facilities at the Property in a manner calculated to be most profitable for itself, regardless of the interests of Plaintiff and the Unit Owners; purports to exercise unrestricted authority to renovate some aspects of the Property while neglecting others; and charges unfair, unreasonable and otherwise improper assessments while denying and preventing Plaintiff and the Unit Owners from performing any review, inspection, or audit of the books and records underlying these assessments.

176.    As a direct and proximate result of the above-described arrangement, there is a bona fide, actual, present dispute and thus a practical need for a declaration of the parties' respective rights, status and other equitable or legal relations relative to Plaintiff's rights under Chapter 720 of the Florida Statutes regarding the Master Declaration.

177.    Additionally, Plaintiff seeks incidental or supplemental relief. Plaintiff seeks the return of those assessments, fees, and other charges that Z Capital has imposed since acquiring the Hotel Lot that violate Section 720.309(1), Fla. Stat.

**(DECLARATORY JUDGMENT AS TO MAJORITY MEMBERS OF THE BOARD OF DIRECTORS AND MEMBER VOTING RIGHTS ON THE MASTER ASSOCIATION) (AGAINST Z CAPITAL AND MASTER ASSOCIATION)**

178.     Plaintiff incorporates and adopts paragraphs 1 through 177 above as if fully set forth herein.

179.     Although the turnover conditions in the Florida Homeowners' Association Act and the Master Declaration have occurred and although it has become the successor to the developer under the Master Declaration, and although it has acknowledged that the turnover of control has or should have occurred under the Master Declaration, Z Florida has not turned control of the board of directors over to the non-developer members of the Master Association, and/or is exercising post-turnover super-majority voting rights in violation of Florida law.  The relevant provision of the Articles of Incorporation of the Master Association, attached as an exhibit to the Master Declaration, which purports to allow the declarant to continue to elect a majority of its board of directors, post-turnover, should be invalidated and stricken as in violation of Fla. Stat. 720.307(1), Fla. Stat. 720.307(3), and Fla. Stat. 720.3075.

180.     Z Capital has also failed to comply with the requirements of Section 720.307(4), Fla. Stat., by failing to deliver to the board of directors of the Master Association control over common areas required to be controlled by the association, the books and records of the association, and all contracts in effect to which the association is a party, among other documents.

181.     Moreover, the March 2016 Amendment violates Section 720.3075(1)(a), Fla. Stat. as it re-designates and shifts control over some of the property from common areas to Shared Facilities, as well as between the existing "Shared Facility" categories.

182. As a direct and proximate result of Z Capital's conduct, including its failure to constitute the Master Association, its implicit exercise of control over the Master Association, and its unilateral amending of the Master Declaration after the time when control of the board of directors of the Master Association should have been turned over to the non-developer members, there is a bona fide, actual, present dispute and thus a practical need for a declaration of the parties' respective rights, status and other equitable or legal relations regarding the North Tower Condominium Declaration and the Master Declaration.

### COUNT XVI
### (INJUNCTIVE RELIEF AND DECLARATORY JUDGMENT AS TO PLANNED RENOVATIONS AND IMPROVEMENTS) (AGAINST Z CAPITAL AND MASTER ASSOCIATION)

183. Plaintiff incorporates and adopts paragraphs 1 through 182 above as if fully set forth herein.

184. Z Capital has announced its plans to make material and unilateral alterations to the nature of the Property. For instance, in September 2016, Z Capital filed a zoning appeal with the Board of Adjustment of the City of Miami Beach to keep the outdoor hotel bar operational past 8:00 p.m. and to convert certain commonly-used areas (*e.g.*, shared facilities) into exclusive portions of the Hotel Lot so as to facilitate a huge expansion of the bar and other private facilities. These modifications were announced in complete disregard of the sentiment of the Unit Owners. These planned renovations will expand Z Capital's property, especially the bar, restaurant, and other spaces used to host indoor and outdoor parties, primarily for the benefit of Z Capital in renting its facilities for weddings or other parties.

185. These planned, unilateral alterations to the nature of the Property are contrary to the representations and promises made by Z Capital in its e-mails to the Unit Owners prior to consummation of the Bankruptcy Sale.

186.     These planned, unilateral alterations of the Property are also unreasonable, arbitrary and capricious, are in bad faith and destroy the general plan of development in violation of Section 720.3075, Fla. Stat.

187.     These planned, unilateral alterations of the Property violate the contractually binding commitment set forth in Section 10 of the North Tower Term Sheet.

188.     Z Capital has already improperly assessed the Unit Owners for a significant portion of the cost of these renovations. These assessments will improperly, unfairly and unconscionably apportion all or a large portion of the costs of improvements to the hotel lobby and reception and certain other areas to Plaintiff with the primary or exclusive benefits accruing to Z Capital's exclusive property. Moreover, because Plaintiff is being denied access to the financial books and records (and supporting documents), Plaintiff has no reliable way to determine whether all or some of these assessments are being properly allocated and assessed to the Unit Owners.

189.     The planned renovations will result in irreparable harm to Plaintiff, in part because Plaintiff will face unlawful, unfair, unreasonable, unverifiable, and unconscionable assessments in violation of (a) Z Capital's promises and representations to NCBCA and the Unit Owners it represents, (b) Section 720.3075 of the Homeowners' Association Act, (c) section 10 of the North Tower Term Sheet, and (d) the Master Declaration.

190.     There is no adequate remedy at law for the planned interference with Plaintiff's property rights.  If a preliminary injunction is not issued to prevent the planned renovations and assessments, the Property will likely be altered and assessments levied before a final judgment in this case can issue.

191.    There is a substantial likelihood that Plaintiff will succeed on each and every one of its claims in this action, and that the planned renovations and assessments are unlawful.

192.    Entering a preliminary injunction will serve the public interest, not only because it will preserve the *status quo* during the pendency of litigation, but also because Z Capital's planned renovations and assessments are contrary to Florida public policy as expressed in the Homeowners' Association Act.

193.    Z Capital will suffer only negligible financial harm as a result of preserving the status quo.  Z Capital faces no imminent need to renovate the property, nor a risk of immediate financial harm from failing to renovate the property before a final judgment in this case.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

(i)    On the First Count, Plaintiff seeks to recover all appropriate damages and retain all of its other rights and remedies, and the rights and remedies of the Unit Owners, arising from Z Capital's fraudulent inducement of NCBCA to enter into the North Tower Term Sheet.

(ii)    On the Second Count, Plaintiff seeks to recover all appropriate damages and retain all of its other rights and remedies, and the rights and remedies of the Unit Owners, arising from Z Capital's negligent misrepresentations relating to its entry into the North Tower Term Sheet.

(iii)    On the Third Count, Plaintiffs seek a judgment awarding monetary damages to compensate for Z Capital's unconscionable, deceptive and unfair practices in violation of the Florida Deceptive and Unfair Trade Practices Act, including Z Capital's pre-Sale misrepresentations in its email campaign directed at the Unit Owners, and awarding attorneys' fees and costs and such other relief available at law or in equity.

(iv)     On the Fourth Count, Plaintiff seeks a judgment awarding monetary damages to compensate for Z Capital's unconscionable, deceptive and unfair practices in violation of the Florida Deceptive and Unfair Trade Practices Act, including losses, overcharges, and other improper charges described above as a result of Z Capital's post-Sale conduct, and awarding attorneys' fees and costs and such other relief available at law or in equity.

(v)     On the Fifth Count, Plaintiff seeks all appropriate damages and remedies, resulting from Z Capital's breaches of the North Tower Term Sheet.

(vi)     On the Sixth Count, Plaintiff seeks a Court order requiring specific performance of the North Tower Contract and/or all appropriate damages and remedies, related to Z Capital's breach of the implied covenant of good faith and fair dealing.

(vii)     On the Seventh Count, Plaintiff seeks an accounting, disgorgement and restitution of all profits and benefits received by Z Capital as a result of its unjust enrichment at the expense of Plaintiff and the Unit Owners.

(viii)     On the Eighth Count, Plaintiff seeks all appropriate damages and remedies resulting from Z Capital's negligence for failure to make timely and prompt stucco and water-proofing repairs to the North Tower.

(ix)     On the Ninth Count, Plaintiff seeks compensatory and expectation damages resulting from Z Capital's breaches of the covenants of the Master Declaration, and an order directing specific performance of Z Capital's obligations under the Master Declaration.

(x)     On the Tenth Count, Plaintiff seeks a Court order requiring specific performance of the Master Declaration and/or all appropriate damages and remedies related to Z Capital's breach of the implied covenant of good faith and fair dealing.

(xi)     On the Eleventh Count, Plaintiff seeks monetary damages in the amount of the assessments wrongfully imposed by Z Capital in violation of the Florida Homeowners' Association Act and a declaration that Z Capital's operation of the Property violates Chapter 720 of the Florida Statutes.

(xii)     On the Twelfth Count, Plaintiff seeks a declaratory judgment that the Master Declaration includes an embedded recreational lease subject to the provisions of Fla. Stat. 718.401(f)(1).

(xiii)     On the Thirteenth Count, Plaintiff seeks monetary damages and a declaration that Z Capital's imposition of unconscionable, unfair and unreasonable obligations on the Plaintiff and its Unit Owners violates Chapter 718 of the Florida Statutes.

(xiv)     On the Fourteenth Count, Plaintiff seeks monetary damages in the amount of the assessments wrongfully imposed by Z Capital in violation of the Florida Homeowners' Association Act and a declaration that Z Capital is operating the Property in an unfair and unreasonable manner, in violation of Section 720.309(1), Fla. Stat.

(xv)     On the Fifteenth Count, Plaintiff seeks a declaration under Sections 720.307(1)(a), 720.307(3), and 720.3075, Fla. Stat., that (a) the members of the Master Association other than Z Capital are entitled to elect at least a majority of the members of the board of directors of the association; (b) the Articles of Incorporation of the Master Association violate Section 720.307(1)(a), Fla. Stat., in that Z Capital controls a majority of the votes, and therefore those provisions granting Z Capital a post-turnover majority of votes should be stricken; and (c) the March 2016 Amendment is null and void.

(xvi)     On the Sixteenth Count, Plaintiff seeks a declaration that the planned renovations and assessments are unlawful under Florida law and a preliminary injunction prohibiting Z

Capital from altering the commonly-used facilities until and unless there is a final determination on the merits of the claims in this case.

(xvii)     On all Counts, Plaintiff also seeks any additional relief in law or equity as the Court may deem necessary, just and equitable under the circumstances.

(xviii)    On all Counts, Plaintiff also seeks costs and legal fees insofar as it is entitled to costs and fees under applicable law.

Dated: June 28, 2017
    New York, New York

Brown Rudnick LLP
By: /s/ Edward S. Weisfelner
Edward S. Weisfelner
Bennett S. Silverberg
BROWN RUDNICK LLP
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801

- and -

Sigrid McCawley
Carl Goldfarb
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Boulevard, #1200
Fort Lauderdale, Florida 33301
Telephone: (954) 356-0011
Facsimile:  (954) 356-0022

*Counsel for the North Carillon Beach Condominium Association*

62689101 v15